

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

THE AMERICAN MEDICAL ASSOCIATION,   :
et al.,
                                    :
                Plaintiffs,         :    00 Civ. 2800 (LMM)
                                    :
        - against -                      MEMORANDUM AND ORDER
                                    :
UNITED HEALTHCARE CORPORATION,
et al.,                             :

                Defendants.         :

------------------------------------x

McKENNA, D.J.,

1.

In this putative class action commenced in the New York County Supreme Court and removed to this Court, plaintiffs assert claims against United Healthcare Corporation and affiliates (collectively "UHC") and others under the Employment Retirement Income Security Act ("ERISA"), for breach of contract and the covenant of good faith, under New York General Business Law § 349, under Section 1 of the Sherman Act, under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and Florida Statutes § 895.01 et seq. (the Florida RICO statute), seeking declaratory and injunctive relief and damages.[1]

---

[1] The Court's Memorandum and Order of August 22, 2008 dismissed several RICO claims, some with leave to replead after the completion of substantive discovery.

In a consent order of July 31, 2001, co-lead counsel were appointed: Pomerantz Haudek Block Grossman & Gross LLP ("Pomerantz"); and Sills Cummis Radin Tischman Epstein & Gross P.A. ("Sills"), subsequently replaced by Wilentz, Goldman & Spitzer P.A. ("Wilentz") when some lawyers from Sills moved to Wilentz.[2]

The heart of this case, it is fair to say, is the use by defendants of databases (collectively "Ingenix") belonging to an affiliate of UHC to determine the amounts payable to subscribers to healthcare insurance when they are entitled to some or all of the "usual, customary and reasonable" ("UCR") (or some similar formulation) fee for a given medical procedure by an out-of-network provider in a given geographical area. Ingenix, it is alleged, is seriously flawed, and determines amounts payable that underreimburse subscribers.

2.

On or about January 15, 2009, the Court received a letter from Weil Gotshal & Manges ("Weil"), counsel for defendants, enclosing a Settlement Agreement dated January 14, 2009 ("SA") between defendants, and Oxford Health Plans, Inc. and affiliates ("Oxford") (not defendants in this action), on the one hand, and a defined putative class, on the other. The settlement would settle not only this action and the related Oborski action, but also

---

[2] The consent order also consolidated Oborski v. United Healthcare (00 Civ. 7246) with the present case.

2

<u>Malchow v. Oxford Health Plans, Inc.</u>, No. 08-935, pending in the United States District Court for the District of New Jersey (Hochberg, J.). The SA is signed by a representative of Pomerantz, but not by a representative of Wilentz. In the ensuing weeks, the Court received a mass of correspondence and motion filings from both Wilentz and Pomerantz, as well as Weil, which made it clear that Wilentz opposed the settlement embodied in the SA, and had done so for some time. No explanation was given (or has yet been given) why neither Wilentz nor Pomerantz approached the Court when they become involved in this disagreement which, of course, affects the potential class both represent.

The Court determined that fairness to the putative class defined in the SA or any other class that might be defined required an evidentiary hearing as to whether preliminary approval should be given to the SA and notice given to the putative class defined in the SA. The hearing was held on March 30 and 31, and April 1, 2, 3, 6 and 16, 2009.

3.

There are two components to the SA, relating, respectively, to injunctive relief and to damages.

In an Assurance of Discontinuance entered into by UHC with the Attorney General of the State of New York, dated January 13, 2009, UHC agreed with the Attorney General that (in brief summary) a university-level school of public health or other

appropriate school will establish and operate an independent database for academic research and as a tool for determining reimbursement rates including UCR rates, doing so through a New York not-for-profit corporation; UHC will contribute $50 million to the not-for-profit corporation to effectuate the purposes of the Assurance of Discontinuance; within 60 days of notification that the new independent database is available for use, UHC will cease to use, or make available to other insurers, the Ingenix databases and will (unless excused by the Attorney General) use the new database to determine reimbursement rates for 5 years; the not-for-profit corporation will also create a website accessible to the public which will enable users identifying specific medical services and zip codes to determine prevailing charges or ranges of charges.

The relief embodied in the Assurance of Discontinuance is described in the SA (Section 4); all counsel have assured the Court, however, that, although that relief will be included in the notice to be given to the class if preliminary approval of the SA is given, the injunctive relief will become operative pursuant to the Assurance of Discontinuance with or without approval of the SA.[3]

---

[3] There appears to be an advantage to the class in including the relief obtained by the Attorney General in the settlement, as a settlement, if approved and reduced to a judgment, may facilitate enforcement of such relief outside of New York.

As to damages (again in brief summary), the SA requires UHC to establish a $350 million, non-reversionary, settlement fund for distribution to the plaintiff class (less costs of administration and attorneys' fees and expenses), distribution to be made according to a Plan of Allocation (Exhibit 5 to the SA), which allocates payments to two categories of class members, subscribers and out-of-network providers, both of whom must submit proofs of claim.

Subscribers may elect to claim as Group A claimants who will receive a payment of $50 for each year the subscriber was a member of a relevant health plan. (A person who proceeds with a Group A claim may not also file a Group B or Group C claim.)

Group B claimants must have paid providers some portion above the Allowed Amount (what a defendant reimbursed the subscriber for covered out-of-network services or supplies), which will be paid 100%, less 20% per claim (up to a total of $2,000 over all claims).

Group C claimants may submit claims for unpaid portions of Adjusted Bills (bills by out-of-network providers reflecting an unpaid amount initially billed) in varying percentages depending on circumstances.

Subscribers may submit both Group B and Group C claims, but not a Group A claim if they submit either a Group B or Group C claim.

5

There are Group D claims for providers.

The costs of notice to the class and administration of the settlement are to come out of the $350 million settlement fund, but UHC assumes the responsibility for the costs of collecting and providing to the claims administrator health care claims data in connection with administration (including, from January 1, 2002, dates that covered out-of-network services or supplies were provided and the allowed amount), and the cost of identifying class members from its own records, for mailing of notice. UHC may advance reasonable costs to the claims administrator, but such costs will reduce the $350 million settlement fund.

A website is to be set up from which class members can obtain information about this case and the settlement (see Notice of Proposed Settlement of Class Action, SA Exhibit 3, at 4), and class members may also obtain claims information, including the dates on which subscribers were provided covered out-of-network services and supplies, and the allowed amounts therefore. (Plan of Allocation, at 2.) It is not clear whether such claims information is to be obtained from the website mentioned above.

Pomerantz proposes a class, for purposes of settlement only, described as follows:

> (i) all Persons whose health care benefits were insured or administered by any Defendant who, at any time from March 15, 1994 through the Preliminary Approval Date, received out-of-network health care benefits that were processed or reimbursed by such Defendant using the Ingenix

6

> Databases or any of Defendants' Out-Of-Network Reimbursement Policies, and (ii) all Out-Of-Network Health Care Providers and Out-Of-Network Health Care Provider Groups who provided Covered Out-Of-Network Services or Supplies to Persons whose health care benefits were insured or administered by any Defendant at any time from March 15, 1994 through the Preliminary Approval Date, and whose resulting claims were processed or reimbursed by such Defendant using the Ingenix Databases or any of Defendants' Out-Of-Network Reimbursement Policies.

([Proposed] Order Preliminarily Approving Proposed Settlement [Axelrod Aff., Jan. 16, 2009, Ex. 1 to Ex. A], ¶ 2.)

**4.**

> Preliminary approval of a proposed settlement is the first in a two-step process required before a class action may be settled. In considering preliminary approval, courts make a preliminary evaluation of the fairness of the settlement, prior to notice. Where the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval, preliminary approval is granted. Once preliminary approval is bestowed, the second step of the process ensues; notices is given to the class members of a hearing, at which time class members and the settling parties may be heard with respect to final court approval.

Nasdaq Market-Makers Antitrust Litig., 176 F.R.D. 99, 102 (S.D.N.Y. 1997) (citations omitted). See also, Initial Public Offering Sec. Litig., 243 F.R.D. 79, 87 (S.D.N.Y. 2007). "In the context of a motion for preliminary approval of a class action settlement, the standards are not so stringent as those applied when the parties

7

seek final approval." Karvaly v. eBay, Inc., 245 F.R.D. 71, 86 (E.D.N.Y. 2007). On the other hand, "[w]hen a settlement is negotiated prior to class certification, as is the case here, it is subject to a higher degree of scrutiny in assessing its fairness." D'Amato v. Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001). While the Grinnell factors --

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation[.]

Robertson v. National Basketball Ass'n, 556 F.2d 682, 684 n.1 (2d Cir. 1977) (quoting City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974)) -- are routinely considered in connection with the final approval of class action settlements, they are a useful guide to inquiry here, as well.

5.

Settlement discussions began, at the instance of UHC's counsel, in March of 2008. (Tr. 11.) UHC was, at the time, engaged in negotiations with the Attorney General. (Tr. 12.) Initially, Pomerantz and the Attorney General negotiated side-by-side with UHC. UHC had proposed a "claims made" settlement, i.e.,

any money not consumed by the payment of claims, expenses and counsel fees would be returned to UHC; but around June 13, 2008, UHC agreed to a $350 million non-reversionary settlement fund. (Tr. 19.)[4] Negotiations continued between UHC and Pomerantz as to details and between UHC and the Attorney General as to reformation of the Ingenix databases. (Tr. 23.) In November of 2008, the Attorney General dropped out of discussions regarding class relief, leaving that to Pomerantz, and focused on the Ingenix databases. (Tr. 26.) The provisions of the SA requiring UHC to supply information from its databases was agreed on only by January of 2009. (Tr. 25.)

Wilentz did not participate substantively in the negotiations that resulted in the signing of the SA, because of their objections, but there is no evidence that they could not have been present at all discussions.

It may be inferred from the record that (unsurprisingly) UHC, faced with the possibility of a formal investigation of the Ingenix databases by the Attorney General, decided that it would settle with him, and that, concomitantly, as is often the case with businesses engaged in litigation, it saw the attractiveness of a global settlement. From a plaintiff's perspective, the time was ripe.

---

[4] The Attorney General may have assisted in getting the $350 million non-reversionary fund. (Tr. 21.)

Much of Wilentz' effort was directed to the argument that the negotiations, on the Pomerantz side, were not "informed." Nasdaq, 176 F.R.D. at 102.

In attempting to estimate potential damages, Pomerantz attempted to consider the difference between all of the bills for out-of-network services or supplies submitted to defendants, and then all of the amounts allowed "and the difference between those two things would be obviously the maximum potential recovery anybody could get in the case." (Tr. 45.) (The difference described is referred to by at least some counsel familiar with claims against healthcare insurers as "the Delta.") Pomerantz then deducts, from a Delta estimated at $4.14 billion, 20% for co-insurance and deductibles, 60% against the event that money damages would be limited to fully insured plans for which UHC was the designated plan administrator, and 50% if money damages were limited to subscribers with out-of-pocket claims. (The percentages are applied consecutively.) The 60% deduction relates to this Court's determinations in its June 15, 2007 Memorandum and Order (at 68-74) based upon Second Circuit law to the effect that an ERISA claim for benefits is to be brought against the plan or the administrators and trustees of the plan. (Id. at 68-69.) The 50% deduction relates to counsel's experience in another class action

against a different insurer. (Tr. 51-53.) After the deductions, the Delta amount is reduced to $670 million. (Pomerantz Ex. 31.)[5]

Wilentz argues, in substance, that Pomerantz' efforts to assess potential damages were insufficient.

Pomerantz first heard of a $4 billion Delta number at a meeting with Attorney General Cuomo in April, 2008. (Tr. 190-191.) In December of 2008, Pomerantz wanted information regarding potential damages for use by an expert, Dr. Siskin, but UHC advised that there was insufficient time. (Tr. 203.) On January 14, 2009, there was a meeting at Weil's office at which Pomerantz, with a different expert, Dr. Goldstein, met with Weil and representatives of UHC.  The SA was signed on January 14, 2009.

Both sides introduced post-settlement calculations, based on UHC information and making use of extrapolations, of the Delta. Dr. Slottje, for Pomerantz, arrived at a Delta, through the end of 2008, of $4.14 billion. (Pomerantz Ex. 42.) He testified that approximately $40 million had to be added to the $4.14 billion

---

[5] Pomerantz Ex. 31 is an after-settlement representation of Pomerantz' thinking at the time of settlement, admitted as a demonstrative exhibit.

11

reflected on the exhibit summarizing his testimony (Tr. 252-253), so that his Delta would become about $4.18 billion.



The Court has little to rely on in the record to determine the size of the class. (See, e.g., Tr. 120, 987-990, 1042.)

6.

The Grinnell factors (see supra at 7-8) offer some help.

It is evident that this case is complex and will be expensive; it will take at least another two years to reach trial given the amount of merits discovery that must remain (the plaintiffs' counterclaims under the Sherman Act will add substantially to the burden); and it is evident that the more work that needs to be done the larger a settlement or judgment afer trial must be to accommodate fees and expenses. The Court notes that in McCoy v. Health Net, Inc., 569 F. Supp.2d 448 (D.N.J. 2008) (decision approving settlement of health care insurance class action) -- to which this Court has been invited to compare the

---

6



present case -- where the parties are said to have been ready for trial, plaintiffs' counsel had accumulated a lodestar of more than $30 million, and costs and expenses of $1.725 million. 569 F. Supp.2d at 479.

The second <u>Grinnell</u> factor has to do with the reaction of the class, and is not pertinent at this time.

As to the third factor, "Stage One discovery" -- "limited to determining the proper parties in this action as opposed to the merits of the case," including issues of standing and exhaustion of remedies (<u>see</u> Memorandum and Order, Oct. 22, 2002, at 6) -- was completed by June 15, 2007. (<u>See</u> Memorandum and Order, June 15, 2007, at 5.) The Court has not been made aware of such merits discovery, if any, as has since been undertaken. It is fair to say that the present case is not yet in a posture similar to that in the Health Net case when it was settled. <u>See</u> 569 F. Supp.2d at 469 ("discovery has provided both sides with sufficient information to assess the probable outcome of a trial").

The fourth and fifth <u>Grinnell</u> factors -- the risks of establishing liability and damages -- are matters for careful evaluation by experienced counsel. The case does present difficulties for plaintiffs. In the first place, it is not at all clear that the <u>McCoy</u> opinion has conclusively established that the Ingenix databases are, in fact, flawed, as Wilentz suggests. (Tr. 1029.) There was no adversary trial of the issue, and the court's

conclusion (which is not a binding finding) was simply that there were "serious problems with the Ingenix database." 569 F. Supp.2d at 468. Thus, the invalidity of Ingenix must still be proved. There are the difficulties reflected in Pomerantz Exhibit 31, discussed <u>supra</u>. And Pomerantz is certainly not being frivolous in its concerns about this Court's rulings on exhaustion. (Tr. 36-38.)

The risk of maintaining a class through trial, the sixth <u>Grinnell</u> factor, is not pertinent here.

The seventh factor -- the ability of defendants to withstand a judgment greater than the settlement -- is probably not pertinent.

The eight and ninth factors, finally -- the reasonableness of the settlement in light of the best possible recovery and of the settlement fund to a possible recovery in light of the risks of litigation -- are, in a sense, the ultimate questions, and the Court has not been given adequate information to reach a conclusion.

7.

$350 million is, obviously, a large amount of money (and is said by counsel to be larger than in any previous class settlement by a class and a healthcare insurer), but, in addition to counsel fees, it must accommodate here the lion's share of the

cost of notice to the class and of administration of the settlement.[7]

Against this background, an accurate Delta and an accurate number of class members become even more significant. ███████████████████████████████████████████████ ███████████████████████████████████ And the difference in estimates of the size of the class -- from 1.6 million (Tr. 1042) to 20 million (Tr. 120) -- is at least equally significant.

The information -- the Delta and the size of the class -- is objective information in the possession of UHC. There is no reason why, under an appropriate confidentiality order if necessary, the sophisticated and experienced counsel from Pomerantz and Wilentz and Weil cannot, together, supply the Court with accurate figures, if they choose to do so.

8.

The Court reserves judgment on the issue of preliminary approval of the SA. There will be a conference on May 28, 2009 at 2:30 p.m., to determine whether the record can be appropriately supplemented.

This Memorandum and Order will be filed under seal. The parties are to advise the Court in writing within one week of the date hereof of those sentences that must be redacted. A redacted

---

[7] In the Health Net case, most of the cost of notice and administration was, it appears, borne by the defendants. (See Wilentz Ex. 33 [Health Net Settlement Agreement], ¶¶ 11.1 & 15.)

version of the Memorandum and Order will be filed after the appropriate redactions are made.

Dated: May 7, 2009

SO ORDERED.

_____
Lawrence M. McKenna
U.S.D.J.