1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE WELLPOINT, INC. OUT-OF-NETWORK "UCR" RATES LITIGATION | )<br>)<br>)<br>)   Master File No. MDL 09-2074<br>)<br>)   The Hon. Philip S. Gutierrez<br>) |

**CORRECTED THIRD CONSOLIDATED AMENDED COMPLAINT**

# TABLE OF CONTENTS

JURISDICTION AND VENUE ...................................................................1

INTRODUCTION .....................................................................................2

PARTIES ...................................................................................................7

    *Subscriber Plaintiffs* ..........................................................................7

    *Provider Plaintiffs* ..........................................................................10

    *Association Plaintiffs* ......................................................................12

    *Defendants* ......................................................................................16

    *Conspirators* ...................................................................................21

OVERVIEW OF THE CONSPIRACY TO DEPRESS REIMBURSEMENT FOR ONS ..............................................................23

ANTITRUST ALLEGATIONS ...............................................................29

    *Interstate Trade and Commerce* ......................................................29

    *Relevant Market* .............................................................................31

    *Communication Opportunities* ........................................................35

    *Collective Interests* .........................................................................36

    *The Ingenix Database:  Mechanism of the Conspiracy* ...................38

    *Ingenix Acquires Existing Databases to Dominate the Data Market* ........40

    *Defendants Effectuate Their Conspiracy and Anticompetitive Agreement By and Through the Ingenix Database* ..........................41

    *Agreements to Provide and Utilize False Data* ...............................42

    *The Data Is Received and Distributed Without Verifying Its Accuracy* ......49

    *The Truth of the Ingenix Database Is Concealed* ............................51

INVESTIGATIONS INTO THE INGENIX DATABASES ..........................54

    *The New York Attorney General's Investigation and Action* ....................54

    *Congress' Investigation* ..................................................................57

HARM TO SUBSCRIBERS ....................................................................59

HARM TO PROVIDERS.........................................................................61

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HARM TO THE ASSOCIATIONS ....................................................................63

ERISA ALLEGATIONS .................................................................................64

    *Plaintiff* Roberts ....................................................................................70

    *Plaintiff Cooper* ....................................................................................72

    *Plaintiff Rivera-Giusti* ..........................................................................72

    *Plaintiff Dr. Henry* ...............................................................................76

    *Plaintiff Dr. Schwendig* .........................................................................79

    *Plaintiff Dr. Peck* .................................................................................82

    *Plaintiff Dr. Pariser* .............................................................................84

    *Plaintiff Dr. Kavali* ..............................................................................88

    *Plaintiff NPSC* .....................................................................................91

    *An Administrative Appeal to WellPoint of Its UCR Determinations Is Futile, Such that Exhaustion Under ERISA Is Excused* ....................93

RICO ALLEGATIONS ..................................................................................99

BREACH OF CONTRACT ALLEGATIONS ...................................................113

    *Plaintiff Dr. Higashi* ...........................................................................122

FALSE ADVERTISING AND DECEPTIVE CONDUCT ALLEGATIONS ....124

CLASS ALLEGATIONS ..............................................................................125

    The Subscriber Class .............................................................................125

    The Provider Class ................................................................................125

    The Antitrust Injunctive Relief Class ......................................................126

    The ERISA Subscriber Subclass .............................................................126

    The ERISA Provider Subclass ................................................................126

    The Non-ERISA Subscriber Subclass ......................................................127

    The Non-ERISA Provider Subclass .........................................................127

FRAUDULENT CONCEALMENT ................................................................133

TOLLING OF APPLICABLE STATUTES OF LIMITATION .........................134

FIRST CLAIM FOR RELIEF ................................................................134

    VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST
    ACT 15 U.S.C. §1 (Against All Defendants on Behalf of All
    Plaintiffs, Including the Association Plaintiffs with the
    limitation for the AMA as well as the Subscriber and Provider
    Classes and the Antitrust Injunctive Relief Class) ........................134

SECOND CLAIM FOR RELIEF ..........................................................136

    CLAIM FOR UNPAID BENEFITS UNDER GROUP PLANS
    GOVERNED BY ERISA 29 U.S.C. §1132(a)(1)(B) (Against
    WellPoint on Behalf of the ERISA Plaintiffs, and the ERISA
    Subclasses and by the Association Plaintiffs on Behalf of
    Their Members)...............................................................................136

THIRD CLAIM FOR RELIEF ..............................................................137

    CLAIM FOR BREACH OF FIDUCIARY DUTY UNDER ERISA
    29 U.S.C. §1132(a)(2) (Against WellPoint on Behalf of the
    ERISA Plaintiffs' and their Plans, and the ERISA Subclasses
    and by the Association Plaintiffs on Behalf of Their Members) ....137

FOURTH CLAIM FOR RELIEF ...........................................................139

    FAILURE TO PROVIDE FULL AND FAIR REVIEW REQUIRED
    BY ERISA 29 U.S.C. §1132(a)(3) (Against WellPoint on
    Behalf of the ERISA Plaintiffs, and the ERISA Subclasses and
    by the Association Plaintiffs on Behalf of Their Members)...........139

FIFTH CLAIM FOR RELIEF................................................................141

    FAILURE TO PROVIDE AN ACCURATE EOC AND SPD 29
    U.S.C. §1132(c) (Against WellPoint on Behalf of the ERISA
    Plaintiffs, and the ERISA Subscriber and Provider Subclasses
    and by the Association Plaintiffs on Behalf of Their Members) ....141

SIXTH CLAIM FOR RELIEF ...............................................................142

    FOR VIOLATIONS OF RICO, BASED ON PREDICATE ACTS
    OF MAIL AND WIRE FRAUD 18 U.S.C. §1962(c) (Against
    All Defendants on Behalf of All Plaintiffs, the Association
    Plaintiffs with the Limitation for the AMA and the Subscriber
    and Provider Classes) ....................................................................142

SEVENTH CLAIM FOR RELIEF ........................................................145

    FOR VIOLATIONS OF RICO 18 U.S.C. §1962(c) FOR
    PREDICATE ACTS 18 U.S.C. §664 (Against Defendants on
    Behalf of All ERISA Plaintiffs and the ERISA Subscriber and
    Provider Subclasses and by the Association Plaintiffs with the
    Limitation for the AMA on Behalf of Themselves and Their
    Members) ........................................................................................145

EIGHTH CLAIM FOR RELIEF ........................................................................149

    FOR VIOLATIONS OF RICO 18 U.S.C. §1962(d) (Against All Defendants on Behalf of All Plaintiffs and the Subscriber and Provider Classes and the Association Plaintiffs with the Limitation for the AMA) ...................................................................149

NINTH CLAIM FOR RELIEF..........................................................................150

    BREACH OF CONTRACT (Against WellPoint on Behalf of the Non-ERISA Plaintiffs and the Non-ERISA Subscriber and Provider Subclasses) .................................................................150

TENTH CLAIM FOR RELIEF .........................................................................151

    BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (Against WellPoint on Behalf of the Non-ERISA Plaintiffs and the Non-ERISA Subscriber and Provider Subclasses) ...................................................................151

ELEVENTH CLAIM FOR RELIEF ..................................................................154

    FOR VIOLATIONS OF CALIFORNIA'S UNFAIR AND DECEPTIVE TRADE PRACTICES STATUTES  (Against WellPoint Defendants on Behalf of Plaintiffs J.B.W., Henry, Higashi, Schwendig, Peck, Pariser, the NPSC, the Non-ERISA Subscriber and Provider Subclasses and AMA, CMA, APMA, CCA and CPA ...................................................................154

TWELTH CLAIM FOR RELIEF.......................................................................159

    FOR VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW AND CALIFORNIA HEALTH AND SAFETY CODE § 1371.4 (Against WellPoint Defendants on Behalf of Plaintiffs Schwendig, the California ER Provider Subclass, CMA, and AMA) ...................................................................159

THIRTEENTH CLAIM FOR RELIEF .............................................................162

    FOR VIOLATION OF THE CARTWRIGHT ACT (Against All Defendants on Behalf of Plaintiffs Roberts, J.B.W., Henry, Higashi, Schwendig, Peck, Pariser, Kavali and the NSPC, the AMA (with the Limitation Below, CMA, APMA, CCA and CPA and the Provider and Subscriber Classes)...........................162

PRAYER FOR RELIEF ....................................................................................164

DEMAND FOR JURY TRIAL ........................................................................166

**JURISDICTION AND VENUE**

1.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that most of the claims asserted herein are brought under federal statutes and necessarily involve adjudication of one or more federal questions.  For Plaintiffs' Sherman Act and the Racketeer Influenced and Corrupt Organizations Act ("RICO") claims, jurisdiction arises under 28 U.S.C. § 1331 and 28 U.S.C. § 1337. For Plaintiffs' Employee Retirement Income Security Act ("ERISA") claims, jurisdiction arises under 28 U.S.C. § 1331 and ERISA § 502(e), 29 U.S.C. § 1132(e). This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. §1367.  In addition, for all of Plaintiffs' claims, including breach of contract, breach of the covenant of good faith and fair dealing and unfair competition claims, jurisdiction arises under 28 U.S.C. § 1332(d)(2) as Plaintiffs seek certification of nationwide classes as set forth herein.   Plaintiffs are located in California, Connecticut, Illinois, Georgia, Maryland, New Jersey, North Carolina, and Oregon, and Defendants are located in California, Indiana and Minnesota.  The amount in controversy exclusive of interest and costs exceeds $5 million.

2.     This Court has personal jurisdiction over the parties because Plaintiffs submit to the jurisdiction of this Court, and each Defendant systematically and continuously conducts business in this State, and otherwise has minimum contacts with this State sufficient to establish personal jurisdiction over each of them.

3.     Venue is appropriately established in this Court under 28 U.S.C. § 1391, 18 U.S.C. § 1965, and 29 U.S.C. § 1132(e)(2) because Defendants conduct a substantial amount of business in this District, including marketing, advertising and selling insurance products, and administering health plans to residents inside this District; because, for ERISA § 502(e) purposes, WellPoint may be found in this District; or because  Defendants otherwise have sufficient contacts with this District to justify them being fairly brought into court in this District.  As to those actions

1   transferred to this District by the Judicial Panel on Multidistrict Litigation, venue
2   properly lies in this District pursuant to 28 U.S.C. §§ 1391 and 1407.

4                              **INTRODUCTION**

5         4.      Plaintiffs Michael Roberts (individually and guardian for D. Roberts),
6   J.B.W. (a minor, by and through Julz W., his parent and guardian *ad litem*); Darryl
7   and Valerie Samsell (the "Samsells"); Mary Cooper, individually and on behalf of the
8   estate of Robert Cooper; Ivette Rivera-Giusti; and (the "Subscriber Plaintiffs"), and
9   Plaintiffs Stephen D. Henry, M.D.; James G. Schwendig, M.D.; James A. Peck,
10  Psy.D.; Michael Pariser, Psy.D., M.D.; Carmen Kavali, M.D.; Stephanie Higashi,
11  D.C., d/b/a Mar Vista Institute of Health; and North Peninsula Surgical Center, L.P.
12  (the "Provider Plaintiffs") respectfully bring this action on behalf of classes of
13  themselves and all others similarly situated (described and defined below as the
14  "Subscriber Class" and the "Provider Class," respectively).  Plaintiffs American
15  Medical Association ("AMA"), California Medical Association ("CMA"), Medical
16  Association of Georgia ("MAG"), Connecticut State Medical Society ("CSMS"),
17  American Podiatric Medical Association ("APMA"), California Chiropractic
18  Association ("CCA"), and California Psychological Association ("CPA")
19  (collectively, the "Association Plaintiffs") bring this action on behalf of themselves
20  and/or on behalf of their membership.

21        5.      Plaintiffs bring this class action alleging violations of the Sherman
22  Antitrust Act, ERISA, and RICO; common law breach of contract; common law
23  breach of the implied covenant of good faith and fair dealing; and violations of state
24  antitrust and unfair competition laws, including California's Cartwright Act and
25  Sections 17200 and 17500 of the California Business and Professions Code.

26        6.      Plaintiffs bring their claims against Defendants WellPoint, Inc. and its
27  insurer subsidiaries and divisions, as listed below in paragraph 58 (collectively,
28  "WellPoint"); UnitedHealth Group, Inc. and its insurer subsidiaries and divisions

                                        2

(collectively, "UnitedHealth"); and UnitedHealth's wholly-owned subsidiary Ingenix, Inc. ("Ingenix") (collectively, "Defendants"), save that Plaintiffs Stephen D. Henry, M.D.; James G. Schwendig, M.D.; James A. Peck, Psy.D.; Michael Pariser, Psy.D., M.D.; Carmen Kavali, M.D.; Stephanie Higashi, D.C., d/b/a Mar Vista Institute of Health, and the AMA do not bring claims against UnitedHealth and Ingenix as part of this Complaint.  WellPoint, UnitedHealth, and other health Insurer Conspirators are collectively referred to herein as the "Insurer Conspirators," as described below in paragraph 61.  Ingenix, America's Health Insurance Plans ("AHIP"), formerly known as the Health Insurance Association of America ("HIAA"); and the Insurer Conspirators are collectively referred to as the "Conspirators."

## OVERVIEW OF THE ACTION

7.      Plaintiffs' claims arise from WellPoint's failure to comply with ERISA and its own contractual obligations with regard to payments for out-of-network healthcare services as well as Defendants' undisclosed fraud-based racketeering scheme and anticompetitive conspiracy to fix prices that WellPoint, UnitedHealth and other Insurer Conspirators pay as reimbursements for out-of-network healthcare services.

8.      Many health insurers, including WellPoint, offer health insurance plans that differentiate between coverage for medical treatment provided by (i) in-network providers who have negotiated discounted rates with the insurer and (ii) out-of-network providers who charge insured consumers their usual, non-discounted rates. Health insurance plans that permit insured individuals (referred to herein and in the health insurance industry as "subscribers," "members," or "insureds") to seek medical care from out-of-network healthcare providers[1] and be reimbursed for those services

---

[1]As used herein, the term "healthcare provider" refers to physicians, physician groups, other healthcare provider and healthcare provider groups, hospitals, clinics, and ambulatory and surgical centers.

are more expensive (*i.e.*, require higher premium payments) than plans that limit members' coverage to care provided by in-network providers.

9.      Members, such as the Subscriber Plaintiffs, pay higher premiums in exchange for the flexibility and right to obtain out-of-network benefits.  Doctors and other healthcare providers, such as the Provider Plaintiffs, agree to treat patients who are not insured under a healthcare network with which they affiliate (*i.e.*, who are not in-network patients) based in part on the patient's "assignment" of its healthcare benefits (the out-of-network health insurance services ("ONS") reimbursement) to the provider.

10.      Health insurers, including WellPoint, promise to reimburse for out-of-network services at a percentage of the lesser of either (i) the actual amount of their medical bills or (ii) the usual, customary, and reasonable rate ("UCR") charged by providers in the same or similar geographic area for the substantially the same service.[2]

11.      As set forth herein, however, WellPoint actually reimbursed its members and out-of-network providers who provided services to such members at a ***lower*** rate. WellPoint improperly and artificially reduced the UCR rates in breach of its contracts with members, and utilized the Ingenix Database as well as other improper methodologies to calculate UCR and other types of reimbursements as set forth in the Agreements.

12.      Plaintiffs' legal claims in this case are directed at a secret and illegal agreement by WellPoint, UHG, Ingenix, and the country's largest health insurers to systemically under-reimburse consumers for ONS.  WellPoint and other health insurance companies agreed to manipulate the rates used to reimburse members for

---

[2] The term "UCR" as used herein encompasses all provisions in WellPoint plans or healthcare policies determining the level or amount of ONS reimbursements other than provisions based on an objective and verifiable formula or standard.

4

ONS.  Pursuant to this unlawful agreement, WellPoint and its Conspirators knowingly created, manipulated and used flawed data to set artificially-low reimbursement rates for ONS.

13.     WellPoint's wrongful conduct affects hundreds of thousands of consumers nationwide who have had to pay more for ONS services as a result of Defendants' illegal agreement, and it affects hundreds of thousands of Providers who have been paid less for ONS.  One of the primary instruments used to accomplish this conspiracy is a data services platform known as the Ingenix Database, maintained by Ingenix, which is wholly-owned and operated by UHG, the second largest insurer in the country.  During the respective Class Periods (defined below), WellPoint contracted with Ingenix to provide ONS claims data and receive uniform pricing schedules which are used to calculate reimbursements for ONS services at artificially-low rates that are presented as UCRs but are, in fact, substantially below the actual UCR.

14.     WellPoint and other Insurer Conspirators contract with Ingenix to (i) provide out-of-network claims data, and pricing information to Ingenix and/or (ii) receive uniform pricing UCR schedules from Ingenix based on the data they submit.  The uniform pricing schedules provide a price range that purportedly reflects the UCR for the services rendered in the patients' geographic area but which are intentionally less than UCR.  WellPoint and other Insurer Conspirators determine what ONS reimbursement they will pay based on that range.

15.     The out-of-network claims data and pricing information provided to Ingenix by WellPoint and the other Insurer Conspirators, however, is rigged to artificially deflate average out-of-network charges.  Ingenix then further manipulates the data to additionally depress the average out-of-network charges to create the purported UCR data set forth on the schedules generated by Ingenix ("False UCRs").  When WellPoint and other Insurer Conspirators utilize the False UCRs to calculate

1   ONS reimbursements, the resulting payments to subscribers and providers are
2   artificially-low and substantially below the actual UCR for similar services.

3         16.    In addition to UCR determinations based on the Ingenix Database,
4   Plaintiffs challenge other improper and undisclosed criteria to reduce benefits for
5   ONS, including those imposed by use of the following methods:   use of faulty
6   internal fee schedules other than Ingenix; use of discounted Par provider amounts (in
7   other words, in-network provider fee schedules); and use of a percentage of fee
8   schedules generated by the Centers of Medicare & Medicaid Services ("CMS"),
9   frequently referred to in practice as "percentage of Medicare" (collectively referred to
10  herein as "Non-Ingenix Methodologies"). UCR determinations using the Ingenix
11  Database and UCR determinations made using Non-Ingenix Methodologies are
12  collectively referred to herein as ONS Benefit Reductions.

13        17.    WellPoint's ONS Benefit Reductions leave its Subscribers financially
14  responsible for unpaid amounts and leave Nonpar Providers under-reimbursed for
15  amounts that WellPoint is otherwise obligated to pay under the terms of its healthcare
16  plans. Because the ONS Benefit Reductions are "exclusions" of coverage under the
17  ERISA plans, WellPoint has the burden to demonstrate that its exclusions comply
18  with its plan(s) and its legal obligations. Plaintiffs allege that WellPoint cannot
19  sustain its burden regarding its ONS Benefit Reductions, and seek unpaid benefits and
20  other relief for themselves under ERISA.

21        18.    WellPoint's utilization of the Ingenix Database and other faulty data or
22  improper criteria for generating False UCRs and ONS Benefit Reductions constitute a
23  breach of WellPoint's obligations under its healthcare plans and a violation of its
24  fiduciary duties under ERISA.

25        19.    As set forth more fully herein, WellPoint's underpayment scheme has
26  been undertaken in connection with its conduct of a RICO enterprise and in concert
27  with the Defendants, thereby violating 18 U.S.C. §§ 1962(c) and (d).

28

20.     As further detailed herein, the agreement between Defendants and other Insurer Conspirators to systematically under-reimburse for out-of-network services through use of the Ingenix Database and other ONS Benefit Reductions, and thus manipulate the price that their subscribers must pay and that the healthcare providers receive, violates the Sherman Antitrust Act.

21.     Defendants' conduct and use of the Ingenix Database and other faulty data or improper criteria also violates numerous state antitrust and unfair competition laws, including California's Cartwright Act and sections 17200 and 17500 of the California Business and Professions Code.

22.     Defendants' False UCRs and ONS Benefit Reductions have resulted in direct injury to Plaintiffs and Class Members.  The Subscriber Plaintiffs, in being under-reimbursed for ONS benefits, have not received the benefits that WellPoint agreed and promised to pay resulting in consequential financial loss flowing from their property by having overpaid for their health insurance coverage.  The Provider Plaintiffs have likewise been denied benefits WellPoint agreed and promised to pay in that they suffered out-of-pocket losses as a result of being under-reimbursed for the ONS they rendered.  The Association Plaintiffs are bringing this action on behalf of their Provider members who have been injured, and certain of the Associations have used their resources to combat the illegal and improper actions of the Defendants.

23.     Defendants' conduct is continuing and will not be remedied absent the relief sought herein by Plaintiffs and Class Members.

## PARTIES

### *Subscriber Plaintiffs*

24.     Plaintiff Michael Roberts (individually and as guardian for his daughter, D. Roberts) is a resident of the State of California.  While insured by WellPoint (through WellPoint's Blue Cross of California subsidiary), Plaintiff received an artificially-depressed reimbursement for ONS, resulting in Plaintiff incurring more

out-of-pocket expense and receiving a health insurance policy of less value and for which he overpaid than he would have absent the unlawful conduct alleged herein.

25.     Plaintiff, J.B.W. (a minor by and through his parent and guardian *ad litem*), is a resident of the State of California.  Plaintiff's petition for the appointment of Julz W., his mother, as his guardian *ad litem* in this matter was granted on April 10, 2009.  While insured by WellPoint *via* Blue Cross of California, Plaintiff received artificially-deflated reimbursement for ONS, resulting in Plaintiff incurring more out-of-pocket expense and receiving a health insurance policy of less value and for which he overpaid than he would have absent the unlawful conduct alleged herein.

26.     Darryl and Valerie Samsell are individuals and residents of the State of North Carolina, residing in Greensboro, North Carolina.  From at least as early as 1998 to the present (hereinafter the "Relevant Time Period"), the Samsells purchased and owned policies of insurance from WellPoint, by and through its predecessor and subsidiary companies including Anthem Blue Cross and Blue Shield, Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield, and Trigon Blue Cross Blue Shield, providing health insurance benefits for themselves and the members of their family.  While insured by WellPoint, Plaintiffs received an artificially-depressed reimbursement for ONS, resulting in Plaintiffs incurring more out-of-pocket expense and receiving a health insurance policy of less value and for which they overpaid than they would have absent the unlawful conduct alleged herein.

27.     Mary Cooper is an individual and resident of the State of New Jersey, residing in Andover, New Jersey.  During the Relevant Time Period, Ms. Cooper and her (now deceased) husband, Robert Cooper, received policies of insurance from WellPoint, by and through its predecessor and subsidiary company, WellChoice Insurance of New Jersey, Inc., providing health insurance benefits for themselves and the members of their family.  The Coopers received this insurance through Mr. Cooper's employer.  While insured by WellPoint (through WellChoice Insurance of New Jersey), Plaintiff Cooper incurred more out-of-pocket expense and received a

1  health insurance policy of less value and for which she overpaid than she would have
2  absent the unlawful conduct alleged herein.

3        28.    Ivy Seigle-Epstein was an individual and resident of the State of New
4  York, residing in Brooklyn, New York who received policies of insurance from
5  WellPoint, by and through its predecessor and subsidiary company Empire Blue Cross
6  Blue Shield, providing health insurance benefits for herself.  While insured by
7  WellPoint (through Empire), Ms. Seigle-Epstein received an artificially-depressed
8  reimbursement for ONS, resulting in Plaintiff incurring more out-of-pocket expense
9  and receiving a health insurance policy of less value and for which she overpaid than
10 she would have absent the unlawful conduct alleged herein.  Ms. Seigle-Epstein
11 passed away during the pendency of this litigation.    Pursuant to the Court's
12 September 16, 2011 Order Granting Motion to Withdraw Subscriber Class
13 Representative Ivy Seigle-Epstein (D.E. 254), Plaintiffs are accordingly dropping
14 Plaintiff Seigle-Epstein's claim under New York General Business Law § 349 until
15 such time as a suitable plaintiff may be substituted to pursue the claim on behalf of the
16 New York Non-ERISA Subclass, at which time a separate complaint by that plaintiff
17 or a Fourth Consolidated Amended Complaint restoring that claim will be filed.  In
18 light of the Court's September 16, 2011 Order Plaintiffs thus expressly reserve their
19 right to re-plead and re-assert that claim, and its omission from the instant Complaint
20 should not deemed or construed as a waiver of the New York General Business Law §
21 349 claim.

22       29.    Ivette Rivera-Giusti ("Rivera-Giusti") is a resident of the State of
23 Oregon.  During the Relevant Time Period, while insured by WellPoint (through
24 WellPoint's predecessor and subsidiary company Empire Blue Cross Blue Shield),
25 Rivera-Giusti received an artificially-depressed reimbursement for ONS, resulting in
26 her incurring more out-of-pocket expense and receiving a health insurance policy of
27 less value and for which she overpaid than she would have absent the unlawful
28 conduct alleged herein.

### *Provider Plaintiffs*

30.     Plaintiff Dr. Stephen D. Henry is an internist providing primary care, with a specialty in HIV treatment, at a private solo practice in Pasadena, California. Dr. Henry is a resident of the State of California and is licensed to practice medicine in California.  Dr. Henry has provided ONS to subscribers enrolled in plans insured or administered by WellPoint and has been damaged thereby as described herein. Dr. Henry is included in the definition of each of the Provider classes and subclasses alleged herein.

31.     Plaintiff Dr. James G. Schwendig is a trauma surgeon at Scripps Memorial Hospital in La Jolla, California.  Dr. Schwendig is a resident of the State of California and is licensed to practice medicine in California.  He has provided ONS to subscribers enrolled in plans insured or administered by WellPoint and has been damaged thereby as described herein.  Dr. Schwendig is included in the definition of each of the Provider classes and subclasses alleged herein.

32.     Plaintiff Dr. James Peck, Psy.D., is a clinical psychologist who specializes in treating individuals with co-occurring mental health and substance abuse disorders, and individuals with HIV/AIDS and co-occurring mental health and/or substance abuse disorders.  In addition to his work at UCLA, Dr. Peck also maintains a separate private practice in Santa Monica, California.  He is a resident of the State of California and is licensed to practice psychology in California.  Dr. Peck has provided ONS to subscribers enrolled in plans insured or administered by WellPoint and has been damaged thereby as described herein.  Dr. Peck is included in the definition of each of the Provider classes and subclasses herein.

33.     Plaintiff Michael Pariser, Psy.D., is a resident of the State of California who resides in Los Angeles County, California.  At all relevant times since 2004, Dr. Pariser has been and continues to be a licensed psychologist practicing in Los Angeles County who has never been part of WellPoint's network of healthcare providers and therefore has and continues to be deemed an out-of-network provider to

insureds covered by employee welfare benefit plans within the meaning of Section 3 of ERISA, 29 U.S.C. §1002(1) and non-ERISA plans which were insured and/or administered by WellPoint.  During that time, Dr. Pariser has provided ONS to people enrolled in plans insured or administered by WellPoint and has been damaged thereby as described herein.  Dr. Pariser is included in the definition of each of the Provider classes and subclasses alleged herein.

34.     Plaintiff Carmen Kavali, M.D., is a plastic surgeon with a private practice in Atlanta, Georgia.  Dr. Kavali is board certified by the American Board of Plastic Surgery and serves on the staff of Northside Hospital and the Center for Plastic Surgery.  She is a resident of the state of Georgia and is licensed to practice medicine in Georgia.  Dr. Kavali has provided ONS to subscribers enrolled in plans insured or administered by WellPoint and has been damaged thereby as described herein. Dr. Kavali is included in the definition of each of the Provider classes and subclasses alleged herein except for the California subclass.

35.     Plaintiff Stephanie Higashi, D.C., is a chiropractic doctor with a private practice ("Mar Vista Institute of Health") in Los Angeles, California.  Dr. Higashi is a resident of the State of California and is licensed to practice medicine in California. Dr. Higashi has provided ONS to subscribers enrolled in plans insured or administered by WellPoint and has been damaged thereby as described herein.  Dr. Higashi is included in the definition of the non-ERISA Provider classes and subclasses alleged herein.

36.     Plaintiff North Peninsula Surgical Center, L.P. ("NPSC") is a non-physician out-of-network healthcare provider doing business as Torrance Outpatient Surgery Center.  NPSC is a healthcare facility or ambulatory surgical center ("ASC") that specializes in providing surgery, pain management and diagnostic procedures on an outpatient basis.  NPSC currently serves the following specialties:  Orthopedics; Gastroenterology/Endoscopy; Ear, Nose & Throat; Pain Management; Gynecology; Spine Surgery; Podiatry; Bariatric Surgery; and Plastic Surgery.  NPSC has provided

11

ONS to subscribers enrolled in plans insured or administered by WellPoint and has been damaged thereby as described herein.  NPSC is included in the definition of each of the Provider classes and subclasses alleged herein.

37.     NPSC's surgical facility is located in Torrance, California and is, and at all relative time periods, has been, accredited by the Accreditation Association for Ambulatory Health Care ("AAAHC").  The AAAHC presently accredits over 4,000 ASCs.     According to the Ambulatory Surgery Center Association ("ASC Association"), over 8 million surgeries are performed yearly at ASCs in the United States.

### *Association Plaintiffs*

38.     Plaintiff American Medical Association ("AMA") is headquartered in Chicago, Illinois.  The AMA is a national tax-exempt membership organization that represents the interests of approximately 240,000 physicians, residents and medical students, as well as their patients located in California and throughout the United States.  Plaintiff Dr. Henry is an active member of the AMA.  As the largest medical association in the United States and as the owner of Current Procedural Terminology ("CPT"), the AMA works to represent its members with respect to payment practices by payors, such as WellPoint, to healthcare providers, particularly physicians.  Both AMA physicians and the AMA in its own capacity have been injured by the egregious acts and practices of Defendants as set forth in this Complaint.  Like the Provider Plaintiffs, AMA is not bringing claims against the UnitedHealth Defendants.

39.     The AMA appears on behalf of itself and its members, and also as a representative of the Litigation Center of the AMA and State Medical Societies.  The Litigation Center was formed in 1995 as a coalition of the AMA and private, voluntary, non-profit state medical societies to represent the views of organized medicine in the courts.  The AMA has individual standing as it has been injured by Defendants' wrongful conduct as described herein.  It also has standing in a representative capacity because the AMA's members have been harmed by

Defendants' conduct in the same manner as the Provider Plaintiffs and a strong likelihood exists that AMA members will be harmed in the future. In addition to the redress it seeks for its own injury, the AMA seeks declaratory and injunctive relief on behalf of its members.

40.     Plaintiff California Medical Association ("CMA") is a non-profit, incorporated professional association of California physicians established in 1856, with its principal place of business in Sacramento, California. CMA is comprised of more than 35,000 physicians practicing medicine in all specialties and serving patients in all demographics throughout the State of California. Plaintiffs Dr. Henry and Dr. Schwendig are active members of CMA. CMA's mission is to promote the art and science of medicine, the care and well-being of patients, the protection of the public health and the betterment of the medical profession. CMA actively engages in the legislative, judicial, political and regulatory processes to carry out its mission. Additionally, CMA regularly engages government and private health plans to advocate for the interests of its members.

41.     CMA has individual standing as it has been injured by WellPoint's wrongful conduct as described herein, including, without limitation, by devoting resources from its Center for Economic Services to help members deal with out-of-network reimbursement practices. CMA also has standing in a representative capacity because CMA's members have been harmed by Defendants' conduct in the same manner as the Provider Plaintiffs and a strong likelihood exists that CMA members will be harmed in the future. In addition to the redress it seeks for its own injury, CMA seeks declaratory and injunctive relief on behalf of its members.

42.     Plaintiff Medical Association of Georgia ("MAG") is a non-profit, voluntary professional association of Georgia physicians. MAG, founded in 1849, is an affiliate of the American Medical Association, and is the largest physician association in Georgia. Presently, MAG has over 4,200 physician members – most of whom are physicians actively practicing medicine in the State of Georgia. Dr. Kavali

13

is an active member of MAG.  MAG was founded to promote the art and science of medicine and the improvement of public health.  With these ends in mind, MAG actively works to advocate physician and patient positions in the United States Congress, the Georgia General Assembly, before state and federal courts, and in the private sector with large health plans, hospitals and other entities that significantly affect patient care.

43.     MAG has individual standing because it has been injured by WellPoint's wrongful conduct as alleged herein.  MAG has expended considerable time and resources helping its members deal with issues concerning WellPoint's improper UCR reimbursements.

44.     MAG also has standing in a representative capacity because MAG's members have been harmed by Defendants' conduct in the same manner as the Provider Plaintiffs and a strong likelihood exists that MAG's members will be harmed in the future.  In addition to the redress it seeks for its own injury, MAG seeks declaratory and injunctive relief on behalf of its members.

45.     Plaintiff Connecticut State Medical Society ("CSMS") is a federation of eight component county medical associations, with a total membership exceeding 7,000 physicians and medical students.  The CSMS itself is a constituent state entity of the American Medical Association.  Founded by the physician-patriots of the American Revolution, the Society operates from a heritage of democratic principles embodied in its Charter and Bylaws.  The philosophy and purpose of the CSMS is to promote the highest standards of medical care in the State of Connecticut, to work to preserve the integrity and independence of physicians, and to support the sanctity of the physician-patient relationship for the benefit of the public by, among other things, facilitating and assisting its physicians in providing top quality care to their patients, providing them with a unified voice and enabling them to take concerted action on behalf of their profession and of their patients, and acting and advocating on their behalf to preserve the ability, independence and freedom of physicians to render the

14

best possible care to every patient.  CSMS physicians have been injured by the acts and practices of Defendants as set forth in this Complaint.  The CSMS has standing in a representative capacity because CSMS's members have been harmed by Defendants' conduct in the same manner as the Provider Plaintiffs and a strong likelihood exists that the CSMS's members will be harmed in the future.  It seeks declaratory and injunctive relief on behalf of its members.

46.     Plaintiff American Podiatric Medical Association ("APMA") was founded in 1912 and is headquartered in Bethesda, Maryland.  The APMA is a national non-profit membership organization that represents the interests of the vast majority of the estimated 15,000 podiatrists in the United States as well as their patients located in California and throughout the country.  It engages in the legislative, judicial, political and regulatory processes to carry out its mission.

47.     The APMA has individual standing as it has been injured by Defendants' wrongful conduct as described herein.  It also has standing in a representative capacity because the APMA's members have been harmed by Defendants' conduct in the same manner as the Provider Plaintiffs and a strong likelihood exists that the APMA's members will be harmed in the future.  In addition to the redress it seeks for its own injury, the APMA seeks declaratory and injunctive relief on behalf of its members.

48.     Plaintiff California Chiropractic Association ("CCA") is headquartered in Sacramento, California.   The CCA is a statewide non-profit membership organization established in 1928 that represents the interests of chiropractic doctors and allied industries as well as their patients located in California.  Its mission is to "[p]romote high standards of professionalism and patient care through education, advocacy and accountability."   The CCA engages in the legislative, educational, political and regulatory processes to carry out that mission.

49.     The CCA has individual standing as it has been injured by Defendants' wrongful conduct as described herein.  It also has standing in a representative capacity

15

1  because the CCA's members have been harmed by Defendants' conduct in the same

2  manner as the Provider Plaintiffs and a strong likelihood exists that the CCA's

3  members will be harmed in the future.  In addition to the redress it seeks for its own

4  injury, the CCA seeks declaratory and injunctive relief on behalf of its members.

5     50.   Plaintiff California Psychological Association ("CPA") is headquartered

6  in Sacramento, California.   The CPA is a statewide non-profit membership

7  organization established in 1948 that represents the interests of psychologists and their

8  patients in California.  It appears herein on behalf of its membership and has

9  associational standing on behalf of its members who have claims against WellPoint

10 for the violations alleged in this complaint and on their behalf seeks declaratory and

11 injunctive relief.  The CPA is an advocate for its members and their patients and

12 engages in the necessary legislative, judicial, political, and regulatory processes to

13 carry out its mission.  It has sponsored many legislative proposals that have resulted in

14 greater access to mental healthcare services for patients and extended protection of the

15 rights of psychologists to practice to the full extent allowed by law.   Individual

16 Plaintiff Dr. Peck is an active member of the CPA.

17    51.   The CPA has individual standing as it has been injured by Defendants'

18 wrongful conduct as described herein.  It also has standing in a representative capacity

19 because the CPA's members have been harmed by Defendants' conduct in the same

20 manner as the Provider Plaintiffs and a strong likelihood exists that the CPA's

21 members will be harmed in the future.  Individual Plaintiff Dr. Peck is an active

22 member of the CPA.  In addition to the redress it seeks for its own injury, the CPA

23 seeks declaratory and injunctive relief on behalf of its members.

24                                  ***Defendants***

25    52.   Defendant UnitedHealth offers, among other things, health insurance

26 products and services.  UnitedHealth is the second largest health insurer in the United

27 States, insuring 29.5 million people nationwide in the second quarter of 2009.  A

28

1 | Minnesota corporation, UnitedHealth's principal place of business is at 9900 Bren
2 | Road East, Minnetonka, Minnesota 55343.

3 | 53.     Defendant Ingenix is a wholly-owned subsidiary of UnitedHealth and
4 | offers a comprehensive line of clinical and cost management solutions for healthcare
5 | payers, providers, employers, pharmaceutical manufacturers, government agencies
6 | and others.  The company's products and services are represented by four business
7 | groups: (i) software and data services; (ii) publishing; (iii) pharmaceutical services;
8 | and (iv) consulting.  Ingenix licenses the use of its proprietary Ingenix Database to
9 | insurers who use it to set reimbursement schedules for out-of-network, non-negotiated
10 | medical services.  A Minnesota corporation, Ingenix's principal place of business is at
11 | 12125 Technology Drive, Eden Prairie, Minnesota 55344.

12 | 54.     UnitedHealth and Ingenix are sometimes collectively referred to herein
13 | as the "UnitedHealth Defendants."  The UnitedHealth Defendants at all times
14 | throughout the Class Period actively participated in the conspiratorial activity alleged
15 | herein and are legally responsible for the unlawful conduct because their directors,
16 | members, officers, employees, and agents, acting in the scope of their authority,
17 | reached an unlawful agreement with their competitors to restrain competition.
18 | Alternatively, the UnitedHealth Defendants are legally responsible because they acted
19 | through, facilitated, dominated, or controlled the actions of each other in furtherance
20 | of the unlawful conspiratorial activity alleged herein.

21 | 55.     Defendant WellPoint is the country's largest health insurer, insuring
22 | more than 34 million persons across the United States as of the second quarter of
23 | 2009.  An Indiana corporation, WellPoint has its corporate headquarters at 120
24 | Monument Circle, Indianapolis, Indiana 46204, and is licensed to conduct business in
25 | all fifty states.

26 | 56.     Blue Cross of California operates through the trade name Anthem Blue
27 | Cross and is a subsidiary of Defendant WellPoint.  WellPoint, through Blue Cross of
28 | California, issued Evidence of Coverage and Disclosure Forms that were provided to

17

Plaintiffs.  Such Evidence of Coverage and Disclosure Forms provide that Blue Cross of California's customer service departments are located in Oxnard and Los Angeles, California and that claims must be submitted to Blue Cross of California's Los Angeles office.  Blue Cross of California is located at 21555 Oxnard Street, Woodland Hills, California 91367.

57.    WellPoint was created in or around 2004 by the merger of WellPoint Health Networks, Inc. with Anthem, Inc.  The merged companies changed their name to WellPoint, Inc. on or about November 30, 2004.   As the successor entity to Anthem, Inc., WellPoint, Inc., is liable for Anthem's actions both before and after the merger between the two companies.  "WellPoint" is used herein to refer to both the current WellPoint entity and its predecessor entities.

58.    WellPoint serves customers throughout the United States, including California, under various names such as HealthLink, Unicare, Lumenos, Empire, and Anthem Blue Cross Blue Shield.  WellPoint also serves California insureds through its subsidiary, Blue Cross of California.  WellPoint operates, trades, or otherwise does or did business through a variety of subsidiary companies and/or affiliates including, but not limited to, the following:

- Anthem Benefit Administrators, Inc.
- Anthem Blue Cross and Blue Shield Plan Administrator, LLC
- Anthem Blue Cross Blue Shield Partnership Plan, Inc.
- Anthem Blue Cross Life and Health Insurance Company
- Anthem Health Plans of Kentucky, Inc. d/b/a/ Anthem Blue Cross and Blue Shield
- Anthem Health Plans of Maine, Inc, d/b/a Anthem Blue Cross and Blue Shield
- Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield
- Anthem Health Insurance Company of Nevada, Inc.
- Anthem Health Plans of Virginia, Inc, d/b/a Anthem Blue Cross and Blue Shield

18

1    • Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield

2    • Anthem HMO of Nevada

3    • Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield

4    • Anthem Life Insurance Company

5    • Anthem Life & Disability Insurance Company

6    • Anthem East, Inc.

7    • Anthem Southeast, Inc.

8    • Blue Cross and Blue Shield of Georgia, Inc.

9    • Blue Cross Blue Shield Healthcare Plan of Georgia, Inc.

10   • Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield

11   • Blue Cross of California d/b/a Anthem Blue Cross

12   • Blue Cross of California Partnership Plan, Inc. d/b/a Anthem Blue Cross Partnership Plan

13   

14   • Claim Management Services, Inc. d/b/a Anthem Blue Cross and Blue Shield

15   • Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield

16   

17   • Compcare Health Services Insurance Corporation d/b/a Anthem Blue Cross and Blue Shield

18   • Empire HealthChoice Assurance, Inc, d/b/a Empire B1ue Cross B1ue Shield.

19   

20   • Empire HealthChoice HMO, Inc, d/b/a Empire B1ue Cross Blue Shield HMO

21   • Golden West Health Plan, Inc.

22   • HealthKeepers, Inc.

23   • HealthLink, Inc.

24   • HealthLink HMO, Inc.

25   • Healthy Alliance Life Insurance Company, d/b/a Anthem Blue Cross and Blue Shield

26   • HMO Colorado, Inc.

27   • HMO Missouri, Inc. d/b/a Anthem Blue Cross and Blue Shield

28   

19

- Lumenos, Inc.
- Machigonne, Inc.
- Matthew Thornton Health Plan, Inc, d/b/a Anthem Blue Cross and Blue Shield
- Peninsula Health Care, Inc.
- Plan of Georgia, Inc.
- Priority Health Care, Inc.
- RightCHOICE Managed Care, Inc, d/b/a Anthem Blue Cross and Blue Shield
- Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield
- UNICARE National Services, Inc.
- UNICARE Health Insurance Company of Texas
- UNICARE Health Insurance Company of the Midwest
- UNICARE Health Plan of Kansas, Inc.
- UNICARE Health Plan of West Virginia, Inc.
- UNICARE Health Plans of Texas, Inc.
- UNICARE Health Plans of the Midwest, Inc.
- UniCare Life & Health Insurance Company
- UNICARE of Texas Health Plans, Inc.
- WellChoice Insurance of New Jersey, Inc.
- WellPoint Behavioral Health, Inc.

59.   In 2005, WellPoint merged with Defendant WellChoice, Inc.  Before that time, WellChoice was the parent company of Defendant WellChoice Insurance of New Jersey and Defendant Empire Blue Cross Blue Shield.  Since the 2005 merger, WellPoint, Inc. has served insureds in New York and New Jersey through its subsidiaries, Defendants WellChoice Insurance of New Jersey, Inc. and Empire Blue Cross Blue Shield.  As the successor entity to WellChoice, WellChoice Insurance of New Jersey and Empire Blue Cross Blue Shield, WellPoint is liable for these entities' actions both before and after the merger between WellPoint and WellChoice.

60. All WellPoint entities have been engaged in inappropriately and artificially reducing payments for ONS through the use of the Ingenix Database, internal fee schedules, in-network amounts, and a percentage of CMS-generated fee schedules (also commonly referred to as a "percentage of Medicare"). At all times relevant to the matters alleged herein, WellPoint had or has knowledge of each of its subsidiaries' ONS reimbursements and maintained control over the same.

### *Conspirators*

61. Other natural persons, corporations and entities not named as defendants in this action participated as Conspirators with Defendants, including without limitation:

(a) Aetna, Inc. ("Aetna") provides health insurance products and related services, including medical, pharmacy, dental, behavioral health, group life, long-term care and disability plans, and medical management capabilities, primarily in the United States. As of 2009, Aetna is the third largest health insurer in the United States with 16 million members nationwide. Aetna participates in the Ingenix Database by providing claims data to Ingenix that Ingenix uses to establish its database of costs for out-of-network healthcare services and/or by using the False UCRs produced by Ingenix to pay claims made by insureds under its health plans. A Pennsylvania corporation, Aetna's principal place of business is at 151 Farmington Avenue, Hartford, Connecticut 06156.

(b) Cigna Corporation ("Cigna"), through its subsidiaries, provides healthcare and related benefits in the United States and internationally. Cigna's healthcare segment offers consumer-directed health plans, health maintenance organizations, network only and point-of-service medical plans, preferred provider plans, and traditional medical indemnity coverage. As of 2009, Cigna is one of the ten largest health insurers in the United States, insuring 12 million people nationwide. Cigna participates in the Ingenix Database by providing claims data to Ingenix that Ingenix uses to establish its database of costs for out-of-network healthcare services

21

1   and/or by using the False UCRs produced by Ingenix to pay claims made by insureds

2   under its health plans.  Cigna is headquartered at Two Liberty Place, 1601 Chestnut

3   Street, Philadelphia, Pennsylvania 19192.

4           (c)    Health Insurance Association of America ("HIAA"), now known

5   as America's Health Insurance Plans ("AHIP"), is a trade group for the health

6   insurance industry.  (AHIP was formed in September 2003 when HIAA merged with

7   the American Association of Health Plans.)  HIAA/AHIP is a national association

8   comprised of a variety of medical entities, including major insurance companies and

9   many of its fellow Insurer Conspirators.  It claims to provide "a unified voice for the

10   community of health insurance plans" by representing the interests of its members on

11   legislative and regulatory issues at the federal and state levels, and by providing

12   conferences and publications for its members.  In 1973, HIAA created a database

13   known as the Prevailing Health Charges System ("PHCS") database by obtaining

14   historical charge data for surgical and anesthesia procedures from numerous data

15   contributors, including health insurance companies, third-party payors, and self-

16   insured companies.  HIAA later expanded PHCS to include data regarding dental

17   (1977), medical services (1988) and drug and medical equipment sales (1998).  HIAA

18   had committees and advisory groups comprised of various insurance company

19   members that were responsible for PHCS's development and management and which

20   caused the PHCS database to become populated with flawed data.  In October 1998,

21   HIAA sold PHCS to Ingenix, and PHCS is now part of the Ingenix Database.

22       62.    In addition to Aetna and Cigna, other health insurance companies, not

23   named as defendants or conspirators, have participated in the alleged unlawful

24   conspiratorial activity in violation of federal and state law.  Such violations include,

25   among other things, knowingly providing flawed and misleading data to Ingenix for

26   use in developing the Ingenix Database; knowingly acquiescing to flawed and

27   improper manipulation of cost data provided by Ingenix; and knowingly using False

28   UCRs produced by Ingenix in determining ONS reimbursements.

63.     Whenever reference is made to an act, statement, or transaction of any corporation or entity in this Complaint, including each of the Defendants and Conspirators, the allegation means the corporation or entity acted, stated or transacted by or through its directors, members, partners, officers, employees, or agents, while they were engaged in the management, direction, control, or conduct of the corporation's or entity's business and acting within the scope of their authority.

64.     At all times mentioned in the allegations herein, each and every Defendant and Conspirator was an agent or representative of and aided and abetted the unlawful conduct of each of the other Defendants and Conspirators.  In doing the things alleged herein, each and every Defendant and Conspirator was acting within the course of such agency or representation and was acting with the consent, permission and authorization of the other Defendants and Conspirators.  All actions of each Defendant and Conspirators as alleged herein were ratified and approved by the other Defendants and Conspirators.

## OVERVIEW OF THE CONSPIRACY TO DEPRESS REIMBURSEMENT FOR ONS

65.     The selection and purchase of health insurance is of vital importance to consumers.  According to a recent survey by the New York Attorney General ("NYAG"), obtaining affordable healthcare is the number one concern for purchasing consumers.  Similarly, how health insurance companies subsequently perform on their contractual obligations is vitally important to physicians.  Defendants and the Conspirators entered into secret and intentionally concealed agreements to depress reimbursements for ONS, thus increasing the price that insured consumers pay for such services, underpaying health care providers (*i.e.*, physicians, hospitals, clinics, etc.) for services rendered, and requiring the expenditure of money, time and other valuable resources by the Association Plaintiffs to educate providers about how to contest such practices.

23

66.     Most health insurers, including WellPoint and the Insurer Conspirators, offer health insurance plans that differentiate between coverage for medical treatment provided by (i) in-network providers who have negotiated discounted rates with the insurer and contractually agreed to subject themselves to its billing practices, and (ii) out-of-network providers who charge insured consumers their usual, non-discounted rates.  Health insurance plans that permit subscribers to seek medical care from out-of-network providers, and be reimbursed for for a portion of the cost of that care, are more expensive (*i.e.*, require higher premium payments) than plans that limit members' coverage to care provided by in-network providers, but they leave the consumer obligated to pay any shortfall in insurer reimbursements to healthcare providers for ONS.

67.     For members, such as the Subscriber Plaintiffs, who have paid higher premiums in exchange for the flexibility and right to obtain out-of-network benefits, health insurers, including WellPoint and the Insurer Conspirators, promise to reimburse for ONS at a percentage of what is determined to be the maximum "allowable charge."  The maximum allowable charge is never more than the amount the provider has actually billed. Under the vast majority of such policies, the allowable charge is the <u>lesser</u> of the lesser of either (i) the actual amount charged by the provider, or (ii) the UCR charged by providers in the same or similar geographic area for substantially the same service.  Physicians and other health care providers, such as the Provider Plaintiffs, who have not agreed to become participants in the patient's health plan, nonetheless frequently agree to treat the patient based, in part, on the expectation of such reimbursement by the insurer.  Patients (including Subscriber Plaintiffs) are often required to execute an "assignment" of their right to receive such ONS reimbursement, so that the provider submits its claim directly to and is paid by the insurer.

68.     The Insurer Conspirators, however, understate the dollar amount of the UCR and actually reimburse their members and (where the patient has assigned

24

benefits), healthcare providers at a rate that is significantly below the UCR for the services rendered, thereby dramatically increasing price of ONS for consumers. As subscribers, these consumers have already agreed to higher premium payments in exchange for the right to use out-of-network health care providers when they choose to do so. The difference in coverage for in-network and out-of-network services make it clear that ONS will almost always involve a larger out-of-pocket contribution by the subscriber, even when fairly reimbursed. As a result, the choice to use ONS is one that subscribers do not take lightly, and is normally exercised when the subscriber feels strongly about the identity of his/her health care provider due to skill, experience, and location. Often, this occurs when a subscriber faces an especially complicated or dangerous medical condition. These subscribers (and the members of the Classes who have procured ONS) do not view in-network providers as an acceptable substitute, as evidenced by their choice of providers.

69.    Plaintiffs' claims in this case are directed at a secret, illegal agreement and deceptive scheme involving Defendants and most of the country's largest health insurers to systemically under-reimburse and thus manipulate the price that their subscribers must pay, and the healthcare providers receive, for ONS. During the Relevant Time Period, the Insurer Conspirators agreed to fix the UCRs used to reimburse for ONS at artificially-low levels. Pursuant to this agreement, Defendants and their Conspirators knowingly created a flawed system that uses limited amounts of manipulated data to artificially depress reimbursement rates for ONS.

70.    Defendants' conduct affects millions of consumers and healthcare providers nationwide, including the Subscriber, Provider and Association Plaintiffs and the Subscriber and Provider Classes. The primary instrument used to accomplish their conspiracy is the PHCS database, and a related platform known as the Medical Data Research ("MDR") database – together, these data services platforms are owned and maintained by Ingenix, Inc. The PHCS and MDR databases are described herein as the "Ingenix Database." The Insurer Conspirators contract with Ingenix (which is

25

owned and operated by UnitedHealth) to receive and use for the purpose of ONS reimbursement a series of schedules which purport to represent the percentile distribution of charges within particular geographic areas for specific medical procedure codes. These schedules are created, promoted, and used for the purpose of establishing UCRs employed in making ONS reimbursement.   The Insurer Conspirators:  (i) provide data on their ONS claims to Ingenix; and (ii) receive uniform pricing UCR schedules from Ingenix based, in part, on that data.  The Insurer Conspirators adopt as the UCR the dollar amounts appearing in these schedules for the particular percentile adopted in the subscribers' plan (typically the 80th percentile).

71.    Unbeknownst to Plaintiffs, healthcare consumers and providers nationwide, Defendants and the Conspirators have conspired to ensure that the UCR pricing schedules generated by Ingenix are artificially low ("False UCRs").  When the Insurer Conspirators then use those schedules to calculate ONS reimbursements, the resulting payments to subscribers and providers are artificially low and substantially below the actual UCR for similar services in the relevant geographic area.  After an extensive investigation of ONS, the NYAG's office concluded that Ingenix under-reported UCRs for doctor visits in New York State by 10%-28%.  The effect of artificially-low UCRs on healthcare consumers was to magnify the portion of the total charges that they were ultimately required to bear, in a manner that was inconsistent with the health plan representations.   For example, assume that the actual UCR for a particular ONS is $125 and the insurer has agreed to reimburse 80% of the UCR.  In this scenario, the insurer should reimburse $100 to the provider, and the healthcare consumer should be responsible for the remaining 20%, or $25.  If the UCR derived from the Ingenix schedules is artificially depressed by 10%, however, it will be reported as $112.50 (the False UCR) rather than $125. Taking advantage of this False UCR, the insurer then reimburses only 80% of $112.50, which is $90.  In either case, the consumer is responsible for the portion of the fee that is not reimbursed by his or her insurer.  In the hypothetical example where *th*e UCR is accurately reported as

26

$125, this amount is $25, but when the False UCR of $112.50 is used the consumer portion of the fee rises to $35.00. In other words, the consumer becomes responsible for 100% of the difference between the actual UCR and the False UCR, rather than being reimbursed on that difference at the contractually-agreed upon rate. As a result, WellPoint and the Insurer Conspirators' ability to artificially depress the UCR by 10% for a $125 medical service produces, in this example, a 40% increase in cost to the healthcare consumer (*i.e.*, from $25 to $35). Using this same example, if the actual UCR were depressed by 28% rather than 10%, the cost to the consumer for this $125 office visit would increase from $25 to $53, an increase of 112%.

72.     Ingenix serves as a conduit for the conspiracy and is a hidden profit engine of the health insurance business. Ingenix contracts with many of the country's largest health insurers, including the Insurer Conspirators, to provide UCR claims data. Various WellPoint entities contribute data to Ingenix, specifically including Unicare, HealthLink, and Empire (collectively referred to herein as WellPoint Contributors). The WellPoint entities are operated as a unified business, referred to internally as the "Enterprise." Defendant WellPoint, Inc. controls the actions of the other WellPoint entities, including those which contribute data to the Ingenix Databases, and profits from their activities. WellPoint Contributors and other Insurer Conspirators UnitedHealth, Aetna and CIGNA contribute nearly 60% of the billing information included in the Ingenix Database. In fact, at points during the Class Period, WellPoint Contributors collectively were the third largest contributor of data. WellPoint was and continues to be viewed as an "essential" customer.

73.     After Ingenix collects the data, it aggregates, scrubs, and manipulates the data, and creates False UCR schedules that are sold to the same health insurers that provided the data in the first place as well as several other health insurers. Defendants and the Conspirators know the Ingenix data collection, aggregation and manipulation process is, and has been, seriously and systemically flawed, and that the result must be

1     artificially-low UCR schedules.  Using False UCR schedules, the Insurer Conspirators

2     under-reimburse the Subscriber and Provider Plaintiffs and the Classes for ONS.

3         74.     The involvement of virtually all of the leading players in the health

4     insurance industry, including WellPoint and the Insurer Conspirators, in the scheme

5     has also eliminated the possibility that health insurers would compete on the basis of

6     ONS reimbursement.  WellPoint and the Insurer Conspirators' collective participation

7     in the scheme to fix UCRs and ONS reimbursements through the Ingenix Database

8     has ensured Ingenix's dominance in the UCR data market.

9         75.     ONS Providers (including Provider Plaintiffs) have been adversely

10     affected by Defendants' conspiracy and deceitful business practices in a number of

11     ways. First, they have been required to expend significant time and resources

12     identifying, disputing, appealing, and negotiating over improper ONS reimbursement

13     determinations.  Second, they are often unable to collect the balance of their market-

14     based fee from their insured patients, resulting in underpayment.   Artificially-

15     depressed reimbursement rates for ONS also exert anti-competitive and unreasonable

16     pressure on health care providers, including the Provider Plaintiffs, to become in-

17     network, participating providers.  By joining an insurer's network, a provider locks in

18     contracted (albeit much lower) rates for their services, and eliminates the substantial

19     costs and uncertainties associated with providing ONS.    In order to generate

20     reasonable profits at these much lower fee levels, however, Providers often must

21     compromise their professional practices, seeing more patients for shorter periods of

22     time, performing fewer diagnostic procedures, or other similar compromises. The

23     reduction in out-of-network providers resulting from under-reimbursement in

24     violation of plan provisions therefore has the effect of reducing competition and

25     harming consumers by narrowing their choice of medical provider and service

26     alternatives.

27         76.     The Association Plaintiffs represent thousands of physicians and other

28     healthcare providers throughout the country who are similarly injured by Defendants'

conspiratorial misconduct.  Certain of the Association Plaintiffs themselves are also directly injured because they expend their money, time, and resources dealing with the many issues created by Defendants' practices.

77.    Plaintiffs allege (i) direct agreements in the form of contracts between Ingenix and many of the country's largest health insurers, including WellPoint, to obtain and/or provide UCR pricing information and (ii) a lengthy chronology of facts that demonstrates a conspiracy between and among the Insurer Conspirators to use Ingenix to develop False UCRs, which in turn are used to determine the amount to reimburse subscribers and/or assignee-providers for ONS.  Rather than compete against each other with respect to ONS reimbursement rates, the Insurer Conspirators operated collectively to generate False UCRs, thus lowering the cost to each insurer when paying ONS claims and depriving their insureds of the benefits for which they had subscribed and paid premiums.  Insurers limited access to information about the UCRs that they applied, did not publish their UCR schedules, and made it difficult or impossible for subscribers and providers to determine reimbursement amounts in advance.  These practices ensured that insurers would not compete against each other based on their UCRs and that each would receive the benefit of artificially-suppressed reimbursements.  The pressure on providers to become participating "in network" providers reduced the total number of providers offering care on an out-of-network basis and increases the number of providers who have agreed to be bound by the health insurers' fee schedules.  By conspiring to artificially lower UCRs, the Insurer Conspirators reduced competition both for their insurance products and for medical services provided to their plan members on an out-of-network basis.

## ANTITRUST ALLEGATIONS

### *Interstate Trade and Commerce*

78.    Defendants WellPoint and UnitedHealth market, distribute, sell, or otherwise provide health insurance coverage and administer and/or operate health insurance coverage plans, including plans that provide ONS coverage, to persons

29

1   throughout the United States, using the means and instrumentalities of interstate trade

2   and commerce.  Accordingly, Defendants' unlawful activity had and has a direct,

3   substantial, and reasonably foreseeable effect upon interstate trade and commerce.

4        79.    Defendants have committed, and conspired to commit, with their direct

5   competitors including, *inter alia*, the Insurer Conspirators, and/or with other third

6   parties, numerous violations of the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq*.

7   Defendants have combined, conspired, and/or agreed with other parties to

8   unreasonably restrain trade in violation of Section 1 of the Sherman Act by price-

9   fixing with regard to paying reasonable and customary rates for non-party

10  transactions.  The price paid by subscribers for ONS has been fraudulently

11  manipulated, competition among health care providers has been impaired by the

12  artificial pressure to join insurer networks, and competition over true rates of

13  reimbursement has been rendered virtually impossible.  Defendants' conduct alleged

14  herein constitutes both a *per se* and Rule of Reason claim under the Sherman Act.

15       80.    WellPoint reached an agreement with the Insurer Conspirators, who are

16  direct competitors, including UnitedHealth *via* its alter ego Ingenix to determine

17  maximum UCRs using primarily the Ingenix Database, as described herein, even

18  while knowing that use of the database would result in artificially-low reimbursements

19  to Subscriber and Provider Class members.  The concerted action among these

20  "competitors," including Defendants and the Insurer Conspirators, has resulted in

21  unlawful and anticompetitive price-fixing agreements, and other horizontal restraints

22  of trade and anticompetitive behavior.  This unreasonable horizontal restraint on trade

23  is a *per se* violation of section 1 of the Sherman Act.

24       81.    Defendants engaged in price fixing when they agreed with their

25  Conspirators to utilize the same flawed database to determine the UCR amounts for

26  out-of-network medical services, which lead to them paying substantially reduced

27  amounts for services rendered to their subscribers.

28

82.     Defendants' agreement also gives them, collectively with their competitors, tremendous power to set UCRs well below those which would exist in a competitive marketplace.  In fact, no competitive pressure to raise UCRs exists while all the Conspirators act collectively to reduce prices.  Without agreement and collective action between them, including the exchange and compilation of relevant pricing data, WellPoint and the Insurer Conspirators would be unable to systematically and across the board reduce their UCRs paid.  This agreement to fix prices is an unreasonable restraint on trade and a *per se* violation of section 1 of the Sherman Act.

83.     The Department of Justice Antitrust Division notes, in discussing price-fixing in its "Antitrust Primer," that price-fixing agreements can take many forms.  "[A]ny agreement that restricts price competitions violates the law."  It adds that "examples of price-fixing agreements" include those to:

(a)     establish or adhere to price discounts;

(b)     hold prices firm;

(c)     adopt a standard formula for computing prices; and

(d)     adhere to a minimum fee or price schedule.

http://www.usdoj.gov/atr/public/guidelines/211578.htm (last visited Oct. 17, 2011).

84.     Defendants, along with the Conspirators, adopted a standard formula for making UCR determinations, by relying on a common database that is designed and intended to reduce reported charges artificially, and each has agreed to a method of determining the maximum price or fee, *via* the depressed Ingenix published UCR rates, that it will pay for out-of-network charges.  This alone amounts to a horizontal agreement to fix prices, which is *per se* illegal.

### *Relevant Market*

85.     Essential to Defendants' scheme was the absence of other more accurate benchmarking products that would reveal the systematic suppression of UCRs in the Ingenix schedules.  It was therefore important that Defendants establish and maintain

control over the market for such Data Services.  This objective was accomplished structurally through a series of acquisitions that eliminated competition and left Ingenix with approximately 75% of the market for medical benchmarking "UCR or charge" products by 2005.  Defendants ensured ongoing control of the market by employing various devices including contractual agreements with insurers that limited their ability to supply their claims data to others, required them not to disclose the Ingenix UCR schedules, and promised to defend them in litigation contesting schedules.  Ingenix also provided deep discounts on its products to insurers who contributed their claims data.  As a result, there were no significant competitive products developed to represent the actual, usual, and customary rates charged for specific medical procedures within given geographic areas. As congressional investigation noted, Ingenix maintained virtual monopoly over the provision of such data services.  This permitted it to publish false UCR's with little risk of detection.

86.    The relevant product market is the market for data used to calculate UCRs for reimbursement of claims by health insurance beneficiaries for out-of-network, non-negotiated medical services (the "Data Market").    Essential to Defendants' scheme was the ability to control and preclude competition in the Data Market.  Had there been unrestrained competition in the Data Market, other products would have more accurately computed UCRs and would have revealed the falsity of the Ingenix UCRs. By precluding such competition, and assuring that neither providers nor subscribers were able to effectively challenge ONS reimbursements, the Insurer Defendants and Co-Conspirators were able to increase the price subscribers paid for ONS, and thus reduce their own costs.  The mathematical relationship between Ingenix UCRs and prices paid by subscribers provides direct evidence of the anti-competitive effects and economic injury resulting from an abuse of power in the Data Market. The relevant geographic market is the United States. Ingenix Databases cover the entire United States and report the same metrics using the same methodology for each geo-zip within the county. This is a key feature because it

32

1    enables insurers such as WellPoint, which operate subsidiaries in many different

2    regions to take the same product and apply it consistently in UCR determination.

3         87.    UCR constitutes the critical element in the reimbursement formula

4    applied under each insurance plan and operates as a ceiling to cap the amount that will

5    be reimbursed to subscribers.  Health care consumers in the linked ONS Market are

6    obligated to pay whatever portion of the fee charged for ONS is over and above the

7    False UCR chosen by the Insurer Defendants.  As a result, and as noted below (*see*

8    Harm to Subscribers, Providers, and Associations, *infra*), for every dollar the Insurer

9    Conspirators are able to decrease their reimbursement cost through their unlawful

10   conspiracy, there is a corresponding dollar of increase to the affected consumer's

11   health care costs.  The resulting losses in insurance reimbursements are directly

12   attributable to Defendants' manipulation of the Data Market, and are borne

13   exclusively by the subscribers and their providers.  Whether these injured parties are

14   viewed as participating directly in the Data Market, their losses are the direct

15   inevitable, and intended consequence of Defendants' Data Market manipulation and

16   are shared by no others.

17        88.    Healthcare consumers are unable to protect themselves from the price to

18   which they are exposed for ONS except by giving up the benefit of the bargain they

19   made with their insurer – *i.e.*, that they pay higher monthly premiums in exchange for

20   the right to seek out-of-network treatment and receive reimbursements for a

21   percentage of the "usual and customary" cost of the out-of-network provider's

22   services.  Additionally, ONS providers are often unable to collect the unreimbursed

23   portion of their bill from subscribers. These providers therefore face economic

24   pressure to cease competing with in-network providers for patients and, instead, to

25   join the Insurer's network and accede to its far lower negotiated contract rates.

26   Defendants' manipulation of the Data Market thus has a direct, inevitable and

27   intended consequence upon competition among health care providers.  To operate at

28   commercially acceptable levels within the network, health care providers may have to

1   modify their prior patient treatment practices by seeing more patients, spending less

2   time with them, and reducing procedures.  Consumers thus suffer not only a reduction

3   in choice among out-of-network providers, but possible reduction in the quality o*f*

4   *ca*re that led them to select ONS in the first place.

5        89.   The majority of major health insurers, including WellPoint and the

6   Insurer Conspirators, have agreed to use the Ingenix Database to determine UCRs for

7   reimbursing ONS claims.  WellPoint is one of the largest contributors to this database.

8   The UnitedHealth Defendants promote the Ingenix Database as the "industry

9   standard" for determining UCRs, a characterization insurance companies use to

10   provide the appearance of legitimacy and accuracy to a product that they know to be

11   faulty, and they regularly tout the "savings" incurred by using it.   Insurance

12   companies use this marketing line to imbue their artificially-low reimbursements for

13   ONS with the appearance of legitimacy and accuracy.  Given the Ingenix Database's

14   broad-based adoption by the largest health insurers, including the Insurer Conspirators

15   named herein who collectively cover approximately 93.5 million privately insured

16   healthcare consumers in the United States, Ingenix clearly possesses market power in

17   the Data Market.

18        90.   The Data Market is conducive to the collusion alleged herein.  The Data

19   Market has high barriers to entry that make it difficult for any non-conspiring firm to

20   provide a service that competes with Ingenix, despite the fact that Ingenix has proven

21   to be highly profitable.  Ingenix's operating profit margins are approximately 20%,

22   compared to 10% for UnitedHealth as a whole.  The barriers to entry in the Data

23   Market include:   (1) the costs of and difficulties of obtaining historical and current

24   insurers' data (particularly in light of the apparent agreement by Conspirator Insurers

25   not to contribute their data outside of Ingenix); (2) the costs of constructing,

26   developing, and maintaining hardware and software platforms necessary to analyze,

27   aggregate and disseminate the data; and the costs of successfully convincing insurers

28   to adopt the services.  Absent a conspiracy, it would be in the best interest of each of

the Insurer Conspirators to encourage a competing data provider for two reasons. First, using a competing product could lower an insurer's cost of procuring UCR information.  Second, using a product that objectively and accurately reported usual and customary charges would give an individual insurer a competitive advantage because the insurer could offer its subscribers fair reimbursements for ONS. Alternatively, a competing product could be used by associations of providers or subscribers to challenge inadequate reimbursements by Insurer Conspirators that used Ingenix.  For these reasons, a competing product that objectively and accurately reported usual and customary charges would materially increase the reimbursements the participating insurers were required to pay to consumers.  As a result, the Insurer Conspirators have agreed to refrain from supplying their own charge data to other potential vendors.  This conduct would be against their individual self interest, barring the existence of the conspiracy to use falsely-reported rates in reimbursing ONS.

91.    The NYAG settlement agreements discussed below confirm the high barriers to entry in the Data Market.  To free consumers and healthcare providers from the trap of the Ingenix conspiracy, the NYAG obtained pledges of nearly $100 million from many of the Insurer Conspirators – including $50 million from UnitedHealth and Ingenix; $10 million from WellPoint; $20 million from Aetna; $10 million from Cigna; and $2 million from HealthNet) – to build a new, independent database to be run by a non-profit organization.

92.    The Data Market is a mature market, having been in existence for decades.  There are few competitors and the market has been marked by consolidation among those few competitors, such that Ingenix now provides the vast majority of data in this market.

### Communication Opportunities

93.    Defendants and the other Insurer Conspirators had, and continue to have, ample opportunities to communicate, and have communicated, among themselves about the conspiracy and combination alleged herein, including the collection and

dissemination of data used to establish the UCRs for calculating reimbursement for ONS.   These communications occur routinely, including, but not limited to, at HIAA/AHIP conferences and board meetings where Defendant WellPoint was, and is, a board member and participated in meetings about the Data Market and the use of Ingenix by the Insurer Conspirators.   Ingenix is a known major sponsor of these conferences.   Under the terms of the licensing agreements that govern the use of the Ingenix Database, UnitedHealth, WellPoint and other Insurer Conspirators are in almost regular communication with Ingenix.   In addition, Ingenix hosts an annual summit attended by representatives of the Defendants and other Insurer Conspirators where they can conspire. Those summits have historically had focus group specifically to discuss the mechanisms of the Ingenix Database, handling appeals and questions regarding the Ingenix Database, and defending potential lawsuits related to the use of the Ingenix Database.   In addition, Ingenix sponsors other events, such as webinars for its customers.   Ingenix's webinars provide a discussion forum for its Ingenix Database customers, during which Ingenix provides guidance in several areas from cost-savings to reimbursement policy language suggestions.

### *Collective Interests*

94.     Given the existence of the conspiracy, it is in the collective interest of the Insurer Conspirators to agree to provide inaccurate, artificially-low healthcare provider charge information to Ingenix for use in its database.   As cartel members, it is contrary to their collective interests to provide accurate reimbursement rates because each of the Insurer Conspirators uses the Ingenix Database for the calculation of ONS reimbursement.   If any Insurer Conspirator were to cheat on the cartel and provide transparent pricing information that accurately reported healthcare provider charges, that accurate information would precipitate higher UCR reimbursements, resulting in a loss of market share, revenue, and customers by cartel members.

95.     Absent the conspiracy, the Insurer Conspirators would each have an incentive to set UCRs accurately and competitively in order to make their insurance

products with ONS coverage more attractive to consumers and thus sell a larger number of policies. Their failure to do so is an action against individual self-interest but in favor of their collective conspiratorial interest and provides further evidence of the conspiracy. In purchasing health insurance products, consumers are able to compare virtually all plan provisions to determine which offers the most attractive mix of benefits. Plans are routinely compared based upon co-pay levels, deductibles, out-of-pocket maximums, numbers of covered visits, pre-existing condition coverage, drug benefits, availability of mental health benefits and numerous other provisions. But when it comes to UCRs, the Insurer Conspirators hide their price terms, which are based on the uniform pricing schedules disseminated by Ingenix. The Insurer Conspirators provide no information about either the amount of their established UCRs, the manner in which those UCRs are calculated and determined, the relationship between those UCRs and amounts actually charged by healthcare providers in the consumer's locale, or the fact that the UCRs are set in cooperation with other insurers through the use of a shared platform. Instead of providing such information, which would allow consumers to compare the value of ONS benefits, including pricing, in the same way they compare other plan provisions, the Insurer Conspirators routinely mislead consumers by including language to the effect that reimbursement will be based on the lesser of the UCR or the actual charge imposed by the healthcare provider, when they are aware that the False UCR has been artificially deflated by them such that the False UCR will almost always be far lower than the actual charges imposed by ONS providers.

96. Due to the lack of transparency in the determination of UCRs and ONS reimbursement as alleged herein, as well as non-disclosure agreements by the Insurer Conspirators not to provide data to potential competitors of Ingenix, there is no competition among the Insurer Conspirators with respect to the determination of UCRs or the ONS reimbursement. Members of the Insurer Conspirators' health plans themselves have no reasonable alternative other than to accept whatever ONS

1  reimbursement is offered by their insurer after a healthcare service has been provided

2  and the responsibility for its payment already undertaken by the Member.

3  *The Ingenix Database:  Mechanism of the Conspiracy*

4  97.    The roots of the Ingenix Database lie in the PHCS database formerly

5  owned and operated by HIAA.

6  98.    From 1973 to the present, those HIAA/AHIP members included, and

7  continue to include, virtually every major health insurer in the United States.  At the

8  time of drafting this Complaint, the Board of Directors of AHIP includes executives of

9  Defendants and the Conspirators, including, but not limited to, the President and CEO

10  of WellPoint and at least one executive vice president at UnitedHealth.

11  99.    Upon its inception in 1973, various committees within HIAA, composed

12  of HIAA members, developed, and managed the PHCS database making decisions

13  concerning the operation and design of the database.  HIAA initially created the PHCS

14  database as a way to aggregate and compile physician charge data as a service to its

15  members.  It compiled information from its vast pool of member-insurers to create the

16  PHCS, which initially pertained to surgical and anesthesia procedures, but within five

17  years began to include dental, medical, and drug/medical equipment rates.

18  100.    Once created, the PHCS became the largest pool of charge data for

19  medical services in the country and was considered to be the nation's largest database

20  of provider charges for private healthcare services – *i.e.*, the rates charged by

21  physicians and other private healthcare providers.  It contained data from more than

22  150 contributors from 50 states, the District of Columbia, Puerto Rico and the Virgin

23  Islands.  The information that HIAA compiled (collected from its member-insurers),

24  however, consisted of only four data points or fields:  the date of service, the Current

25  Procedure Terminology ("CPT") code, the amount of the billed charge, and the geo-

26  zip. CPT codes are a system by which the Plaintiff American Medical Association

27  categorizes all medical services by five-digit codes.  "Geo-zips" are portions of states

28  comprised of cities and towns sharing the first three digits of postal zip codes, which

1   Ingenix grouped together because of geographic proximity and what it arbitrarily

2   decided were "data similarities."

3       101.    The four data fields were the only information pertaining to outpatient

4   medical services that HIAA sought from its members to create the PHCS.  HIAA (*via*

5   its committees and Board of Directors) consciously decided to limit the amount of

6   information it received from contributors to create the PHCS.  In its own documents,

7   HIAA stated that the data was limited and that even the quality of the data was

8   "questionable."  Once HIAA obtained the "questionable" data, it compiled the various

9   submissions and created the PHCS reports from which were then submitted to its

10  members as a service.  HIAA expressly informed insurers that the PHCS database was

11  not intended to be used to establish UCRs.

12      102.    Thus, the PHCS database was built on submissions from health

13  insurance companies, but was not designed to determine precise reimbursement

14  amounts.  Rather, it was intended only to provide a general idea about prevailing

15  charges in a given area based upon the admittedly limited data HIAA collected to

16  create the initial PHCS database.

17      103.    Indeed, HIAA submitted the following disclaimer with the PHCS data it

18  provided insurers:

19          The DATA, whether actual charge data, derived charge data, conversion

20          factor data or length of stay data, are provided to the LICENSEE for

21          information purposes only.  The HIAA disclaims any endorsement,

22          approval or recommendation of the DATA.  **There is neither a stated**

23          **nor an implied 'reasonable and customary' charge, either actual or**

24          **derived; neither is there a stated nor an implied 'reasonable and**

25          **customary' conversion factor** or length of stay.  Any interpretation

26          and/or use of the DATA by the LICENSEE is solely and exclusively at

27          the discretion of the LICENSEE.   THE LICENSEE MUST NOT

28

39

1   represent the DATA in any way other than as expressed in this

2   paragraph.

3   ***Ingenix Acquires Existing Databases to Dominate the Data Market***

4   104.   In October 1998, the members of HIAA (including WellPoint) agreed to

5   sell the PHCS to Ingenix for an undisclosed amount.  At that point, WellPoint was in a

6   position of control of HIAA.  Leonard Schaeffer, the CEO of WellPoint, was the

7   Chairman-Elect, the number two official, of HIAA.  This was part of a plan by

8   Ingenix and its parent company, UnitedHealth, to acquire a dominant position in the

9   market for the provision of data services used to calculate UCR that included over 50

10  acquisitions.   Shortly before the PHCS purchase, in December 1997, Ingenix

11  purchased the MDR database of derived data from Medicode, Inc.  Ingenix would

12  later effectively merge those two databases to form what has herein been referred to as

13  the Ingenix Database.

14  105.   Under the terms of the 1998 sale of PHCS to Ingenix, HIAA and Ingenix

15  agreed to have member companies participate in an ongoing Ingenix PHCS Advisory

16  Committee, which would have input as to what data Ingenix used and how Ingenix

17  used it.   Because WellPoint's CEO was the Chairman of HIAA in the year

18  immediately following the sale, he and others working with him at WellPoint

19  necessarily had ongoing responsibility for the implementation of the database.  All

20  HIAA staffers who then worked on the PHCS were offered positions with Ingenix.

21  106.   Accompanying the sale to Ingenix, HIAA and Ingenix agreed to a 10-

22  year Cooperation Agreement which provided HIAA with continued input in the

23  development and operation of the PHCS and provided for lasting co-mingling of the

24  two entities in the form of a "Liaison Committee" to advise and evaluate Ingenix.  The

25  Cooperation Agreement further provided that Ingenix would charge HIAA members

26  50% less than non-HIAA members for use of the database and Ingenix, an otherwise

27  highly profitable arm of UnitedHealth, would waive all fees for HIAA members that

28  contributed twice the required minimum annual data input.   For example, the

40

WellPoint Contributors receive waivers of license fees ranging between 50% to 100%. This conduct is contrary to the individual self-interest of a profit-maximizing firm such as UnitedHealth and was a *quid pro quo* for members of the cartel in return for them agreeing not to provide the data they have submitted to Ingenix to another potential database developer. In fact, Unicare has always received a 100% waiver and is an original contributor to PHCS.

107.    Ingenix, upon purchasing the PHCS, entered into a Confidentiality Agreement mandating that it shield from disclosure the identity of entities (*i.e.*, the Defendants and Insurer Conspirators in this action) that had submitted or would submit information for use in the database. At the time of the sale of the PHCS to Ingenix, and as a condition thereto, UnitedHealth agreed to become a member of HIAA, but did not have to pay any membership dues during the duration of the 10-year Cooperation Agreement.

108.    By and through the creation and eventual domination of the Data Market by Ingenix, Defendants and the Conspirators conspired and agreed to create, expand, continue, promote and use the Ingenix Database to control and set False UCRs among and between purported horizontal competitors in the health insurance market (including WellPoint and the Insurer Conspirators) with the ultimate aim of reimbursing ONS below market levels.

### Defendants Effectuate Their Conspiracy and Anticompetitive Agreement By and Through the Ingenix Database

109.    The way in which the Ingenix Database has operated and continues to operate, and the manner in which the Insurer Conspirators utilize the Ingenix Database, demonstrates that the anticompetitive agreement to establish False UCRs has been ongoing, persisting to the present.

110.    Ingenix is a self-styled nationwide "healthcare information company" that sells "customized fee analyzers" to medical providers, healthcare insurers and automobile liability insurance companies. Essentially, Ingenix creates "modules" or

41

uniform pricing schedules, which provide whole dollar-payment ranges for given medical procedures in various locations.  The UnitedHealth Defendants market the Ingenix Database as the "industry standard," the "gold standard," or the "Intel inside," and all users of the database, *i.e.*, the Insurer Conspirators, are given fee schedules containing precisely the same dollar amount ranges for each particular procedure and area contained in each particular module.  Defendants and the Insurer Conspirators all then use the same Ingenix-established UCR fee schedules to cap reimbursement for ONS.

### Agreements to Provide and Utilize False Data

111.    To create the database, Ingenix first enters into contracts/licensing agreements with health insurers, including Defendants WellPoint and UnitedHealth, as well as the other Insurer Conspirators, to (i) obtain data regarding billing rates and information ***from those health insurers*** and/or (ii) provide UCR uniform pricing schedules ***to those same health insurers***, including the Insurer Conspirators, for their use in reimbursing for ONS.  Ingenix offers the Ingenix Database and its uniform UCR pricing schedules to health insurers at a discounted rate if those insurers agree to provide data to Ingenix to create that very database.  The amount of discount received by each data contributor is based on how much of their information is accepted and used by Ingenix.  All of the Insurer Conspirators provide raw pricing data to Ingenix and receive UCR pricing data in return, at a discounted price.  Ingenix uses the billing data provided by the Insurer Conspirators to create False UCR schedules, and those False UCR schedules, in turn, are used by the Insurer Conspirators to determine how much to reimburse their members for ONS.

112.    For the creation and continued updating of its database, Ingenix relies entirely on accumulating data from its various information providers (including Defendants and their Insurer Conspirators) *via* its "voluntary incentivized data contribution program" where those health insurers that are Ingenix clients submit information about the amounts they purport to have been billed by an undisclosed

1   number of unidentified healthcare providers for specific CPT codes.  The data Ingenix

2   receives has been termed a "convenience sample."  As Ingenix's own statistician

3   noted, "contributed data has no known probability distribution for representing the

4   entire population of charge data."

5        113.    When a WellPoint subscriber is provided ONS by a healthcare provider,

6   that provider submits a standardized claims procedure form to WellPoint.  The

7   WellPoint Contributors then extract information from that form and purportedly

8   submit it to Ingenix.  The only information that Ingenix accepts on its claims forms,

9   however, are the following four data points:  (i) the date of service; (ii) the CPT code;

10  (iii) the zip code where the service was provided; and (iv) the amount billed by the

11  provider.

12       114.    In or around 2005, members of HIAA (which by then had changed its

13  name to AHIP), including WellPoint, discussed submitting more than these four data

14  points to Ingenix because they expressly recognized the four data points were

15  inadequate to calculate accurate UCRs. On information and belief, these discussions

16  were triggered by lawsuits challenging the UCRs.  Around this same time, Ingenix

17  actually asked WellPoint to submit more data points.  WellPoint never did so, yet

18  when its contract with Ingenix was renewed in 2008, it continued to receive license

19  fee waivers ranging from 50% to 100%.  Despite this express acknowledgement,

20  Defendants and the Conspirators agreed to continue only to submit the four above-

21  listed elements to Ingenix.  Defendants and the Conspirators understood and agreed

22  that Ingenix would continue to base UCRs on the same insufficient data points it had

23  always been using.  By that decision, Defendants and their Conspirators affirmatively

24  determined to continue to enter and submit only the four data points.  In doing so, they

25  also affirmatively determined to continue to ignore other material information relevant

26  (and indeed crucial to) pricing, including, but not limited to:

27            (a)     where the services were rendered (*i.e.*, doctor's office, trauma

28  center, clinic, hospital, nursing home, *etc*.);

43

1    (b)    what type of provider performed the service (*i.e.*, licensed
2  specialist, general practitioner, nurse practitioner, *etc*.);

3    (c)    the number of providers of the service in the specific geographic
4  area at issue;

5    (d)    the level of experience or training of the provider;

6    (e)    the complexity of the procedure under the circumstances or the
7  existence of special circumstances as reported on the claim form in a standard code
8  known as a modifier;

9    (f)    the resources expended to perform the procedure as reported on the
10  claim form in a standard code known as a modifier;

11    (g)    age or condition of the patient; and

12    (h)    cost-of-living adjustments, if any.

13    115.    None of the Insurer Conspirators ever advised their members of the
14  inadequacy of the four data points or of their failure and refusal to expand those data
15  points.

16    116.    The Ingenix Database also is manipulated by the health insurance
17  companies (including WellPoint and the Insurer Conspirators) that submit data to
18  Ingenix.  Prior to submission to Ingenix, some health insurers first "scrub" claims
19  submissions forms to remove the highest charges, thereby submitting only the lowest
20  claims amounts.  This results in a lower reported average cost and systematically
21  suppresses the UCRs presented by Ingenix at different points in the distribution (*e.g.*,
22  70th percentile, 80th percentile, 90th percentile).  In 2005, Ingenix changed its data
23  contribution forms to require data contributors to certify with each submission that the
24  contributed data was complete and was not pre-edited or otherwise manipulated.  At
25  the same time, Ingenix began to "require" contributors to answer certain questions
26  regarding their submissions of data.  Ingenix, however, knew that certain answers
27  were false but nevertheless continued to accept the data and overlook the falsehoods.
28  At this point, WellPoint through the WellPoint Contributors began to provide those

required certifications to Ingenix attesting to the fact that its data submission was complete and not pre-edited.  WellPoint knew, and continues to know, that those certifications are false and misleading because it, like other Insurer Conspirators, continues to "scrub," pre-edit, or otherwise manipulate the data it contributes to Ingenix.  Ingenix was also aware that these certifications were unreliable because it was in some cases visually apparent that only partial data was being supplied.

117.    In fact, today, WellPoint essentially admits that it was not providing complete or "clean" provider data. At the 2010 AHIP conference, WellPoint, along with third party Enclarity, Inc., ran a program entitled "The Power of Better Provider Data: A WellPoint Case Study."  In this program, Enclarity, along with WellPoint, "reveal the success, results and benefits of **obtaining clean** provider data during a case study presentation."  Further, the program materials claimed that "[t]his presentation will explore how one major insurer, WellPoint, has harnessed new technology to significantly **improve the accuracy of their provider data** and transform their operations.  Specifically, the session will explore the challenges faced by WellPoint related to provider data management, describe the solution to the problem and reveal the results and improvements to WellPoint's Provider Data Quality Index (PDQI)."

118.    Once Ingenix receives the contributed data, it then combines information from all the contributing health insurers (including the Insurer Conspirators).  To the extent that an insurer has included "modifiers' with its claims data, Ingenix removes these codes that are used to denote special circumstances affecting the complexity or duration of a treatment and that affect the amount that the provider has billed.  Once Ingenix removes the modifier, the charge is then given equal weight to the charge corresponding to that unmodified CPT code, notwithstanding that the service was provided under altered conditions.

119.    Ingenix next edits the pooled data to remove high-end values through a system of "scrubbing."  Ingenix does so by using formulaic edits to identify purported

statistical outliers and automatically removes them without factual basis or further investigation to determine if they are truly incorrect data points (and should be removed) or are simply valid high charges. Although Ingenix claims to remove or scrub both high and low charges, a higher percentage of high-end charges are removed in an effort to skew the percentiles downward. The incorrect removal of valid high charges further biases the upper portion of the fee schedules downward, the very portion of the fee schedules that most insurers use to set UCR reimbursement caps for ONS. Ingenix also excludes any data it deems "unreliable," but no information is available about what factors Ingenix uses to determine when a billed charge is deemed unreliable.

120.    The Ingenix Database does not tabulate data according to the specific geographic area where a UCR actually would apply. Instead, Ingenix divides all states into geo-zips. Geo-zips are not medical service areas amenable to cost comparison. Ingenix makes no effort to determine what areas should be treated as equivalent or comparable medical service market areas, despite repeated consumer complaints, studies and direct objections to specific geozip areas.

121.    Ingenix purports to "warn" its customers, including the other Defendants here, that its geo-zips do not represent a medical service market area:

> Because the fee ranges in the Analyzer are based on the first three digits of your geo-zip, you need to assess where your locale stands in relation to others in this three-digit area. For example, many different three digit areas contain both urban and rural locales with different charging patterns. Use your judgment to determine how to interpret the fee range for your particular community.

122.    As Ingenix is fully aware, WellPoint and the Insurer Conspirators never exercise independent judgment in determining whether the specific geo-zip applicable to a particular UCR determination is valid, including whether it may contain "urban and rural locales with different charging patterns." Instead, the Insurer Conspirators

46

1  rely strictly on the False UCRs that reflect the unspecific geographic groupings
2  provided by the Ingenix Database, without taking into account possible different
3  charging patterns within each geo-zip.

4      123.    Based on these procedures, Ingenix produces two cycles of uniform
5  pricing schedules per year that include medical, surgical, anesthesia and coding
6  system service rates for a given "geo-zip" and applicable CPT code in the form of a
7  price range that shows the charges at various percentage intervals, *e.g.*, 50th, 75th and
8  90th.  For any CPT code and geo-zip combination with fewer than nine billed charges
9  remaining in the database after deletions by both the contributing insurers and
10  Ingenix, Ingenix instead determines and reports "derived charges," which are offered
11  in a similar percentile price range format, ranging from the 25th to the 95th
12  percentiles.  According to Ingenix, "derived charges" are calculated by pooling billed
13  charges for similar services in the same geographic area, and then adjusting that data
14  using values assigned by Ingenix to account for differences in the complexity and
15  expense of the procedure at issue.  Although the MDR Database, which is released
16  four times per year contains some actual charge data, it primarily consists of "derived
17  charges," which are offered in a similar percentile price range format, ranging from
18  the 25th to the 95th percentiles.  The derived charges in the MDR Database are
19  calculated using a different methodology than used in the PHCS database.
20  Accordingly, although the exact same underlying data is used to generate the MDR
21  and PHCS products which make up the Ingenix Database, the UCRs for the same CPT
22  code in the same geozip differ between the two products.  In the past, the differences
23  between the two products averaged as much as 6%.

24      124.    Once WellPoint receives these uniform pricing schedules, they are
25  uploaded onto a computerized claims platform and automatically accessed by
26  WellPoint to determine reimbursement amounts for ONS within the range provided by
27  the Ingenix UCR schedules.  WellPoint's computer systems then automatically
28  generate reimbursement amounts for ONS claims.  In other words, the Ingenix

47

1    Database is automatically applied and no human intervention is utilized to evaluate the

2    accuracy of the pricing data provided by Ingenix.

3        125.    Similar to its "warning" about the geo-zips, Ingenix also "warns" its

4    customers, including the other Defendants, here, that it does not formally endorse,

5    approve or recommend the use of the Ingenix data for UCRs.  With each production,

6    Ingenix includes the following disclaimer:

7            The Ingenix data are provided to subscribers for informational purposes

8            only.   Ingenix, Inc. disclaims any endorsements, approval, or

9            recommendation or particular uses of the data.  There is neither a stated

10           nor an implied "reasonable and customary charge[.]"

11   The Insurer Conspirators are well aware of these disclaimers.

12       126.    Despite this disclaimer, Ingenix explicitly markets the Ingenix Database

13   for adoption by insurers in reimbursing ONS based upon UCRs.  At least one time a

14   year, Ingenix provides WellPoint and the Insurer Conspirators with uniform UCR

15   pricing schedules (*i.e.*, False UCRs)  for which the upper portion of the fee range is

16   depressed.  Ingenix knows the Ingenix Database is being used by health insurers for

17   the  purpose  of  determining  UCRs  and  ONS  reimbursements.    Indeed,  the

18   UnitedHealth Defendants promise that Ingenix Database users will achieve substantial

19   cost savings, including a promised 16:1 return on investment.  This promise makes

20   sense only if the Ingenix Database is being used to determine ONS reimbursement

21   amounts. In the past, MDR database modules were expressly marketed as "UCR"

22   modules and current Ingenix employees have routinely referred to these price ranges

23   as "UCRs."   The only purpose of the uniform pricing schedule is to establish an

24   artificially-low  range  of  fees  upon  which  subscribing  insurers  base  their  ONS

25   reimbursement.  The False UCR range in the Ingenix schedules thereby serves as an

26   absolute  ceiling  on  the  amount  the  Insurer  Conspirators  will  pay  in  ONS

27   reimbursement for particular procedures across the country and also as a mechanism

28   to depress ONS reimbursements throughout the insurance industry (*i.e.*, if the entire

1   upper range of fees reflects artificially-low UCRs, then ONS reimbursements based on
2   that range are necessarily artificially-low also).

3            ***The Data Is Received and Distributed Without Verifying Its Accuracy***

4            127.   There is no review procedure in place at WellPoint to verify the
5   accuracy of the multiple yearly releases of uniform pricing schedules generated by the
6   Ingenix Database.   Instead, the uniform pricing schedules created by the Ingenix
7   Database are automatically relied upon to determine and establish UCRs.

8            128.   Likewise, Ingenix cannot guarantee that all claims received for a
9   particular CPT code service at any given time have been reported, much less
10  accurately reported, by its contributing insurers.   Nor does Ingenix ascertain if the
11  bills that are listed constitute the unnamed providers' usual and customary charges for
12  the service, or, instead, a discounted rate required by the agreements one or more of
13  the providers may have had with healthcare insurers.   Again, during the 2004-05 time
14  period, Ingenix considered employing an audit system.    None of the Insurer
15  Conspirators' data, however, has been meaningfully audited.    In fact, WellPoint
16  *refused* to submit to an audit when suggested by Ingenix.   In response, Ingenix turned
17  a blind eye.   Although it  requests that the CPT code billing data be accurate and
18  complete, Ingenix employs no mechanism to enforce or validate accuracy or
19  completeness of the client attestations and billing data.

20           129.   Ingenix does not – and has never – tested its results to determine if its
21  statistical conclusions bear any relationship to the actual high, low, median or any
22  particular percentile of actual marketplace CPT code service rates charged by
23  healthcare providers in any given area, even though the very purpose for its UCR
24  product – indeed, its *raison d'être* – is to determine ONS reimbursements that are
25  consistent with charges for those services by providers in a given area.   In fact,
26  Ingenix never submitted its products to any literature review or academic study.

27           130.   Ingenix and Co-Conspirators know that the data is not statistically valid.
28  And Ingenix knew that the Ingenix Database it distributed to WellPoint and the

Insurer Conspirators resulted in artificially-low ONS reimbursements.  It explored enhancing its databases to make them more defensible and accurate, yet no steps were ever taken to do so.  During that process, Ingenix admitted that it knew of serious flaws in its databases.  Ingenix knew as early as 2004, for example, that its databases were not statistically valid.  It used the number "9" for the number of occurrences of a CPT code as the cut-off for using actual data for a UCR.  This is to say that if, for a CPT code, there were fewer than 9 occurrences of that medical procedure, Ingenix would use "derived data" to generate UCR.  For those CPT codes that occurred more than 9 times, the actual, contributed, charge data would be used.  Ingenix, however, possessed expert opinion that the number 9 as a cut-off point was far too low and that, in fact, when fewer than <u>100</u> occurrences were available, UCRs were subject to volatility and instability.  Ingenix further knew of other serious flaws in the MDR and PHCS databases such as that:  Ingenix had "no control of data and how contributors gather it," the databases were dependent on subjective characteristics, the data was not representative of any denominator, there were illogical charging patterns,  "Geozips are Ingenix derived and not based on any identifiable industry or demographic standards," and documentation surrounding the databases was "insufficient."

131.   The result of this cycle of collusion is a database that produces flawed uniform pricing schedules (the False UCRs) that systematically result in the under-reimbursement for ONS by WellPoint and the Insurer Conspirators.  The flaws in the Ingenix Database are pervasive and, *inter alia*, include:

(a)   no statistically validity and questionable accuracy of underlying data;

(b)   failing to inquire whether all of the contributors are using the same criteria and coding (as well as aggregating) accurately and consistently;

(c)   aggregating data from similar codes to create a larger sample when there is not enough charge data to provide a statistically valid sample for a CPT code using flawed methods;

1        (d)     combining geo-zips to determine what Ingenix considers to be a

2  "sociodemographic region" for which there is no verification;

3        (e)     scrubbing data in such a manner that removes outliers in a

4  subjective manner, *i.e.*, Ingenix removes a larger percentage of high-end values as

5  compared to low-end outliers, resulting in the upper end of the fee range being biased

6  downward;

7        (f)     failing to incorporate an appropriate statistical methodology

8  (including sampling, data editing or data estimation), resulting in data that is

9  inappropriate and biases downward the upper end of the fee range;

10        (g)     using cumulated data that has already been scrubbed by the

11  individual contributors to remove high-end values, thereby further reducing the

12  charges in the upper end of the fee range;

13        (h)     including charges for procedures in non-comparable geographic

14  areas;

15        (i)     failing to account for the skill, experience, training, or education of

16  providers;;

17        (j)     combining ONS charges with "in-network" providers who have

18  already agreed to a discounted contracted rate – thus further skewing the charges

19  reported in the upper end of fee ranges downward;

20        (k)     failing to distinguish the data based on the number of healthcare

21  providers whose charges are reflected; and

22        (l)     failing to edit any data that reflect negotiated or discounted

23  charges.

24              ***The Truth of the Ingenix Database Is Concealed***

25        132.   As a condition of obtaining uniform UCR pricing schedules from

26  Ingenix, WellPoint and the Insurer Conspirators entered into confidentiality and non-

27  disclosure agreements whereby the Insurer Conspirators agreed not to reproduce data

28  provided by Ingenix in the Ingenix Databases except under very limited and strictly-

51

controlled circumstances. These confidentiality and non-disclosure agreements restrain potential competition in the relevant market and help conceal the agreement to fix prices as well as the role each Insurer Conspirator has in that agreement. Indeed, Ingenix has maintained 70%-80% of the market share for UCR pricing products from 2000 to the present and has effectively prevented any new competitors from entering this market.

133.    WellPoint and the other Insurer Conspirators have ample opportunity to, and do, communicate through HIAA/AHIP and regularly share UCR pricing information using Ingenix as a conduit to distribute agreed-upon pricing memos to each Insurer Conspirator for the purpose of artificially lowering ONS reimbursements to Plaintiffs and the Classes. At least annually, WellPoint and the Insurer Conspirators convene at meetings set up by Ingenix (the conduit) and discuss the Ingenix Database. WellPoint and the other Insurer Conspirators know the data being provided to Ingenix is flawed and have communicated this fact to one another and to Ingenix. The Insurer Conspirators understand that, as a consequence, the pricing schedules received from Ingenix are flawed and cause them to under-reimburse for ONS. Nevertheless, the Insurer Conspirators continue to have input into the type of data used by Ingenix and jointly produce provider cost data and utilize Ingenix's False UCRs to coordinate and centrally set a pricing schedule for the purpose of calculating ONS reimbursement.

134.    WellPoint and the other Insurer Conspirators' scheme to manipulate UCRs for the purpose of under-reimbursing for ONS is predicated, in part, on keeping the Ingenix Database, and its inherent flaws, a complete secret from subscribers and providers. As a result, Defendants and the Insurer Conspirators actively conceal the true UCRs, knowing the success of the scheme will be jeopardized if true UCRs are known to the healthcare-purchasing public. To prevent transparency and inhibit price competition, neither WellPoint nor any of the Insurer Conspirators makes its False UCRs available to its insureds or ONS providers until after an ONS has been

52

rendered.  Ingenix and the Insurer Conspirators have agreed to limits on the number of procedures/geographic areas for which subscribers can obtain information about UCRs, thus barring subscribers from shopping for better plan terms that may be available from potential competitors.  The Insurer Conspirators likewise do not disclose to Plaintiffs or the general public that they contract with Ingenix, provide Ingenix with data, and use False UCRs provided by Ingenix to determine ONS reimbursement amounts.  They do not disclose how they and Ingenix arrive at False UCRs, or that Ingenix disseminates the False UCRs they all use for calculating ONS reimbursement.  They further do not disclose that they have agreed not to provide data to potential competitors of Ingenix.

135.     Rather than disclose the defective nature of the Ingenix Database and the participation by WellPoint and the Insurer Conspirators in creating False UCRs, the Insurer Conspirators shield these facts from subscribers and providers through misrepresentations and material omissions designed to lead them to believe they are using fair and accurate UCR schedules to reimburse for ONS.  Further, as part of the database licensing arrangements between Ingenix and the Insurer Conspirators, those parties have agreed to act together to help the Insurer Conspirators enforce the False UCRs reported in the periodic uniform pricing schedules and used by the Insurer Conspirators in calculating reimbursements, against both provider and subscriber challenges.  Ingenix and the insurers regularly communicate about any challenges or questions about UCR, and, in fact, have developed canned and routine responses that serve to obfuscate the mechanism by which they are determined.

136.     None of the Insurer Conspirators has attempted to set up a rival database despite Ingenix's profitability and the fact that it is owned by a competitor (Ingenix's operating profit margins are 20%, compared to 10% for UnitedHealth as a whole). Rather, as members of HIAA/AHIP, the Insurer Conspirators acted together to transfer the Ingenix Database to Ingenix, to administer and maintain it, and agreed among themselves and with Ingenix that none of them would provide billed claims

53

data to a potential competitor database.  By agreeing not to disclose any of the data they have submitted to Ingenix for inclusion in its database to any other potential database developer, the Insurer Conspirators have rendered it entirely impracticable for other members of the cartel to create a competing database for use in determining UCRs for ONS.

## INVESTIGATIONS INTO THE INGENIX DATABASES

### The New York Attorney General's Investigation and Action

137.    During 2007 and 2008, the NYAG performed a preliminary investigation into how health insurers computed ONS reimbursement rates.  On February 13, 2008, the NYAG "Healthcare Industry Taskforce" launched an industry-wide investigation into allegations that insurers were under-reimbursing for ONS. The investigation centered on Defendants and several of the Insurer Conspirators, and particularly on Ingenix.

138.    After six months of investigation that included document review, data analysis, and interviews, the NYAG found that the Ingenix Database systematically reduces the rate at which insurers paid for out-of-network care.  As a result, the NYAG's office expanded its investigation by issuing subpoenas seeking documents from more than a dozen health insurers, including Defendants UnitedHealth and WellPoint as well as several of the Insurer Conspirators.

139.    The NYAG found those documents revealed a shocking lack of transparency and accuracy in the industry's use of the Ingenix Database.  The NYAG found insurers such as WellPoint obfuscate their policy language by promising to reimburse based on usual and customary rates but instead reimbursing based on schedules compiled by one of their own:  UnitedHealth *via* Ingenix.

140.    The NYAG further found this conflict of interest is entirely hidden from consumers because Defendants and the Conspirators pretend an independent database underlies their UCRs for ONS when, in reality, the schedules themselves, created in a well of conflicts, are unreliable and inadequate.  The result is that consumers are

54

1   "tricked" into having to pay more for medical care than they had anticipated, leading

2   to unexpected healthcare debts.

3       141.   The NYAG determined that health insurers, who have a financial

4   incentive to do so, first provide flawed data and then receive flawed data to determine

5   UCRs for ONS that are understated and artificially low.  Or, as the head of the

6   NYAG's investigative task force stated, "***garbage in, garbage out***."

7       142.   To test the accuracy of the Ingenix Database, the NYAG's office

8   collected and analyzed millions of healthcare bills from a variety of sources, including

9   over a million bills from ordinary doctors' office visits within the state of New York.

10  It then compared these actual bills to the UCRs produced by the Ingenix Database for

11  that geographic area.  This enabled the NYAG's office to compare the rate that the

12  Ingenix Database indicated should be paid for a particular medical service in a

13  particular region with the rate that the doctors in that region actually charged.  The

14  comparison ultimately revealed that insurers systematically under-reimburse their

15  insured patients for doctors' office visits in New York state by 10%-28%, and that up

16  to 110 million Americans have been harmed by Defendants' conspiracy to the tune of

17  hundreds of millions of dollars in losses for consumers and providers nationwide.

18      143.   Upon completing its investigation, the NYAG's office summarized its

19  central findings in a January 13, 2009 document entitled "Health Care Report:  The

20  Consumer Reimbursement System is Code Blue" ("the NYAG Report").  The NYAG

21  Report found that the Ingenix Database and the insurers' participation in and use of

22  Ingenix was:

23          (a)   "an industry-wide problem";

24          (b)   "a ***rigged system***";

25          (c)   "fraudulent";

26          (d)   used to advance the interests of the insurers;

27          (e)   "critically ill"; and

28

1        (f)  operated as a "***black box***" to consumers, who are left in the dark as
2    to "what reimbursement rate to expect from the insurer."

3       144.  According to the Attorney General:

4       [T]he responsible consumer reads the plan documents and sees a thicket
5       of words.  One term seems intelligible:  the "usual and customary rate"
6       of a similar physician for a similar service in a similar area.  That sounds
7       reasonable.  The consumer makes the leap out-of-network and submits
8       the bill to the insurer, only to be told the consumer will not be fully
9       reimbursed because the doctor's charge exceeded the usual and
10      customary rate.  The fog of ignorance continues, thanks to the insurer.
11      The physician-patient relationship is undermined, as the physician has
12      been branded a charlatan whose bills are inflated.  No one's interests
13      here are advanced, except perhaps when next time, the consumer decides
14      to stay in network for fear of what bills may accrue for out-of-network
15      care.  The interests advanced in that event are those of the insurer,
16      whether by accident or design.

17      145.  The NYAG left little doubt that this industry-wide problem needed an
18   industry-wide solution because all industry members benefitted unfairly and at the
19   expense of consumers over at least the past ten years.

20      146.  Following issuance of its Report, the NYAG entered into several
21   "Assurances of Discontinuance" with UnitedHealth, WellPoint, and certain of the
22   Insurer Conspirators named in this case (Cigna, Aetna, and Health Net).  Those
23   assurances provided that the Ingenix Database would cease to exist and a new
24   unbiased database would be created.  Specifically, the agreements provided that:

25       (a)  An independent third party that is free from conflicts and uses a
26   fair, objective and reliable database is needed to replace Ingenix;

27

28

56

1        (b)     An independent database would be created and operated through a

2 not-for-profit corporation that will own the new database and collect data from

3 contributors and publish rate information in a public and transparent way;

4        (c)     The not-for-profit corporation will create a website available to the

5 public to disclose out-of-network reimbursement rates.  The website will include a

6 search function that will clearly indicate the prevailing charge in a given area;

7        (d)     Insurers will provide information to their members explaining the

8 method of determining reimbursement rates including that Ingenix is owned by

9 UnitedHealth, and will explain that a new database is being created;

10       (e)     Insurers will contribute to fund the creation of the new database.

11 Defendant UnitedHealth agreed to pay $50 million; Defendant WellPoint agreed to

12 pay $10 million; Conspirator Aetna agreed to pay $20 million; Conspirator Health Net

13 agreed to pay $2 Million and Conspirator Cigna agreed to pay $10 million; and

14       (f)     Once the new database is created, insurers will have 60 days to

15 cease operating and using the Ingenix Database.

16                                 ***Congress' Investigation***

17       147.    Congress also is actively investigating the use of the Ingenix Database in

18 setting UCRs.  Early in 2009, the Senate Committee on Commerce, Science, and

19 Transportation held full committee hearings on "Deceptive Health Insurance Industry

20 Practices – Are Consumers Getting What They Paid For?"  The Committee held two

21 such hearings, the first on March 26 and the second on March 31, 2009, examining

22 how the health insurance industry reimburses consumers for out-of-network

23 healthcare services; specifically, how the industry calculates the UCR for out-of-

24 network non-MD healthcare providers.  The statements and archived webcast are

25 available                                                                  at

26 http://commerce.senate.gov/public/index.cfm?FuseAction=Hearings.Hearing&Hearin

27 g_ID=4edbd03a-bf22-4783-87db-dfd57d980123 (March 26, 2009 Hearing) and

28 http://commerce.senate.gov/public/index.cfm?FuseAction=Hearings.Hearing&

1    Hearing_ID=63b0f558-ec43-4ab8-82f0-070bcc699e38 (March 31, 2009 Hearing)

2    (SR-253).

3         148.    At the March 31, 2009 hearing, Senator and Committee Chairman John

4    D. Rockefeller, IV, speaking for the majority of the Senate Committee, explained why

5    they believed the insurance industry's practices were "deceptive."  Mr. Rockefeller

6    noted that more than 100 million Americans paid for health insurance that would give

7    "them the option of going outside of their provider networks for care," but that the

8    insurance companies were not living up to their end of the bargain:

9         Let's be very clear about this.  The insurers aren't letting their

10        policyholders see non-network doctors out of the goodness of their

11        hearts.  Consumers are paying for this option - through higher premiums

12        and higher cost sharing.  There are many reasons American consumers

13        decide to pay the extra money for health insurance with an out-of-

14        network option.  One New York consumer we heard from last week, Dr.

15        Mary Jerome, said she paid extra for the "peace of mind" that she could

16        get the best care available when she really needed it.

17        What we learned at our first hearing was that while consumers held up

18        their side of the bargain, the insurers did not.  The insurance industry

19        promised to base their out-of-network payments on what they call the

20        "usual, customary, and reasonable" cost of medical care in a particular

21        area.  Thanks to the New York investigation and other lawsuits, we now

22        know that the insurance companies were not delivering what they

23        promised.

24        149.    Senator Rockefeller specifically addressed the NYAG's findings as to

25   the insurance industry's use of the Ingenix Database to pay far less than the UCR

26   amounts:

27        In Erie County, New York, for example, insurance companies were

28        reimbursing their policyholders for doctor visits at rates that were 15 to

58

1    25% below the local prevailing rates.   A federal judge recently

2    concluded that the reasonable and customary data insurers used in New

3    Jersey was 14.5% lower than the prevailing market rates.  Everywhere

4    experts have looked at this data, they have found what statisticians call a

5    "downward skew" in the numbers.  For ten years or even longer, this

6    skewed data was used to stick consumers with billions of dollars that the

7    insurance industry should have been paying.  The source of the skewed

8    data was Dr. Slavitt's company, Ingenix.

9    150.   In light of the insurance industry's fraudulent use of the Ingenix

10   Database in setting UCRs, the Senate Committee is currently evaluating whether more

11   federal oversight and regulation of the insurance industry is necessary.  For now,

12   however, the only avenue of redress for subscribers and providers, such as Plaintiffs

13   and the Classes, is through the courts.

**HARM TO SUBSCRIBERS**

15   151.  By scheming to fix UCRs at below-market levels as a means to

16   artificially depress ONS rates, the Defendants shifted the actual costs of paying for

17   ONS to the subscribers (including Subscriber Plaintiffs and Class), and thus

18   artificially increased the price that subscribers were required to pay for ONS.  Every

19   provider charge for ONS is comprised of two parts: the price the subscriber will

20   ultimately pay for the service and the portion that will be reimbursed by the insurer.

21   By reducing the reimbursement, the price to the subscriber is increased in an equal

22   dollar amount. The Ingenix Database has been used to effectuate this goal in the

23   following manner.  When a health plan subscriber (or his/her healthcare provider

24   pursuant to an "assignment of benefits" when such an assignment has occurred)

25   submits a claim for reimbursement, the Insurer Conspirators use the False UCR

26   schedules produced by the Ingenix Database to pay less than the "usual and customary

27   rate" for the services rendered, thereby requiring the subscriber to make up the

28   difference to the ONS provider by way of out-of-pocket payments, whether or not

59

there has been an assignment of *benefits*.  This hidden, undisclosed cost thereby increases the cost of care, and, commensurately, the cost of receiving healthcare pursuant to the Insurer Conspirators' health plans.   Subscribers have been economically injured both by paying higher premiums for a plan that allows ONS reimbursement, and by failing to receive the level of reimbursement promised by the plan.

152.   The Insurer Conspirators agreed through contracts, licenses, and oral understandings to provide flawed pricing information to Ingenix; to obtain and use the resulting flawed Ingenix uniform pricing schedules to determine ONS reimbursements, thereby depriving subscribers of a competitive market for obtaining ONS; and to keep Ingenix UCR data secret from subscribers, providers, and potential Ingenix competitors.  As a result of the structure of the sale of the PCHS database by HIAA and agreements among the leading health insurers that tie them to Ingenix, there is no viable competitor in the market for data services used to calculate UCRs. Defendants' anticompetitive scheme ensured there would be no viable competitor in the market for data services used to calculate UCRs.  The absence of such competition prevented subscribers and providers from comparing UCRs and detecting the falsity of the rates created by Defendants and their Co-Conspirators.

153.   Due to the agreement by the Defendants and the Conspirators to manipulate a limited number of data points, which are used to set the False UCRs that Ingenix disseminates and WellPoint and others deploy, competition in the market for the provision of data services used to calculate UCRs was harmed and constrained. This had the inevitable and quantifiable effect of increasing the price that subscribers were required to pay for ONS, reducing the amount ultimately recovered by providers for such services, and dramatically reducing the Insurers' own costs.

154.   As a result of the Defendants' anticompetitive and deceptive conduct, the Subscriber Plaintiffs and Classes pay increased out-of-pocket costs due to the artificially-low reimbursement amounts, thus, paying a higher price for ONS than they

would have in a competitive market free from collusion and price-fixing: each dollar the Insurer Conspirators were able to lower ONS reimbursements is one additional dollar Plaintiffs and Class members were, and are, obligated to pay out of pocket.

155.    As discussed herein, the Subscriber Plaintiffs' contractual relationships with WellPoint require that they be ultimately responsible for any payments to Providers.  As such the Subscriber Plaintiffs and the Classes they represent have standing to pursue their claims even if they have assigned their claims for out-of-network benefits to providers.  When subscribers assign their claims for benefits, they are still contractually responsible and financially responsible for full payment to their respective providers.  Moreover, providers generally seek to recoup the balance of any amount beyond what is paid by WellPoint from the subscriber (known as "balance billing').  Because subscribers are ultimately responsible for payment for the services, have paid the difference between what WellPoint reimbursed as UCR and the billed charge by providers' balancing billing, all Subscriber Plaintiffs, including those who have assigned their claims to Providers, have standing and have been injured by WellPoint's conduct.

## HARM TO PROVIDERS

156.    Defendants' scheme to fix UCRs at below-market levels as a means by which to artificially depress rates for ONS injures the Provider Plaintiffs and Class in several ways.

157.    By limiting payment to the False UCR, the Defendants cause the Providers financial harm by not paying them the full amount to which they are entitled – their full billed charge or their actual usual, customary and reasonable rate for their services.

158.    When ONS reimbursements are less than the Provider Plaintiffs' usual and customary rate for the service rendered, the Provider Plaintiffs systematically bear the financial loss because they cannot otherwise collect the full amount to which they

are entitled.  It has been estimated that approximately 5.5% of non-profit hospital charges and 5% to 10% of private physician charges are written off as non-collectible.

159.   WellPoint and the Insurer Conspirators' systematic improper ONS reimbursement determinations also cause Providers to needlessly expend valuable time and resources identifying and then appealing unlawful determinations through a process deliberately designed to deny, delay, and impede providers from obtaining proper ONS reimbursements (providers frequently submit claims for reimbursement themselves when patients execute "assignments of benefits" that make the provider the beneficiary of the ONS reimbursement).  When Provider Plaintiffs and members of the Provider Class submit claims, they typically receive "Explanations of Benefits" ("EOBs") that claim the charge submitted exceeds the UCR, but without any explanation of how the UCR was calculated.  Providers then face a futile appeal procedure, where accurate UCR determinations are impossible as the Insurer Conspirators rely solely upon Ingenix's False UCRs.  The Insurer Conspirators frustrate the purposes and mission of the Association Plaintiffs.

160.   These injuries coerce Providers to become participating, "in-network" providers.  By agreeing to be bound by insurer fee schedules that apply so-called "negotiated fees" for services, providers can eliminate the  business from patients who receive bills with surprisingly high balances remaining after insurer reimbursement, but only at the cost of significantly lower fees for their services.  Insurer Conspirators then receive the benefit of lower payments to providers on their insureds' claims through the "negotiated fee" schedules to which in-network providers are required to adhere and which strictly cap what providers may charge for their services.  Thus, the economic pressure on ONS providers to become part of the insurer's network forces them to accept significantly reduced compensation and to modify their patient care and treatment practices in a manner that conforms to the insurer's billing policies. This reduces the provider choice that would otherwise be available to subscribers.

161.   The Provider Plaintiffs and the Class have standing to pursue these claims as assignees of their patients' out-of-network benefits and/or as third-party beneficiaries of their patients' out-of-network benefits.

162.   WellPoint acknowledges this when they pay the Provider directly or otherwise recognize the Provider's valid assignment of benefits.

## HARM TO THE ASSOCIATIONS

163.   The impact of the Insurer Conspirators' non-transparent ONS reimbursement scheme and pervasive under-reimbursements causes the Association Plaintiffs to expend significant time, energy and money to, *inter alia*, counsel members on how to counteract the practices at issue, monitor the Insurer Conspirators' practices, advocate on their members' behalf, and/or lobby for legislative or other insurance reform.  Each of these efforts requires staff, time and money that would not be expended but for Defendants and the Conspirators' fraudulent scheme and price-fixing conspiracy.

164.   One of the core missions of the Association Plaintiffs is to advance and safeguard the provider-patient relationship.  The Defendants' scheme undermines the relationship between providers and their patients.  Subscribers believe they are covered for the "usual and customary" charge for medical services, yet when they receive ONS, they are frequently left with a surprisingly large bill because the ONS reimbursement has covered only a portion of the providers' fees.  Because the subscribers do not (and cannot) know that the low ONS reimbursement is due to the Insurer Conspirators' price-fixing scheme, blame is laid at the feet of the provider, whose rates are made to look exorbitant by the Insurer Conspirators' explanation that the charges exceed the "usual and customary rate."  The conspiracy thereby introduces mistrust and friction into the relationship between subscribers and their care providers.  This phenomenon adversely affects thousands of the Association Plaintiffs' members, including the Provider Plaintiffs.

165.    The Association Plaintiffs have standing to pursue these claims both individually and/or on behalf of their members through associational standing.

## ERISA ALLEGATIONS

166.    Under the terms of their healthcare plans, WellPoint is obligated to provide specific healthcare benefits and reimbursements to subscribers.  Under federal law, WellPoint is an ERISA fiduciary for the ERISA health plan at issue.  As such, WellPoint owes its plan members (including the Subscriber Plaintiffs) the fiduciary duties of care and loyalty, and they must apply their respective plan provisions in good faith and as required under ERISA.  When subscribers assign their ERISA benefits to healthcare providers (including the Provider Plaintiffs), WellPoint also owes such fiduciary duties and obligations to act in good faith to the assignee healthcare providers.  As set forth below, WellPoint has breached, and continues to breach, its obligations to the Subscriber and Provider Plaintiffs and the ERISA Provider and Subscriber Subclasses, and in so doing has violated ERISA.

167.    Under ERISA, WellPoint is required, among other things, to comply with the terms and conditions of its healthcare plans; to afford plan subscribers and assignees an opportunity to obtain a "full and fair review" of any denied or reduced reimbursements; and to make certain disclosures to plan subscribers, such as accurately setting forth plan terms, explaining the specific reasons why a claim is denied and the internal rules and evidence that underlie such determinations, disclosing the basis for their interpretation of plan terms, and providing appropriate data and documentation concerning coverage decisions.

168.    The federal common law of trusts, which is applicable to ERISA fiduciaries such as WellPoint, further requires that fiduciaries deal honestly with plan subscribers and their assignees, and adhere to certain specific fiduciary standards in their dealings.

169.    In offering and administering its healthcare plans, WellPoint assumes the role of "Plan Administrator," as that term is defined under ERISA, in that

WellPoint interprets and applies the plan terms, makes all coverage decisions, and provides for payment in the form of medical reimbursements to plan subscribers and/or their assignee-providers.   As the Plan Administrator, WellPoint assumes various obligations specified under ERISA.  These obligations include providing its plan members with a "summary plan description" ("SPD"), a document designed to describe in layperson's language the material terms, conditions and limitations of the healthcare plan.  The full details of the plan, which are summarized in the SPD, are contained in the Evidence of Coverage ("EOC").

170.    Alternatively, in those instances where WellPoint has not explicitly assumed the role of "Plan Administrator," it has acted as the "*de facto*" Plan Administrator by, among other things, providing Plan documents to participants, receiving claims for medical reimbursements, evaluating the claims and making medical reimbursement determinations, interpreting the terms of the Plan and making and administering medical reimbursement payments.   In carrying out these Plan Administrator functions, WellPoint has preeminent authority to manage and administer their medical reimbursement Plans.

171.    WellPoint is obligated under ERISA to make coverage determinations in a manner consistent with the disclosures contained in their respective SPDs.  To the extent there is a disparity or conflict between the SPDs and an applicable EOC, the SPD governs, so long as the plan member benefits from the application of the SPD.  If the employer, rather than WellPoint, is deemed to be the Plan Administrator, WellPoint, as co-fiduciary, remains responsible for ensuring the SPD complies with the law as provided in ERISA, 29 U.S.C. § 1105.  Such is the case even if the employer prepares or disseminates the SPD.

172.    WellPoint breached its fiduciary duties by failing to disclose the actual and true reimbursement rules used to pay ONS benefits by knowingly using inaccurate, flawed and fabricated data from the Ingenix Database to calculate UCRs, by knowingly delegating their duty to collect accurate information regarding UCRs to

1   Ingenix (whom WellPoint knew was collecting inadequate and inaccurate data

2   regarding UCRs), and by failing to fulfill its obligations of good faith, due care and

3   loyalty.  Moreover, WellPoint breached its duties by manipulating the data it used to

4   pay ONS so as to artificially depress the data Ingenix relied upon in creating UCR

5   schedules for ONS reimbursements.

6       173.   WellPoint through the WellPoint Contributors is a contributor of

7   provider charge data to the Ingenix Database.  Following receipt of the data from

8   WellPoint, Ingenix removes valid high charges from all contributors' data.  Ingenix

9   then published the corrupted database.  Simply stated, WellPoint and Ingenix "cooked

10  the books," and the corruption of the data invalidates its use by WellPoint as the basis

11  for determining UCR for ONS.   These actions (among others referenced herein)

12  violated the law.

13  ***Non-Ingenix UCR Methodologies***

14      174.   In addition to UCR determinations based on the Ingenix Database,

15  Plaintiffs challenge WellPoint's other improper ONS Benefit Reductions, including its

16  use of  (1) cryptic internal fee schedules; (2)  discounted in-network or Par provider

17  fee schedules rather than valid UCR data; and (3) undisclosed low percentages of

18  CMS rates, oftentimes referred to as a percentage of Medicare (collectively, "Non-

19  Ingenix Methodologies").   These Non-Ingenix Methodologies breach subscribers'

20  contracts and constitute violations of ERISA.

21      175.   Although WellPoint healthcare plans represent that ONS will be

22  reimbursed based on UCR determinations, WellPoint does not base its determinations

23  on the usual, customary, and reasonable rates based on charges of similar types of

24  providers performing similarly complex procedures in the relevant geographic

25  location.  Instead,  at times, WellPoint employs ONS Benefit Reductions to reimburse

26  ONS based on an undisclosed percentage of extremely low and unrepresentative

27  Medicare rates.   For example, some health plans state that ONS will be reimbursed

28  based on UCR.  That UCR is determined, though, by an undisclosed percentage of a

CMS fee schedule.  In fact, WellPoint entities have used 100% of CMS fee schedules to reimburse for UCR even though those schedules already represent government-driven, below-market rates.

176.   WellPoint also impermissibly makes UCR reimbursement determinations using flawed or incomplete internal fee schedules.  These fee schedules are wholly cryptic and undisclosed and the methodologies supporting them have never been known.  In addition, the data supporting them is incomplete and does not accurately reflect the amount most often charged for a given service in the same geographic area, or the average price charged for a given service in the same geographic area, as required by the operative WellPoint plans.

177.   Certain WellPoint healthcare plans provide that ONS will be reimbursed based on a percentage of the so-called "Negotiated Fee Schedule" used to pay in-network providers.  Contrary to WellPoint's representations, however, the "Negotiated Fee Schedule" is not a product of arms-length negotiations between in-network providers and WellPoint but, rather, is WellPoint's standard, discounted fee schedule that WellPoint unilaterally develops and imposes on a portion of its in-network providers.  WellPoint's standard fee schedule does not reflect the rates applicable to those in-network providers who actually negotiate fees with WellPoint.

178.   The use of Non-Ingenix Methodologies (as well as the Ingenix Database) to reimburse for ONS leaves  WellPoint's members financially responsible for unpaid amounts that WellPoint is otherwise obligated to pay under the terms of its healthcare plans.  Because the ONS Benefit Reductions are "exclusions" of coverage under the ERISA plans, WellPoint has the burden to demonstrate that its exclusions comply with its plan(s) and its legal obligations.  Plaintiffs allege that WellPoint cannot sustain its burden regarding its ONS Benefit Reductions, and seek a redetermination of their ONS benefits claims and corresponding recalculation and payment of unpaid benefits and other equitable relief for themselves under ERISA.

179.    WellPoint also made numerous UCR and other ONS Benefit Reductions to Plaintiffs based on practices challenged herein as violations of federal law, including UCR based on manipulated and invalid data from the Ingenix Databases and undisclosed, improper criteria such as internal fee schedules, negotiated rates, and CMS-prescribed percentages.

180.    WellPoint is legally obligated to adhere to the specific provisions of its Members' group health plans.  WellPoint cannot make ONS Benefit Reductions if they are not authorized or accurately disclosed in their Members' Certificates and SPDs, the latter of which is a document designed to describe in layperson's language the material terms, conditions, and limitations of the healthcare plan.  During the Class Period, WellPoint breached the express terms and conditions of Members' Certificates and SPDs when it made ONS Benefit Reductions.

181.    Plaintiffs and Class Members challenge WellPoint's systemic application of rules and policies in making ONS Benefit Reductions that are not authorized by WellPoint Members' Certificates and SPDs; its routine violation of its fiduciary duties; and its failure to comply with ERISA, federal claims procedure regulations, federal common law and other applicable law.

182.    WellPoint's EOBs reflecting ONS Benefit Reductions did not comply with legal requirements, including federal claims procedure regulations.  The EOBs failed to advise WellPoint Members of the specific reasons for the denial(s), the specific plan provisions, and their appeal rights.  WellPoint's EOBs reflecting UCR determinations failed to advise the Plaintiffs of the data that WellPoint used to calculate UCR.

183.    Various procedural rules that covered Subscriber Plaintiffs' appeals were also violated.  WellPoint's substantive and procedural violations prevent it from relying on defenses to Plaintiffs' claims, such as exhaustion or statutes of limitations.

184.    WellPoint issued EOCs to the Subscriber Plaintiffs and all subscribers and beneficiaries that set forth the benefits that WellPoint promised to pay its

subscribers.   According to the Subscriber Plaintiffs' EOCs, benefits were to be conferred to each subscriber and his enrolled family members.

185.   Like most insurance plans, WellPoint's plans typically at issue here differentiate between (i) coverage for medical treatment from "in-network" providers who have negotiated discount rates with the insurer and (ii) coverage for treatment from "out-of-network" providers who charge insureds their usual, non-discounted rates.  WellPoint refers to such providers as "non-participating," "non-contracting," "non-network," and/or "out-of-network" providers (collectively, "out-of-network"). As part of their contracts with WellPoint, in-network providers agree to not bill insured patients or WellPoint more than the contracted amounts for in-network services.  Conversely, out-of network providers have no service contracts with the insurance company and thus are not precluded from billing at their usual rates.  In cases where the out-of-network provider's bills exceed more than the insurance company will pay, the balance is the WellPoint subscriber's responsibility.

186.   Under the Subscriber Plaintiffs' plans, subscribers have an express right to receive treatment from out-of-network providers.  When WellPoint plan members receive ONS, payments are based on a percentage of the lesser of (i) the billed charge or (ii) what WellPoint describes as the "usual and customary" rate for that service. Health insurers, including WellPoint, use the terms "UCR," "usual and customary" "reasonable and customary" and "reasonable charge" interchangeably.

187.   WellPoint often refers to the UCR as the "maximum amount allowed" "allowable expense" or "allowable charge."  WellPoint makes clear in its respective EOCs, as well as in other written communications to its subscribers, that the plan member is financially responsible for the difference between the UCR (amount allowed) and the provider's billed charge for ONS.  For example, EOCs state that the amount the ONS provider charged for the service, the amount allowed, the percentage and portion of the amount allowed that WellPoint will pay, and the balance owed by the subscriber, which WellPoint describes as "Your Responsibility."  Other EOCs

69

refer to this amount as "What You May Owe Providers" or similar language conveying WellPoint's position that the portion of an ONS that WellPoint has not paid is the plan member's obligation.

188.   The portions of ONS charges not paid by WellPoint are not credited toward deductibles or out-of-pocket maximums that limit the total amount a plan member has to pay for medical services over a given time period.  Thus, these out-of-pocket expenses are charges wholly in addition to the amount that the subscriber has agreed to pay for healthcare coverage.

189.   In processing claims for ONS charges, WellPoint is obligated under ERISA to calculate accurate UCRs and reimburse subscribers accurately UCRs in a manner consistent with the definition of UCR used by WellPoint to describe its health plans to its plan subscribers.  WellPoint does not fulfill this obligation because it fails to pay benefits based on accurate UCRs.

### Plaintiff Roberts

190.   Plaintiff Michael A. Roberts (individually, and as guardian for D. Roberts) alleges that WellPoint breached its fiduciary duties under ERISA.  He further seeks unpaid benefits from WellPoint arising from the reduced UCR payment described below for which he exhausted his administrative remedies.

191.   Plaintiff Roberts' daughter, D. Roberts, during the Relevant Time Period, was either under the age of 19 or a full-time student attending an accredited college in the state of Massachusetts.  Plaintiff Roberts submitted the requisite written certification of student status to WellPoint.  Plaintiff Roberts' daughter was thus directly insured under his plan.

192.   Plaintiff Roberts' employer sponsored an "Employee Elect Medical Plan" for its employees, including Plaintiff Roberts, which was directly insured by WellPoint *via* Blue Cross of California.  Plaintiff Roberts and his family were thereby directly insured by WellPoint under this plan during the Relevant Time Period.

193.    Upon subscribing to his employer-sponsored plan, Plaintiff Roberts received his "Combined Evidence of Coverage and Disclosure Form" ("Plaintiff's EOC"). Plaintiff Roberts' EOC provides that Plaintiff Roberts and his eligible family members are directly insured under the Plan and lists within "family member" any of Plaintiff Roberts' children including:

> Unmarried children of the Subscriber, the Subscriber's enrolled Spouse, or the Subscriber's enrolled Domestic Partner from the nineteenth (19th) to twenty-fourth (24th) birthday who qualify as dependents for federal income tax purposes and who are full-time students (for twelve (12) or more credits) attending an accredited college, university, vocational or technical school.  Blue Cross requires written proof of student status annually.

194.    Plaintiff Roberts' EOC specifies a set deductible, and that once this deductible is satisfied, WellPoint is required to reimburse its subscribers, including Plaintiff Roberts, according to a chart contained within Plaintiff Roberts' EOC. Pursuant to the chart, medical procedures are classified as either being undertaken by a participating provider or by a non-participating provider.  "Non-Participating Provider" is defined as an entity (hospital, physician or otherwise) "which does NOT have a Prudent Buyer Plan Participating Provider agreement with Blue Cross in effect at the time services are rendered[.]"

195.    The chart in Plaintiff Roberts' EOC contains various medical procedures and corresponding reimbursement amounts/subscriber payment responsibilities.  For example, Plaintiff Roberts' EOC lists "Outpatient Hospital and Emergency Room" procedures at a non-participating provider (in or out of the State of California) and provides that the consumer, Plaintiff Roberts, must pay "40% of the Customary and Reasonable charge."   WellPoint is obligated to pay the remaining 60% of the Customary and Reasonable charge.

196.    The EOC defines "Customary and Reasonable Charge" as "the average price that a majority of providers charge for a particular procedure, supply, piece of equipment or service, based on where the procedure, supply, piece of equipment or service is performed or obtained."

197.    On or about December 4, 2007, Plaintiff Roberts' daughter underwent an outpatient hospital procedure at a Non-Participating Provider hospital.  Plaintiff Roberts submitted a claim with WellPoint regarding this procedure.  WellPoint made a UCR determination on this claim, based upon the fee schedules produce by the Ingenix Database,  that reimbursed Plaintiff Roberts less than the stated percentage of the provider's actual charges.  This UCR determination resulted in Plaintiff Roberts being obligated to pay not only his deductible, but also that part of the provider's billed charge that exceeded the UCR amount determined by WellPoint.

198.    WellPoint failed to comply with the terms of Plaintiff Roberts' group plan by making a UCR determination that reduced the stated percentage of the provider's charges without valid data to support such a determination.

199.    On May 12, 2008, Plaintiff Roberts appealed WellPoint's decision by specifically requesting relief from WellPoint regarding this claim.   WellPoint, however, never provided Plaintiff Roberts with any data or other documentation for its UCR determination.  Plaintiff Roberts repeatedly requested, in writing and otherwise, that WellPoint provide specifics about its UCR determination and about why the provider's charges had been determined to exceed the UCR.  Plaintiff Roberts did not receive data, documentation, or adequate redress from WellPoint (or otherwise), and continues to be liable for the remainder of the medical bill (to the tune of thousands of dollars).  He thereby exhausted his administrative remedies.

### *Plaintiff Cooper*

200.    Plaintiff Mary Cooper and her (now deceased) husband, Robert Cooper, obtained health insurance from WellPoint, by and through its predecessor and subsidiary company, WellChoice, under a WellChoice Small Group Health Benefits

1    PPO.  The Coopers were thereby directly insured by WellPoint/WellChoice during the

2    Relevant Time Period.

3         201.    The Coopers' WellChoice policy provided coverage for services

4    performed by both in-network and out-of-network providers.  Thus, under that policy,

5    Mary and Robert Cooper were contractually entitled to choose care from ONS

6    providers.   With respect to services provided by out-of-network providers, the

7    Coopers were obligated under their WellChoice policy to pay a thirty (30) percent co-

8    insurance payment, which they did.

9         202.    WellPoint was to provide reimbursement for services provided by out-

10   of-network providers under the Coopers' WellChoice policy for all "Covered

11   Charges," subject to the co-insurance payment noted above.

12        203.    "Covered Charges" are defined in the Coopers' WellChoice policy as

13   "Reasonable and Customary" charges for services and supplies as so listed in the

14   "Covered Charges" section of the policy.  The "Covered Charges" section of the

15   Coopers' WellChoice policy include all "Covered Charges," such as a practitioner's

16   charges for non-surgical care and treatment, practitioner's charges for surgical care

17   and treatment, dialysis center charges, hospital charges, and pre-admission charges, to

18   name a few examples.

19        204.    "Reasonable and Customary" is defined in the Coopers' WellChoice

20   policy as an amount that is not more than the lesser of "the usual or customary charge

21   for the service or supply as determined by WellChoice Insurance of New Jersey, based

22   on a standard approved by the Board; or the negotiated fee schedule."  The Policy

23   further provides that "[t]he Board will decide a standard for what is Reasonable and

24   Customary" under the policy and that "[t]he chosen standard is an amount which is

25   most often charged for a given service by a Provider within the same geographic

26   area."

27        205.    During the Relevant Time Period, the Coopers utilized ONS under their

28   WellPoint policy.  For example, Mary Cooper received cardiology related services

73

1    from an out-of-network provider on or about February 27, 2003, March 3, 2003, and

2    March 7, 2003.

3         206.    Robert Cooper received numerous medical and laboratory services from

4    out of network providers on or about November 5, 2004, November 18, 2004,

5    November 26, 2004, January 5, 2005, January 10, 2005, January 18, 2005, March 16,

6    2005, November 5, 2005, April 12, 2006, and March 1, 2007, among other dates.

7         207.    In each instance, WellPoint made a determination of the "Reasonable

8    and Customary" amount on these claims based upon the flawed Ingenix Database.

9         208.    WellPoiont's determination and subsequent payment of the so-called

10   "Reasonable and Customary" amount for the Coopers' ONS resulted in the Coopers

11   being obligated to pay, in addition to co-insurance payments, the ONS medical

12   providers' charges that exceeded the "Reasonable and Customary" amount as

13   improperly calculated by WellPoint.

14        209.    WellPoint itself has never provided the Coopers with adequate data,

15   documentation or other information regarding its "Reasonable and Customary"

16   amount determinations or WellPoint's use of the flawed Ingenix Database and the

17   Coopers were otherwise unaware that the "Reasonable and Customary" amount

18   determinations had been improperly calculated by WellPoint based on flawed Ingenix

19   data.

20        210.    WellPoimt breached the terms of the Coopers' health insurance policy

21   by making a "Reasonable and Customary" determination that improperly reduced the

22   stated amount payable by WellPoint for the providers' ONS charges.

23        211.    As alleged below, an administrative appeal to WellPoint of its

24   "Reasonable and Customary" determinations as they pertain to the Coopers and other

25   WellPoint/WellChoice subscribers is futile such that demonstrating exhaustion of

26   administrative appeals under ERISA is excused.

27

28

### *Plaintiff Rivera-Giusti*

212.   Plaintiff Rivera-Giusti's was enrolled in a  "Preferred Provider Organization (PPO) Plan" through her employer, which was directly insured by WellPoint *via* Empire Blue Cross Blue Shield.  She and her family were thereby directly insured by WellPoint under this plan during the Relevant Time Period.

213.   Upon subscribing to her employer-sponsored plan, Plaintiff Rivera-Giusti received her "Plan User Guide" (the "User Guide").  Her User Guide specifies that WellPoint pays for out-of-network benefits once a subscriber meets out-of-network deductible and coinsurance payments.  "Out-of-Network Services" are defined as "services provided by a licensed provider outside Empire's PPO network or the PPO networks of other Blue Cross and/or Blue Shield plans."

214.   The User Guide includes a chart that contains various medical procedures and corresponding reimbursement amounts/subscriber payment responsibilities.  For example, the chart lists "Hospital Services" at an out-of-network provider and states that the consumer, Plaintiff Rivera-Giusti, must pay a "Deductible and 20% coinsurance."  WellPoint is obligated to pay the remaining amount.

215.   In 2007 and 2009, Plaintiff Rivera-Giusti gave birth to her two children after receiving prenatal care from an out-of-network certified nurse midwife, who also performed the deliveries.  In each instance, Plaintiff Rivera-Giusti submitted a claim with WellPoint regarding the medical care she received from the nurse midwife.  WellPoint made  determinations of  "allowed amounts" on these claims, based upon the Ingenix Database, that reimbursed Plaintiff Rivera-Giusti less than the stated charges of the provider's actual charges.  These "allowed amount" determinations resulted in Plaintiff Rivera-Giusti being obligated to pay not only her deductible and coinsurance payments, but also part of the provider's bill charge that exceeded the "allowed amount" determined by WellPoint.

216.   In addition, Plaintiff Rivera-Giusti received counseling services from an out-of-network certified social worker in 2008.  She submitted fourteen claims with

75

WellPoint regarding the fourteen counseling sessions she had with the certified social worker. WellPoint made a determination of an "allowed amount" on this claim, based upon the Ingenix Database, that reimbursed Plaintiff Rivera-Giusti less than the stated charge of the provider's actual charges. This "allowed amount" determination resulted in Plaintiff Rivera-Giusti being obligated to pay not only her coinsurance payment, but also part of the provider's bill charge that exceeded the "allowed amount" determined by WellPoint.

217. WellPoint failed to comply with the terms of Plaintiff Rivera-Giusti's PPO plan by making an "allowed amount" determination that reduced the stated percentage of Plaintiff Rivera-Giusti's providers' charges without valid data to support such a determination. WellPoint never provided Plaintiff Rivera-Giusti with any data or other documentation for its "allowed amount" determination.

### Plaintiff Dr. Henry

218. Plaintiff Dr. Henry is an internist with a private practice in Pasadena, California. He is licensed to practice medicine in the State of California, and has been certified by the American Board of Internal Medicine, American Board of Emergency Medicine, American Board of Medical Specialties, Subspecialty in Geriatrics, and American Academy of HIV Medicine, HIV Specialist. During the relevant time, Dr. Henry provided ONS to WellPoint's subscribers. ONS fees account for approximately 30%-35% of Dr. Henry's annual revenue.

219. Because patients find it difficult to pay out of pocket for medical treatment at the time of service, they rely on their health plans to reimburse their physicians for their services. While this arrangement is generally beneficial for the patient who does not have to pay for his treatment at the time of service, it leaves the Provider Plaintiffs and members of the Provider Class to advance the cost of such medical treatment until they receive payment from their patients' insurers. To facilitate direct payment from insurers, Dr. Henry's patients sign a form assigning their health benefits to him before treatment. This form includes an express

authorization by the patient for insurers, such as WellPoint, to remit payment for "professional services otherwise payable to [the patient] or the holder of the policy" directly to Dr. Henry.

220.    At all relevant times, Dr. Henry utilized a HCFA 1500 form, or more recently, a CMS 1500 form, to submit claims to WellPoint for payment.  Dr. Henry's claims are routinely submitted electronically.  Once an electronic claim is submitted it passes through a clearinghouse before reaching WellPoint.  All of Dr. Henry's claims are submitted to WellPoint using CPT codes, Healthcare Common Procedure Coding System ("HCPCS") and modifiers, as necessary.  Dr. Henry does not find out his compensation from WellPoint for services rendered until after a procedure is performed and a claim for payment is submitted.

221.    At all relevant times, Dr. Henry expected to be reimbursed by WellPoint at the lesser of his billed charges or the current UCR.  WellPoint defines UCR as follows:

> A "usual" charge is the amount that is most consistently charged by an individual physician for a given service.  A "customary" charge is the amount that falls within a specified range of usual charges for a given service billed by most physicians with similar training and experience within a given geographic area.  A "reasonable" charge is a charge that meets the Usual and Customary criteria, or is otherwise reasonable in light of the complexity of treatment of the particular case.  Under a UCR Program, the payment is the lowest of the actual billed charge, the physician's usual charge or the area customary charge for any given covered service.

222.    On September 8, 2008, Dr. Henry provided covered medical services to a patient subscriber of Blue Cross of California, a plan administered by Defendant WellPoint.  Dr. Henry submitted the appropriate CMS 1500 (or its equivalent) to WellPoint for payment for these services.  On September 19, 2008, Blue Cross of

California sent an EOB by U.S. mail to Dr. Henry, informing him that for each of the procedure codes that he submitted "[t]his is the amount in excess of the allowed expense for a non-participating provider.  The Health Plan is not responsible for any amounts in excess of this allowed expense."  In other words, out of the $289.00 of billed charges submitted by Dr. Henry, Blue Cross of California did not allow payment of $150.60, leaving Dr. Henry out of pocket for his services.

223.   On June 19 and 26 of 2008, Dr. Henry provided covered medical services to a patient subscriber of Blue Cross of California, a plan administered by Defendant WellPoint.  Dr. Henry submitted the appropriate CMS 1500 (or its equivalent) to WellPoint for payment for these services.  On July 7, 2008, Blue Cross of California sent an EOB by U.S. mail to Dr. Henry, informing him that for each of the procedure codes that he submitted "[t]his is the amount in excess of the allowed expense for a non-participating provider.  The Health Plan is not responsible for any amounts in excess of this allowed expense."  In other words, out of the $286.00 of billed charges submitted by Dr. Henry, Blue Cross of California did not allow payment of $129.95, leaving Dr. Henry out of pocket for his services.

224.   At various times, WellPoint unlawfully diminished Dr. Henry's compensation by improperly calculating UCRs and then misapplying these rates to his claims.  Dr. Henry's EOBs and Remittance Advices often state that his billed charges purportedly are "in excess of the allowed expense for a non-participating provider," and that the "Health Plan is not responsible for any amounts in excess of this allowed expense."  Nowhere on the EOBs, Remittance Advices or elsewhere in any other correspondence sent to Dr. Henry does WellPoint or its Blue Cross of California subsidiary discuss or identify how it actually calculates UCRs.  The EOBs do not even specify whether Ingenix data or other ONS Benefit Reductions are used.

225.   WellPoint's EOBs are intentionally uninformative, false, and misleading regarding the use of UCRs.  This ambiguity has resulted in the inconsistent ONS reimbursements.  WellPoint  has repeatedly reimbursed Dr. Henry differently for

78

1  identical procedures performed within the same timeframe, with no explanation for
2  the discrepancy.

### *Plaintiff Dr. Schwendig*

4  226.    Plaintiff Dr. Schwendig is a trauma surgeon at Scripps Memorial
5  Hospital in La Jolla, California.  He is licensed to practice medicine in the State of
6  California, and has been certified by the American Board of Surgery and National
7  Board of Medical Examiners.  At all relevant times, Dr. Schwendig provided ONS (in
8  the form of emergency and trauma healthcare services) to WellPoint subscribers.

9  227.    As an emergency department-based trauma surgeon, Dr. Schwendig is
10 responsible for the initial resuscitation and stabilization of patients.    Under
11 California's Health and Safety Code, emergency room doctors are obligated to treat
12 all emergency room patients without regard to whether they are insured or able to pay.
13 Calif. Health & Safety Code § 1317.  The Code further provides that health plans must
14 pay for emergency medical services (by implication and judicial interpretation at
15 UCRs).   Calif. Health & Safety Code § 1371.4(b).   This is necessary because
16 emergency room patients are in need of immediate care and generally are not in a
17 position to choose their physicians as routine patients do – in other words, in-network
18 or out-of-network considerations do not apply under such circumstances.

19 228.    On September 10 through 18, 2007, Dr. Schwendig provided emergency
20 healthcare services to a patient subscriber of Blue Cross of California, a plan
21 administered by Defendant WellPoint.  Dr. Schwendig, through his billing service,
22 submitted the appropriate CMS 1500 (or its equivalent) to WellPoint for payment for
23 these services.  On September 29, 2007, Blue Cross of California sent an EOB by U.S.
24 mail to Dr. Schwendig, informing him that for each of the procedure codes that he
25 submitted "[t]his is the amount in excess of the allowed expense for a non-
26 participating provider."   In other words, out of the $2,234.00 in billed charges
27 submitted by Dr. Schwendig, Blue Cross of California did not allow $708.23.  On
28 October 19, 2007, Dr. Schwendig appealed this underpayment by letter sent by U.S.

mail, which stated that "[t]here is an amount of $708.23, denied as 'over allowed amount', that remains to be paid.  According to our records, no contract exists between Dr. James Schwendig and Blue Cross that would obligate him to accept your "allowed amount" as payment in full for his services.  Please re-process this claim for payment of the full billed charge amount as soon as possible.  Please also keep in mind that this was a Trauma/Emergency situation and the patient had no choice of physicians."  On November 19, 2007, Blue Cross of California reprocessed the claims and sent a second EOB by U.S. mail to Dr. Schwendig.  This time, Blue Cross of California paid an additional amount for the patient's co-insurance, but nothing more for the disallowed amounts, stating the same basis for the underpayment determination.  As a result of WellPoint's improper ONS determination, Dr. Schwendig was forced to send his patient to collections to recover the $708.23 of his billed charges, but the patient has not paid this amount and Dr. Schwendig remains out of pocket for this amount.

229.    Dr. Schwendig's patients are typically unable to make an "assignment of benefits" prior to treatment.  Nevertheless, WellPoint routinely acknowledges an assignment of benefits by sending EOBs and remitting payment directly to Dr. Schwendig for services rendered.  At times, however, and for no apparent reason, WellPoint will send payment to the patient instead, forcing Dr. Schwendig to attempt to recoup his lawful reimbursement from the patient.  This presents a significant hardship for trauma surgeons like Dr. Schwendig who rarely treat their patients on a long-term basis; continued treatment is generally delivered by specialists or the patient's primary care physician.  Trauma surgeons like Dr. Schwendig may never see their patients after discharge.

230.    At all relevant times, Dr. Schwendig utilized a HCFA 1500 form, or more recently, a CMS 1500 form, to submit claims for payment to WellPoint.  Dr. Schwendig's claims are routinely submitted electronically.  Once an electronic claim is submitted, it passes through a clearinghouse before reaching WellPoint.  All

of Dr. Schwendig's claims are submitted using CPT codes, HCPCS and modifiers, as necessary.  Dr. Schwendig does not find out his compensation from WellPoint for services rendered until after a procedure is performed and a claim for payment is submitted.

231.    Rather than simply pay Dr. Schwendig the lesser of his billed charges or UCRs, WellPoint routinely and deliberately reimbursed his claims at the False UCR levels or through other improper ONS Benefit Reduction levels – including discounted Par provider fee schedules (in other words, in-network fee schedules) – requiring him to expend significant amounts of time and energy identifying and appealing improperly-reimbursed claims.   As a result, WellPoint unlawfully diminished Dr. Schwendig's compensation by improperly calculating UCRs and misapplying these faulty rates to his claims.  Dr. Schwendig's EOBs and Remittance Advices often state that his billed charges purportedly are "in excess of the allowed expense for a non-participating provider."   Nowhere on the EOBs, Remittance Advices or elsewhere in any other correspondence sent to Dr. Schwendig does WellPoint discuss or identify how it actually calculates UCR.  The EOBs do not even specify whether Ingenix data or other ONS Benefit Reductions are used.

232.    Upon identifying improper payment of a claim by WellPoint, Dr. Schwendig – through his medical billing service, Practice Development Strategies ("PDS") – promptly appealed the determination by sending a formal letter asking WellPoint to reprocess the claim for additional payment.  Dr. Schwendig has appealed several of WellPoint's claims determinations in this regard.  Each appeal letter sent by PDS on Dr. Schwendig's behalf states that "no contract exists between Doctor James Schwendig and Blue Cross that would obligate him to accept WellPoint's 'allowed amount' as payment in full for his services," and further explains that "this was a Trauma/Emergency situation and the patient had no choice of physicians."  In addition to sending these appeals letters, PDS made telephone calls on Dr. Schwendig's behalf to WellPoint to appeal the insurer's wrongful determinations.  Dr. Schwendig has

1   repeatedly exhausted any administrative appeals available through WellPoint without

2   succeeding in obtaining full and proper reimbursement for his services.

3                           ***Plaintiff Dr. Peck***

4          233.    Plaintiff Dr. James Peck, Psy.D., is a clinical psychologist who resides

5   in Marina Del Rey, California and maintains a private practice in Santa Monica,

6   California.  Dr. Peck also works at UCLA in Los Angeles, California.  One of

7   Dr. Peck's areas of focus is in substance abuse treatment.  He completed a three-year

8   National Institute of Health/National Institute on Drug Abuse (NIH/NIDA)

9   Postdoctoral Fellowship at UCLA and holds the American Psychological

10  Association/College of Professional Psychology Certificate of Proficiency in the

11  Treatment of Alcohol and other Psychoactive Substance Use Disorders.  Dr. Peck is

12  also a member of an internationally-recognized substance abuse research group at the

13  David Geffen School of Medicine at UCLA.  He also specializes in HIV prevention

14  for high-risk populations and served as the Principal Investigator of a NIDA-funded

15  study of an intervention for methamphetamine-abusing HIV-positive patients at the

16  UCLA CARE Clinic.

17         234.    As part of his private practice, Dr. Peck has obtained assignments of

18  benefit payment rights from insureds covered under WellPoint employer sponsored

19  and non-employer sponsored healthcare plans, and for such plans where WellPoint

20  functions as a plan administrator under ERISA.

21         235.    During the Relevant Time Period, Dr. Peck was an ONS Provider to

22  insureds covered by WellPoint's plans, and remained free to charge his patients his

23  actual charges for medical services rendered.  During that time, Dr. Peck had no direct

24  contractual relationship with WellPoint.

25         236.    Because he was not in WellPoint's network of preferred providers,

26  Dr. Peck, like other Class Members, obtained assignments from his patients, through

27  which he was paid directly by WellPoint for providing healthcare to its insureds.

28  These assignments did not alter the legal relationship between WellPoint and its

insureds, but rather provided the convenience of allowing its insureds to obtain needed healthcare on the implicit promise of later payment by WellPoint to Dr. Peck.

237.   The assignment of benefit forms that Dr. Peck and Provider Class members obtain from their WellPoint patients are security for future payment by WellPoint and direct WellPoint, as the patient's insurer, to pay the benefit claim directly to the out-of-network healthcare provider.   Dr. Peck could and did check claim coverage and obtain pre-authorization from WellPoint before performing services for WellPoint's insureds, but like other Class Members, Dr. Peck was not told WellPoint's intended UCR reimbursement amount.   Payment amount was unknown in advance and payment was frequently not automatic, unlike the services that WellPoint has obtained for its insureds.

238.   Dr. Peck, like other Class Members, submitted his claims to WellPoint using standardized procedural codes such as CPT Codes, HCPCS (Healthcare Common Procedure Coding System) Codes, and modifiers, as needed, on a HCFA form 1500 (n/k/a CMS 1500).   These claims were submitted to WellPoint either in paper form or electronically and may or may not have been immediately processed by an electronic clearinghouse before reaching WellPoint.   Dr. Peck could submit larger claims to WellPoint on paper using the U.S. mail.

239.   Dr. Peck received EOBs from WellPoint indicating that his bills and his patients' claims were processed and/or administered by Anthem Blue Cross.   For example, Dr. Peck billed Anthem Blue Cross $150 on April 1, again on April 11 and again on April 29, 2009, for Procedure Code 90806 services he performed on each of those three days.   Anthem Blue Cross did not pay him $150 for each such service. Instead, on May 21, 2009, Anthem Blue Cross issued an EOB indicating that it reduced the allowable amount down to $107.13 on the false premise that it represented the UCR amount for out-of-network providers.

240.   With respect to the False UCRs or other ONS Benefit reductions (including discounted Par provider fee schedules) that WellPoint and its subsidiary

Anthem Blue Cross imposed on Dr. Peck, any exhaustion of administrative remedies with respect to those UCR determinations would be futile, because WellPoint, as a matter of policy, refuses to alter or reprocess claims that have been processed pursuant to the Ingenix Database.  Regardless, Dr. Peck has satisfied any applicable exhaustion requirements.

241.    Dr. Peck has called Anthem Blue Cross at the number provided on its EOBs and challenged the $107.13 "allowed amount" as unreasonable and below the UCR amount for the Los Angeles metropolitan area.  Anthem Blue Cross advised Dr. Peck that the "allowable amount" was all that he was entitled to be paid as an out-of-network provider in that geographical area.  Dr. Peck also submitted a written dispute challenging the UCR determination, which was received by Anthem Blue Cross on June 20, 2009.  On August 14, 2009, Anthem Blue Cross sent Dr. Peck a letter denying his appeal, stating that Dr. Peck's claim "was appropriately paid based upon the 'reasonable and customary' value of the services [he] rendered" and that the "decision is final and all levels of [its] appeal process have been exhausted."

### Plaintiff Dr. Pariser

242.    Plaintiff Michael Pariser is a licensed psychologist and certified psychoanalyst who practices and resides in Los Angeles, California.  He previously held teaching positions at the California Graduate Institute and the Institute for Contemporary Psychoanalysis.  Currently, in addition to his psychotherapy practice, Plaintiff Pariser supervises psychology interns at the Chicago School Counseling Center.  In his private practice, Dr. Pariser specializes in providing individual psychotherapy.  Dr. Pariser is, and throughout the Relevant Time Period alleged herein has been, an out-of-network healthcare provider to insureds covered by plans insured and/or administered by WellPoint, and remained and continues to remain free to charge his patients his actual charges for medical services rendered.  During the Relevant Time Period, Dr. Pariser has had no direct contractual relationship with

84

WellPoint.   His experience with WellPoint is typical of other Class Members' experience during the Relevant Time Period.

243.    Because he has been and continues to be a non-MD healthcare provider not in WellPoint's network of preferred providers, Dr. Pariser, as with other Class Members, typically has, and continues to obtain, a claim assignment from his patients, through which WellPoint has, and continues to, pay him for providing healthcare to its subscribers.   These claim assignments do not alter the legal relationship between WellPoint and its subscribers, but rather provide the convenience of allowing these subscribers to obtain needed healthcare on the implicit promise of later payment by WellPoint.  ONS fees from WellPoint subscribers account for approximately 25% of Dr. Pariser's income.

244.    The assignment of benefits that Dr. Pariser and Class Members obtain from their WellPoint patients are security for future payment by WellPoint and direct WellPoint, as the patient's insurer or as the administrator of the patient's insurer, to pay the claim directly to the out-of-network healthcare provider.  The assignment of benefits form Dr. Pariser receives from his patients and relied on for the claims he submits to WellPoint has an express authorization by the subscriber for insurers, including Anthem Blue Cross and Blue Cross of California, to assign "any benefits to be received for services performed and submitted on my behalf by Dr. Michael Pariser to be paid directly to Dr. Pariser."

245.    As with all other Class Members, Dr. Pariser was not told WellPoint's intended UCR reimbursement amount prior to the completion of his service.  Indeed, as with all other Class Members, WellPoint would not have disclosed or advised Dr. Pariser of the UCR reimbursement amount before he treated the subscriber even if Dr. Pariser verified claim coverage and obtained pre-authorization from WellPoint before treating WellPoint's subscribers.  Payment was unknown and frequently not automatic – unlike the services that WellPoint obtained for its subscribers.

246.   Dr. Pariser, like other Class Members, submitted and continues to submit his claims to WellPoint using standardized procedural codes such as CPT Codes, as needed, on a HCFA 1500 form (n/k/a CMS 1500).  These claims are submitted to WellPoint either in paper form or electronically and may or may not have been immediately processed by an electronic clearinghouse before reaching WellPoint.  Dr. Pariser could submit larger claims to WellPoint on paper using the U.S. mail.

247.   At all relevant times, Dr. Pariser expected to be reimbursed by WellPoint at the lesser of his billed charge or the current UCR, and relied on WellPoint to determine and pay him the appropriate reimbursement amounts in compliance with WellPoint's legal and contractual obligations, and not to take actions to improperly lower the reimbursement rates.

248.   WellPoint unlawfully diminished Dr. Pariser's compensation by improperly calculating UCRs and then misapplying these rates to his claims, as described herein.  Since at least January of 2007, Dr. Pariser received EOBs and Remittance Advices for at least five separate patients from WellPoint, including Anthem Blue Cross under Provider ID/Sequence number 1699980573 and Blue Cross of California under Provider ID/Sequence number 270111592.  Dr. Pariser's EOBs and Remittance Advices often stated that his billed charges purportedly were "in excess of the allowed expense for a non-participating provider," and that the "Health Plan is not responsible for any amounts in excess of this allowed expense."  Nowhere in the EOBs, Remittance Advices or any other correspondence sent to Dr. Pariser, however, does WellPoint discuss or identify how it actually calculates UCR.  The EOBs do not even specify whether Ingenix data or some other ONS Benefit Reductions (including discounted Par provider fee schedules).  For example, when Dr. Pariser billed WellPoint his usual $200 rate for Procedure Code 90806, WellPoint did not pay him $200, but rather imposed an "allowed amount" of $107.13 on the false premise that it represented the UCR amount and then paid him the percentage of the

86

1  UCR amount provided under the patient's plan.  Dr. Pariser's patients are responsible

2  for amounts owed to him in excess of WellPoint's allowed UCR reimbursement

3  amount.

4      249.    With its methods for calculating UCRs shrouded in a veil of secrecy,

5  WellPoint has been able to derive improper rates using faulty methodologies and data,

6  and apply them to out-of-network provider claims to diminish lawful reimbursements

7  to Dr. Pariser and the Classes.

8      250.    Dr. Pariser contacted WellPoint more than one year ago and complained

9  about WellPoint's decreasing the UCR for his service and to learn about his avenues

10  of redress.  WellPoint informed Dr. Pariser that the UCR amount stated on its EOBs

11  for his service was correct and was given the impression that there was nothing he

12  could do to further challenge the UCR.

13      251.    With respect to UCR reductions WellPoint imposed on Dr. Pariser, any

14  exhaustion of administrative remedies with respect to the UCR determinations would

15  be futile for several reasons, including:  (i) WellPoint, as a matter of policy, refuses to

16  alter or reprocess claims that have been processed pursuant to the Ingenix Database or

17  other faulty data it uses; (ii) other out-of-network providers have already submitted

18  and completed claims through WellPoint's administrative process seeking to increase

19  their reimbursements based on WellPoint's faulty UCRs and WellPoint has denied

20  each of those claims; and (iii) WellPoint, as described herein, has expressed its intent

21  to continue using Ingenix and other improper ONS Benefit Reductions for UCR

22  determinations by expressly agreeing with the NYAG that it will not stop using the

23  faulty data until 60 days after it is notified that a new database has been developed.

24      252.    Alternatively, Dr. Pariser should be deemed to have exhausted any

25  claims that otherwise were not exhausted, due to WellPoint's inadequate disclosure

26  concerning grievance procedures and its violation of ERISA and the applicable

27  ERISA regulations.

28

### *Plaintiff Dr. Kavali*

253.   Plaintiff Carmen Kavali, M.D., is a plastic surgeon with a private practice in Atlanta, Georgia.  Dr. Kavali is board certified by the American Board of Plastic Surgery and serves on the staff of Northside Hospital and the Center for Plastic Surgery.  She is a citizen of the state of Georgia and is licensed to practice medicine in Georgia.  Dr. Kavali does not currently participate in the WellPoint physician network and sees WellPoint patients only on a non-participating basis.

254.   Dr. Kavali previously entered into a Provider Agreement with WellPoint entity Blue Cross Blue Shield of Georgia and, as a result, became a member of the WellPoint provider network.  On July 25, 2007, Dr. Kavali sent both a fax and a certified letter notifying WellPoint that she was terminating the contract and that she understood the termination would become effective as soon as possible but no later than ninety days after WellPoint's receipt of the letter.  As a result, on or before October 23, 2007, Dr. Kavali was no longer a participant in the WellPoint network and thus, with respect to WellPoint, had the status of a non-participating physician thereafter.

255.   Throughout the relevant time, Dr. Kavali provided out-of-network healthcare services to WellPoint plan enrollees.  Dr. Kavali's experience with WellPoint's unlawful business practices is typical of what has happened to the Provider Class as a whole.

256.   Before and no later than October 23, 2007, Dr. Kavali treated patients with coverage under plans covered or administered by WellPoint on an out-of-network basis.  In each case, Dr. Kavali has obtained from the patient signed Assignment of Benefits form.  Customarily, before Dr. Kavali performs a procedure for these patients, her office staff will contact WellPoint to confirm coverage, the lack of a pre-certification requirement, inquire about the basis upon which payment to her will be made, and ask for the amount of the payment so that the patient's share of the cost can be calculated.  WellPoint, however, customarily refuses to explain the basis

1   upon which payment will be made and will not disclose the amount that Dr. Kavali

2   will receive.  The only information that WellPoint typically will disclose is the amount

3   of the patient's co-insurance, the out-of-network deductible, and how much of the

4   deductible has already been met.

5        257.    After receipt of Dr. Kavali's claim for medical services, WellPoint

6   customarily will send to her or to her patient an EOB (such as a "Provider Explanation

7   of Medical Benefits Report," "Remittance Advice" or similar explanation of benefits)

8   that specifies the amount being paid for each of the services that were provided.  In

9   each instance, the EOB shows that the amount paid by WellPoint has been less than

10  the billed charge.  WellPoint has given various explanations for its decision not to pay

11  the full amount, such as "this charge has been processed based upon the provider's

12  participation status and your contract terms."

13       258.    On November 6, 2007, Dr. Kavali provided covered medical services to

14  patient E.P.  Dr. Kavali obtained an Assignment of Benefits from the patient before

15  providing treatment.  On December 13, 2007 Dr. Kavali mailed through the U.S. mail

16  to BCBS of Georgia, a WellPoint subsidiary, a complete and clean HCFA form

17  submitting CPT 19357.  CPT Code 19357 indicates that the procedure involved a

18  "breast reconstruction, immediate or delayed, with tissue expander, including

19  subsequent expansion."  Her submitted charge was $6,240.  After applying the

20  patient's $31.82 deductible and $32.01 coinsurance amounts, BCBS reduced

21  Dr. Kavali's $6,240 submitted charge by $4,586.28.  BCBS allowed payment of

22  $1,589.89 rather than $6,176.17.

23       259.    On or about January 10, 2008, BCBS sent through the U.S. mail to

24  Dr. Kavali and/or her patient an EOB for services provided on November 6, 2007 for

25  patient E.P.  The EOB provided no explanation for the reduction of benefits.  Dr.

26  Kavali did not bill patient E.P. for that service.

27       260.    On December 4, 2007, Dr. Kavali provided covered medical services to

28  patient S.B.  Dr. Kavali obtained an Assignment of Benefits from the patient before

1  providing treatment.  On or about December 4, 2007, Dr. Kavali mailed through the
2  U.S. mail to BCBS of Georgia, a WellPoint subsidiary, a complete and clean HCFA
3  form submitting CPT Code 19370-50.  CPT Code 19370 indicates that the procedure
4  involved an "open periprosthetic capsulotomy, breast."  Modifier 50 was used to
5  indicate that the procedure was bilateral.  Her submitted charge was $6,500.  After
6  applying the patient's $370.31 coinsurance amount, BCBS reduced Dr. Kavali's
7  $6,500 submitted charge by $5,265.65.  BCBS allowed payment of $864.04 rather
8  than $4,550.

9      261.    On or about January 4, 2008, BCBS sent through the U.S. mail to
10 Dr. Kavali and/or her patient an EOB for services provided on December 4, 2007 for
11 patient S.B.  The EOB did not provide an explanation for the reduction of benefits.
12 Dr. Kavali did not balance-bill patient S.B. for said service.

13     262.    By using the Ingenix Database or other ONS Benefit Reductions –
14 including discounted Par provider fee schedules – to calculate the amount that she
15 receives for her services, WellPoint and its subsidiaries improperly and unlawfully
16 diminished the compensation to which Dr. Kavali is entitled.  Because she typically is
17 unable to collect from her patients the full amount of her billed charges, Dr. Kavali
18 has been injured monetarily as a direct and proximate result of WellPoint's improper
19 conduct.

20     263.    The EOBs issued by WellPoint relating to the out-of-network patients
21 treated by Dr. Kavali do not provide any procedures or process by which to appeal the
22 amount of compensation.  Even if the EOBs are received by Dr. Kavali, which
23 typically they are not, it is unclear if the adjudication may be appealed or if so, how.
24 The EOB-related documents simply contain a statement that "if you have any
25 questions, please call" and a toll-free telephone number is given.  A website to "view
26 eligibility, benefits or claim details online" is provided.

27     264.    Dr. Kavali understands from the information she does receive from
28 WellPoint that, as an out-of-network provider, it is not necessary to file a written

appeal to WellPoint. WellPoint only provides appeal procedures to participating providers. Dr. Kavali or her staff has telephoned WellPoint entities to complain about the amounts of compensation paid for a particular service without any success in obtaining additional payment.

265.   Any further appeal to WellPoint regarding the amount of her compensation would have been futile because WellPoint did not disclose and, indeed, concealed its use of the Ingenix Database or other ONS Benefit Reductions (including discounted Par provider fee schedules) to diminish payments based upon UCRs and routinely asserted that it was paying the proper amount due under the patient's plan. Further, it would have been inconsistent with WellPoint's scheme to disclose to physicians such as Dr. Kavali as part of any appeal process that it was manipulating the calculation of UCRs or to provide additional compensation to physicians as such additional payments would have constituted an admission of its improper conduct.

### Plaintiff NPSC

266.   NPSC's surgical facility is located in Torrance, California and is and at all relative times has been accredited by the Accreditation Association for Ambulatory Health Care ("AAAHC"). The AAAHC presently accredits over 4,000 ASCs. According to the Ambulatory Surgery Center Association ("ASC Association"), over 8 million surgeries are performed yearly at ACSs in the United States.

267.   To facilitate direct payment from insurers such as WellPoint, NPSC has all of its patients execute an assignment form that assigns their health benefits to NPSC in advance of any procedure performed at its facility and, further, permits NPSC to communicate directly with the insurer concerning payment of those health benefits and facilities fees. As part of this process, NPSC also attempts to obtain pre-approval of its claims from insurers whenever possible.

268.   All of NPSC's claims for payments are submitted to WellPoint using ICD-9 codes and CPT codes and modifiers, if necessary. NPSC is not advised of the

91

1  facilities fees to be paid by WellPoint for services provided until after a procedure is

2  performed and a claim for payment is submitted.

3      269.    At all relevant times, NPSC expected to be reimbursed by WellPoint at

4  the lesser of its billed charges or the current UCR.  WellPoint defines UCR as follows:

5          A "usual" charge is the amount that is most consistently charged by an

6          individual physician for a given service.  A "customary" charge is the

7          amount that falls within a specified range of usual charges for a given

8          service billed by most physicians with similar training and experience

9          within a given geographic area.  A "reasonable" charge is a charge that

10         meets the Usual and Customary criteria, or is otherwise reasonable in

11         light of the complexity of treatment of the particular case.  Under a

12         UCR Program, the payment is the lowest of the actual billed charge, the

13         physician's usual charge or the area customary charge for any given

14         covered service.

15     270.    At various times, WellPoint unlawfully diminished NPSC's

16  compensation by improperly calculating UCRs and then misapplying these rates to its

17  claims.  NPSC has also expended considerable time and resources dealing with issues

18  concerning Defendants' improper UCR reimbursements and, as a result, has suffered

19  direct and actual harm.  NPSC seeks damages and other appropriate relief on behalf of

20  itself and as a representative of other similarly-situated facilities.

21     271.    With regard to the specific experiences of Plaintiffs Roberts, Cooper,

22  Henry, Schwendig, Peck, Pariser, Kavali, and the NPSC, WellPoint failed to comply

23  with the terms of the operative healthcare plan by making UCR determinations based

24  on Ingenix's False UCR schedules or other ONS Benefit Reductions, which had the

25  effect of covering less than the percentage of providers' charges that WellPoint had

26  agreed to pay.  As a consequence of these actions, even after some Plaintiffs appealed,

27  they were reimbursed less than what should have been paid under terms of applicable

28  health plans.  WellPoint pursued its standard and uniform policies in making UCR

determinations in a fashion that conflicted with its contractual obligations under the relevant plans, and doing so violated its fiduciary obligations to the Provider Plaintiffs.  In addition, WellPoint misrepresented to the Provider Plaintiffs and its subscribers that the UCR amounts were calculated on the basis of valid and accurate data.

### An Administrative Appeal to WellPoint of Its UCR Determinations Is Futile, Such That Exhaustion under ERISA Is Excused

272.    The manner in which WellPoint responds to appeals to its UCR determinations establishes clearly that pursuing an administrative appeal of such benefit determinations would be futile.

273.    Plaintiffs Henry's, Schwendig's, Peck's, Pariser's, Kavali's, and NPSC's experiences with WellPoint are typical of the treatment endured by the Class Members and Association Plaintiffs' tens of thousands of members who provide ONS and consistently are not only underpaid, but must expend significant time, cost, and energy fighting an intransigent corporate bureaucracy that purposefully obfuscates and frustrates out-of-network providers into accepting lower fees for their services.

274.    With regard to the specific experiences of Plaintiffs Roberts, Cooper, Henry, Schwendig, Peck, Pariser, Kavali, and the NPSC, WellPoint failed to comply with the terms of the operative healthcare plan by making UCR determinations based on Ingenix's False UCR schedules or other ONS Benefit Reductions, which had the effect of covering less than the percentage of providers' charges than WellPoint had agreed to pay.  As a consequence of these actions, even after appealing, Plaintiffs Roberts, Henry, Schwendig, Peck, and Pariser were reimbursed less than what should have been paid under terms of applicable health plans.  WellPoint pursued its standard and uniform policies in making UCR determinations in a fashion that conflicted with its contractual obligations under the relevant plans, and by doing so violated its fiduciary obligations to the Provider Plaintiffs.  In addition, WellPoint misrepresented

1 to the Provider Plaintiffs and its subscribers that the UCR amounts were calculated on

2 the basis of valid and accurate data.

3     275.    One example is a WellPoint insured (referred to here as "Subscriber X"

4 to maintain confidentiality) who was insured by WellPoint under a self-funded plan

5 based in California.  Pursuant to the Certificate of Coverage provided to Subscriber X

6 by his employer, claims were administered by WellPoint subsidiary Blue Cross of

7 California on behalf of BC Life & Health Insurance Company.

8     276.    Under the terms of the WellPoint plan, Subscriber X was entitled to

9 obtain healthcare services from non-par providers, and benefits would be "the lesser

10 of the billed charge or (1) for a physician, the customary and reasonable charge or

11 (2) for other than a physician, the reasonable charge."

12     277.    "Customary and reasonable charge" was defined in the plan as follows:

13     **Customary and reasonable charge**, as determined annually by the

14     claims administrator, is a charge which falls within the common range of

15     fees billed by a majority of physicians for a procedure in a given

16     geographic region.  If it exceeds that range, the expense must be justified

17     based on the complexity or severity of treatment for a specific case.

18     278.    Subscriber X received complicated surgery from a non-par provider in

19 September 2008.  The non-par provider billed for two services, one for $10,424 and a

20 second for $4,872.  WellPoint (through Anthem Blue Cross) issued an EOB to

21 Subscriber X in December 2008 in which it excluded $9,999.71 from the first bill and

22 $4,014.36 for the second, based on the following explanatory code:

23     This is the amount in excess of the allowed expense for a non-

24     participating provider.  The Health Plan is not responsible for any

25     amounts in excess of this allowed expense.  Refer to your plan of

26     coverage booklet for details regarding the schedule of benefits.

27     279.    Based on the healthcare plan covering Subscriber X, it is self-evident

28 that WellPoint reduced the benefits by a total of 91.6% based on its "customary and

94

1    reasonable charge" exclusion, but used, as its explanation, its reference to "the amount

2    in excess of the allowed expense for a non-participating provider."

3         280.   After receiving the EOB reflecting such a substantial reduction in

4    benefits, Subscriber X sought to appeal the denial.  She first wrote to her employer,

5    which served as the designated plan administrator, but her administrator denied the

6    appeal.  She also had a telephone conference with the plan administrator as well as

7    with a representative from WellPoint to pursue her appeal, but she was informed that

8    no change would be made.  In that call, WellPoint confirmed that it relied on the

9    Ingenix Database for determining its benefit levels for non-par providers and that it

10   would not reconsider its decision.

11        281.   When faced with the denials of her appeals, Subscriber X submitted a

12   specific request for additional information to both her employer and WellPoint

13   concerning WellPoint's UCR determinations.  In particular, on January 8, 2009,

14   Subscriber X requested the following information from her employer:

15            Documentation you have to support your position that their

16       customary and reasonable determination complies with the terms of my

17       health care plan.  To the extent that Anthem Blue Cross and Stanford

18       relied on the Ingenix database to set customary and reasonable rates,

19       please provide me details concerning how it determines customary and

20       reasonable and, moreover, any back-up data upon which the Ingenix

21       database is based for purposes of my claims.  I therefore want to see

22       what evidence you have (including all supporting or back-up data) which

23       shows that my providers' charges were in excess of what most other

24       providers would charge for similar services or supplies.  I need this

25       information to enable me to facilitate my appeal and to enable me to

26       attempt to demonstrate to you that your customary and reasonable

27       determination is improper.

28

282.   Subscriber X's employer refused to provide further information, explaining on January 9, 2009, that WellPoint was the responsible party, stating:

> Regarding your request for additional information, . . . [the Plan] has delegated the responsibility for the processing and payment of claims for participants enrolled in the Blue Cross Prudent Buyer Plan to Blue Cross.  Furthermore, Blue Cross is the fiduciary for and has the authority and control over benefit determinations and, as such, would be in the best position to respond to your requests.  Toward that end, I will ask them to respond to you directly and to notify me that they have done so.

283.   Shortly thereafter, Subscriber X learned that the NYAG had entered into a settlement agreement with UnitedHealth Group, the parent company for Ingenix, pursuant to which UnitedHealth agreed to give up its Ingenix Database and to pay $50 million toward funding the creation of a new and independent UCR database. Subscriber X informed her employer of the settlement, which highlighted the problems with the Ingenix Database and how it was being changed in the future. Again, however, Subscriber X's employer took no further action, but continued to defer to WellPoint, stating in an e-mail dated January 20, 2009:

> We all fully appreciate the frustration you have with what you perceive to be inadequate reimbursement of the providers who supplied services related to your hip surgeries this past summer and your corresponding financial responsibility.  As we know you understand, the reimbursement of providers who render care to our employees and their eligible dependents enrolled in the [Plan] is handled by Anthem Blue Cross, to which the Plan has delegated the responsibility for administering the processing and payment of claims and for determining the disposition of any appeals for denials of benefits under the Plan.  As a result of the delegation of this fiduciary obligation, [the Plan] has no authority to determine the disposition of any claims . . .

96

* * * *

Having said this, we also acknowledge the uncertainty surrounding the use of reasonable and customary charge databases and receipt of your email about the settlement of the investigation undertaken by the Attorney General of the State of New York.  We have been told by Anthem Blue Cross that they remain committed to appropriately processing all claims, including those for out-of-network services, fairly reimbursing providers for covered services, and protecting members and employers from excessive charges from certain non-participating providers.  We are aware that you have contacted Anthem Blue Cross about your database questions and that they will respond to you directly about the information you have requested.  Any further concerns you have about the database and how it is used by Anthem Blue Cross to reimburse non-participating providers should be addressed to them.

284.    In light of the employer's response, Subscriber X had to rely entirely on WellPoint (through Anthem) as the sole party that was responsible for making UCR determinations.  By letter dated January 29, 2009, WellPoint denied Subscriber X's appeal in full, and refused to provide any further information.  In explaining its decision, WellPoint confirmed its use of Ingenix, stating:

A review of your claims history showed that you received services from . . . a non-contracting, non-participating provider with Anthem. The claim and medical records were reviewed by a general surgeon and a board-certified orthopedic surgeon.  The review most favorable to you was performed by the general surgeon.  . . . Anthem paid [the non-par provider] **using the Professional Customary and Reasonable fee schedule methodology from an internal database known as Ingenix.**

(Emphasis added.)

285.   WellPoint further explained that it refused to provide any details concerning its UCR determinations or its reliance on Ingenix, stating:

> Your appeal letter addressed to [the Plan], requesting additional information on how customary and reasonable payments were calculated on your claims, was forwarded to me for response.  Your letter requested "all supporting back-up documentation" upon which the Ingenix database is based.   I have been advised that the information you requested is proprietary and confidential.  Accordingly, Anthem will not be able to release the information to you.

286.   Finally, WellPoint made clear that its denial of Subscriber X's appeal was final.  It stated that "if you continue to disagree with Anthem's payment on the claims . . . you may have received from a non-contracting provider, your SPD provides for binding arbitration if the amount of the dispute is not within the jurisdictional limits of small claims court."  WellPoint then concluded that, "[i]f you wish to pursue arbitration or small claims court, please forward your written demand or small claims action to [the Plan]."

287.   Given the experience of Subscriber X, it is clear that the pursuit of an administrative appeal to WellPoint of its UCR determinations would be futile.  WellPoint relies exclusively on Ingenix for making UCR determinations and refused to reconsider that reliance, even when confronted with the investigation and settlement reached by the NYAG concerning Ingenix.   Moreover, WellPoint precludes an effective appeal of its reliance on Ingenix by refusing to provide any of the "supporting back-up documentation" relating to the Ingenix findings, deeming such information to be "proprietary and confidential."   Under these circumstances, the exhaustion requirement under ERISA should be excused.

**RICO ALLEGATIONS**

288.   All of the factual allegations set forth above are incorporated by reference as though set forth herein.

289.   As described herein, Defendants have undertaken an elaborate fraudulent scheme to underpay for out-of-network services rendered to WellPoint Subscribers by healthcare providers.  This scheme has involved the use of the Ingenix Database to provide false, artificially-low reimbursement amounts for ONS, and the use (or causing the use) of the U.S. mails and interstate wire facilities to transmit the flawed data between the Defendants and between Insurer Conspirators and Ingenix, in order to create the false UCR amounts arrived at by the Defendants.  The scheme further involved pricing schedules that were transmitted by Ingenix to the Defendants and Insurer Conspirators, through the U.S. mails or electronically over interstate wire facilities (including the Internet), and that were based on the flawed data and that were used by Defendants to reimburse Plaintiffs for ONS claims based on the False UCR rates.

290.   At all relevant times, and as described in this Complaint, Defendants carried out their underpayment scheme to defraud Plaintiffs, the Provider and Subscriber Classes, in connection with the conduct of an "enterprise," within the meaning of 18 U.S.C. § 1961(4).

291.   Plaintiffs allege that the Defendants' fraudulent scheme was conducted through an association in fact enterprise comprised of WellPoint, UnitedHealth and Ingenix (the "WellPoint-Ingenix Enterprise" or the "Enterprise").

292.   The WellPoint-Ingenix Enterprise was formed in or about 1998, at the time of the sale of the PHCS database by HIAA to Ingenix.

293.   Through the Enterprise described above, Defendants undertook a fraudulent scheme to underpay Subscribers and Providers for the ONS provided to WellPoint subscribers.  Through the fraudulent underpayment scheme, WellPoint, UnitedHealth and others agreed to utilize the flawed Ingenix Database for their UCR

determinations in an effort to depress the prices paid for ONS by the conspiring healthcare companies.  WellPoint and UnitedHealth knowingly participated in the formation and maintenance of, purchased and utilized the Ingenix Database with the express purpose of depressing their ONS payments and in fact supplied "scrubbed" and otherwise flawed and incomplete data to Ingenix with the purpose of lowering payments for ONS.  Defendants agreed to conceal the flaws in the Ingenix data as well as the scheme to depress ONS payments achieved by use of the Ingenix Database for UCR determinations.  In furtherance of the scheme, WellPoint engaged in thousands, if not millions, of acts of mail and wire fraud.

294.   WellPoint, UnitedHealth and Ingenix were all participants in the Enterprise.

295.   At all relevant times, the Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of RICO, 18 U.S.C. § 1962(c).

296.   The WellPoint-Ingenix Enterprise was at all relevant times a continuing unit involving WellPoint, UnitedHealth and Ingenix functioning with a common purpose of reducing the price paid for ONS, and increasing the profits of the Enterprise participants and the Insurer Conspirators.  The Enterprise described above was utilized to create a mechanism or vehicle by which Defendants could reduce payments to Plaintiffs and the Classes for ONS through the use of flawed and invalid data that could not be challenged effectively.  In particular, as described herein, the Enterprise was used to create and administer what appeared to be an appropriate and unassailable database which reported actual charge data; the Ingenix Database was designed to appear valid as a basis for UCR when, in fact, it is and was, invalid.

297.   Throughout the Class Period, WellPoint, UnitedHealth and Ingenix remained members of the Enterprise, undertaking countless and nearly constant acts of mail and wire fraud for their common purpose reducing the price paid for ONS.

298.   The Enterprise had and continues to have an ascertainable structure and function separate and apart from the pattern of racketeering activity in which it has

engaged.  Decision-making within the Enterprise with regard to the inclusion of data within the Ingenix Database that would reduce ONS payments was consensual.  The members of the Enterprise functioned as a continuous unit, and performed roles consistent with this structure.   WellPoint, UnitedHealth and Ingenix, and the Enterprise, performed certain legitimate and lawful activities that are not being challenged in this Complaint, including the provision of health insurance and plan and claims administration services by WellPoint, UnitedHealth and Ingenix, which was done for many claims lawfully and without resort to unlawful practices.  Ingenix also legally administers and sells a number of other products which are legitimate and not related to the claims described in this complaint.  the collection and dissemination of health insurance information by Ingenix, however, was not legitimate when it involved the creation, use and dissemination of invalid data for use in making UCR determinations.  Aside from legitimate activities carried out by the members of the Enterprise, its members used the Enterprise's structure to carry out the fraudulent scheme and unlawful activities alleged in this Complaint including, but not limited to, intentional underpayment of benefits to Subscriber Plaintiffs and the Subscriber Class and Provider Plaintiffs and the Provider Class resulting from Defendants' use of flawed and invalid data for UCR determinations.

299.   Through its role in the Enterprise and the scheme, Ingenix benefited directly by enhancing its ability to earn licensing fees through the sale of the Ingenix Database.  WellPoint and UnitedHealth benefited by reducing the amount they paid to Providers or reimbursed to Subscribers for their ONS through the use of the Ingenix Database to price UCR.

300.   In furtherance of the fraudulent scheme, Ingenix provided extensive "litigation support," including vouching for data used to price UCR by its data users.  Ingenix employed staff to assist data users, including testifying in court, testifying in depositions, supplying documentation and otherwise bolstering the users' use of Ingenix data to price UCR.  WellPoint and UnitedHealth provided data, through the

U.S. mails or interstate wire facilities, to Ingenix which they knew would be edited by Ingenix in a manner which precluded its use for UCR.  Ingenix, in turn, sent or caused to be sent, through the U.S. mails or over the interstate wire facilities, the flawed data and related communications and information that were used by Defendants and Insurer Conspirators in reimbursing for ONS.

301.    Ingenix not only knowingly sought and accepted WellPoint's and the Insurer Conspirators' incomplete data, through the U.S. mails or electronically through the interstate wires (including the Internet), but also it continued to provide a significant discount (at times a 100% discount) to these data contributors as part of its arrangement with them.  Ingenix also failed to conduct any audits or reviews of the data that it received from data contributors, including WellPoint.  These actions were taken in furtherance of Ingenix's effort to understate UCR amounts for the benefit of the WellPoint-Ingenix Enterprise.

302.    During the Class Period, Defendants participated in the conduct of the Enterprise in order to shift the costs of medical treatment to their Subscribers and Providers and therefore to Plaintiffs and the Classes, to reduce UCR payments and to create an appearance of legitimacy for their out-of-network benefit reductions.  Such participation or direction is demonstrated by the circumstances underlying WellPoint's and UnitedHealth's relationship with the Ingenix Database.  WellPoint participated in the sale of the PHCS database from HIAA to UnitedHealth.  At that point, the then-CEO of WellPoint, Leonard D. Schaeffer, was the Chair-Elect of the HIAA's Board of Directors, the number two official of HIAA.  As a result of Schaeffer's positions and WellPoint's roles, WellPoint was one of the primary decision-makers as to the sale and had control over, or participated in, the direction of the Ingenix Database.  WellPoint also participated in the oversight by HIAA of the implementation of the Ingenix Database, and had input into its operation and direction through Schaeffer's position as Chairman of HIAA's Board of Directors (a position that he held through at least the first year of the implementation, and which also

1   allowed WellPoint to exercise control and direction over the initial stages of the

2   Ingenix Database).  In addition, another WellPoint executive, D. Mark Weinberg, was

3   a member of HIAA's Board of Directors.

4       303.   As part of the sale of the PHCS database to Ingenix, UnitedHealth

5   agreed with HIAA to become a member of the HIAA for at least ten years.

6   UnitedHealth also agreed as part of the sale agreement that Ingenix would create an

7   advisory committee composed of HIAA members (which included WellPoint) to

8   exercise control over the PHCS product.  Also, as part of the ten-year cooperation

9   agreement entered into in 1998 between Ingenix and HIAA and which stipulated to

10  creation of a liaison committee (as discussed above) HIAA members participated in

11  the continued development, operation, and direction of the database after its sale by

12  HIAA to Ingenix.

13      304.   As discussed above, in or about 2003, HIAA merged with the American

14  Association of Health Plans to become AHIP.  AHIP's Board of Directors includes the

15  President and CEO of WellPoint, Angela Braly, and the Chairman and CEO of U.S.

16  Health Group, Inc., Benjamin Cutler.  Furthermore, the executive vice president of

17  WellPoint, Samuel Nussbaum, served as Chair of AHIP and a member of its board of

18  directors during the Relevant Time Period.  The positions of these WellPoint

19  executives in HIAA's successor organization, and UnitedHealth's membership in

20  HIAA, allowed WellPoint and UnitedHealth to exercise continued control and

21  participation in the direction of the Ingenix Database.

22      305.   The WellPoint and UnitedHealth Defendants' participation in the

23  activities of the enterprise is also reflected by the agreement between the Wellpoint

24  Defendants and Ingenix pursuant to which the former provide scrubbed data to

25  Ingenix and in return obtain a significant discount on the flawed data upon which they

26  base their false reimbursement rates.  Specifically, as part of the master licensing

27  agreements entered into between Ingenix and the WellPoint Defendants and Insurer

28  Conspirators, the WellPoint Defendants and Insurer Conspirators all promise to

supply their data (which, as discussed above, is scrubbed or rigged) to Ingenix to allow Ingenix to use the data in the Ingenix Database and, in return, they obtain both a significant discount and the flawed data from Ingenix in order to issue false reimbursement amounts to Plaintiffs.  In this respect, using U.S. mail and interstate wire facilities, lower-rung employees of the WellPoint Defendants, operating under the direction of upper management and in collaboration with one another, submit false and misleading information to Ingenix in order to create the Ingenix Database that was used by the Defendants and Insurer Conspirators for the Enterprise's own direct and indirect financial gain.  For its part, Ingenix, through its agreements with the WellPoint Defendants and in accordance with the scheme to defraud, directed the submission of the flawed data from the WellPoint Defendants, and similarly used lower-rung employees operating under the direction of upper management to carry out this scheme.  Likewise, through its role in the Enterprise, WellPoint exercised decision-making authority with regard to which data was ultimately transmitted  to Ingenix and used in the Ingenix Database.  WellPoint also selected and intentionally provided through the U.S. mails and/or interstate wire facilities (including the Internet) false and misleading data to Ingenix itself for use in the Ingenix Database, and used (or caused the use of) the U.S. mails or interstate wires for other communications or transmissions that facilitated the sending of the misleading data.

306.   The Enterprise benefited from the pattern of racketeering activity through the reduction of UCR costs by WellPoint and other users of the Ingenix Database, which would not have been obtained absent entry into the Enterprise and was, in addition to the conduct of WellPoint alleged above, the shared goal of the Enterprise for which its members functioned as a continuous unit.

307.   WellPoint further used the Enterprise to facilitate its goal of reducing out-of-network benefits paid to Plaintiffs and the Classes by submitting incomplete and inadequate data to Ingenix, thereby artificially reducing the numbers that would be reported in the final Ingenix Database and which WellPoint used to make UCR

104

1    determinations.  As part of this fraudulent scheme, as alleged herein, WellPoint

2    intentionally submitted (or caused the submission of), *via* U.S. mail and interstate wire

3    facilities, data which it knew would be used to create false databases which, in turn,

4    would be used to price UCR for its members and members of other healthcare plans.

5    Ingenix was aware of the inadequacy of data contributed by data contributors such as

6    WellPoint, but allowed it to occur, since it was consistent with the Enterprise's

7    purpose of reducing the cost of out-of-network healthcare services.

8        308.    WellPoint's and UnitedHealth's submission of data to Ingenix benefited

9    Ingenix, and users of the Ingenix Database.  The inclusion of WellPoint's and

10   UnitedHealth's data was critical to both the appearance of legitimacy of the Ingenix

11   PHCS database, and the usefulness of that data for depressing the price paid for ONS.

12   Further, WellPoint and UnitedHealth knew the data they contributed to Ingenix was

13   flawed and incomplete and its use by the Enterprise and Ingenix would depress the

14   price of ONS for all the Insurer Conspirators.   WellPoint and UnitedHealth

15   participated and conducted the affairs of the Enterprise not only by submitting false

16   and incomplete data to Ingenix, but also, as discussed above, by participating in, or

17   controlling, the decision-making regarding the database and by utilizing the flawed

18   data for illicit purpose of determining UCR.

19       309.    If WellPoint had not participated in the conduct of the Enterprise by

20   participating in the decision-making regarding the database, by submitting flawed data

21   to Ingenix, and by using the Ingenix Database, it would not have been able to obtain

22   the benefits it did from the Enterprise.  Ingenix needed sufficient data to allow it to

23   represent to its customers that the Ingenix Database was the largest available and had

24   sufficient numbers to dispel any doubt as to their validity.  WellPoint knew such

25   representations were being made by Ingenix and used Ingenix's representations for the

26   identical purpose of removing doubt as to their validity.  Ingenix needed the data to

27   provide databases to its users to save them money on ONS claims.  Without data from

28   WellPoint, UnitedHealth and other large data contributors, the Ingenix Database could

not have been successfully marketed as the "industry standard" for UCR pricing. Similarly, WellPoint and UnitedHealth could not have saved the millions of dollars they did if they had not used the Ingenix Database for making UCR determinations even though they knew that they were flawed and invalid.  By using the Ingenix Database for making UCR determinations, WellPoint was able to benefit substantially from its role in participating in the control and direction of the Enterprise, along with Ingenix.

310.   Each of the members of the Enterprise benefitted from its successful operation.  Ingenix benefited directly by enhancing its ability to earn licensing fees through the sale of the Ingenix Database.  As the parent company of Ingenix, UnitedHealth benefitted from the Ingenix fees as well as by reducing the amount it paid for ONS reimbursements, incentivizing subscribers to see in-network providers and reducing competition.  WellPoint benefitted from reduced competition and because it also reduced the amount it was required to pay for ONS reimbursements and incentivized its subscribers to see providers in their respective networks.  Thus, all members of the Enterprise benefitted from the pattern of racketeering activity at the expense of the Subscriber and Provider Plaintiffs and Classes.  Absent participation in the Enterprise, the members of the WellPoint-Ingenix Enterprise would not have so benefitted.

311.   Through their wrongful conduct as alleged herein, Defendants, in violation of 18 U.S.C. § 1962(c), conducted and participated in the conduct of each of the Enterprise's affairs, directly and indirectly, through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5).  These acts of racketeering activity have continued throughout the Class Period to the present.

312.   Defendants, acting through their officers, agents, employees and affiliates, committed numerous predicate acts of "racketeering activity," as defined in 18 U.S.C. § 1961(5), prior to and during the Class Period, and continue to commit such predicate acts, in furtherance of their underpayment scheme for ONS, including

(a) mail fraud, in violation of 18 U.S.C. § 1341, and (b) wire fraud, in violation of 18 U.S.C. § 1343.  Defendants also caused the commission of such predicate acts, knowing that their use would follow in the ordinary course of business or that their use was reasonably foreseen.  Each use, or causing of such use, of the mail or wire in furtherance of the fraudulent scheme described above is a predicate act of mail and wire fraud.  Such predicate acts include the following:

(a)     using, or causing the use of, the U.S. mails to transmit to Ingenix (1) data (that, as discussed above, was materially false or misleading) for use in the Ingenix Database, or (2) communications or information that facilitated the scheme to defraud involving such data, for the purpose of effectuating the above-described fraudulent scheme, with each such use of the mails constituting a separate and distinct violation of 18 U.S.C. § 1341.  Examples of such predicate acts include, but are not limited to,

(i)     a data submission information form, indicating that Empire Blue Cross/Blue Shield, a WellPoint Company in New York had submitted data to L.T., the Ingenix data contribution program manager in Utah, via the U.S. mails on November 24, 2004 on a CD ROM, and listing M.S., an employee of Empire Blue Cross/Blue Shield (a WellPoint Company) in Brooklyn, New York as the contact person for any questions regarding the submission;

(ii)    a July 17, 2009 email transmission from M.S. of Healthlink, a WellPoint subsidiary in Missouri , to Ingenix in Utah (at data.contribution@ingenix.com), in which M.S. confirmed that Healthlink's data contribution to Ingenix for July 2009 had been sent via the U.S. mails on a CD ROM to Ingenix on July 17, 2009;

(iii)   an email exchange between Socha and M.C., an Ingenix employee in Utah, on July 22, 2009, July 30, 2009, and August 4, 21, and 24, 2009, in which M.C., over the course of nine emails, indicated Ingenix's

1  receipt of the CD ROM containing the data, requested M.S. to resend the

2  data on at least three more occasions because of problems accessing it

3  from the CD ROM, and in which M.S. indicated that she had mailed via

4  the U.S. mails the data to Ingenix in Utah at least two times on a CD

5  ROM;

6      (b)    transmitting, causing to be transmitted and/or knowingly agreeing to the

7  transmittal via the U.S. mails and/or interstate wire facilities of various materials and

8  information concerning, but not limited to, (1) data (that was materially false or

9  misleading  as  discussed above) for use in the Ingenix Database, or (2)

10  communications or information that facilitated the scheme to defraud involving such

11  data, by means of telephone, facsimile, and the Internet, in interstate commerce, for

12  the purpose of effectuating the above-described false payment schemes, and each such

13  transmission constituting a separate and distinct violation of 18 U.S.C. § 1343.

14  Examples of such predicate acts include, but are not limited to:

15      (i)    a January 26, 2007 email sent at 7:17 p.m. from Ingenix's data

16  contribution department, at Ingenix, 2525 Lake Park  Blvd., Salt Lake

17  City, UT 84120 (data.contribution@ingenix.com), to F.C., a WellPoint

18  manager in New York, confirming Ingenix's receipt of data from

19  WellPoint on January 16, 2007;

20      (ii)    a January 8, 2007 12:21 p.m. email from Ingenix's Data

21  Contribution department in Utah (data.contribution@ingenix.com) to

22  F.C. of WellPoint in New York reminding him that Ingenix requires

23  biannual submissions of data contributions from its customers and that

24  WellPoint was behind in its submissions of data to Ingenix (*i.e*., data

25  that, as discussed above, was misleading);

26      (iii)    a January 23, 2009 exchange of three emails between C.M. of

27  Ingenix in Utah  M.S. of Healthlink, a WellPoint subsidiary in Missouri ,

28  in which Ingenix confirmed its receipt of data (that was misleading, as

discussed above) on January 21, 2009 from Healthlink that was transmitted via email to Ingenix's email address, datacontribution@ingenix.com;

(iv)     an October 25, 2007 email exchange between J.M., an employee of Ingenix in Utah (data.contribution@ingenix.com), and J.A., a New York employee of Empire BlueCross Blue Shield (a WellPoint company), concerning Empire's submission of the misleading data to Ingenix and the proper method of submission of such data to Ingenix in Utah, which included mailing the data on a CD ROM to Ingenix in Utah or uploading it onto Ingenix's website;

(v)     an email exchange between R.P., a Wellpoint employee in Massachusetts and L.T., Ingenix's data contribution program manager in Utah, in which those individuals, in four emails dated May 4, 5, and 8, 2009, discussed WellPoint's submission of data to Ingenix and in which WellPoint's employee, R.P., indicated that he emailed WellPoint's May 2009 data contribution to Ingenix as an attachment to a May 8, 2009 email to Ingenix in Utah;

(vi)     an email exchange between L.P., a WellPoint employee in California, and employees of Ingenix in Utah, including C.C. and S.S., in which C.C., S.S., and L.P., over the course of five emails sent on October 13, 2003, November 14, 2003, December 8, 2003, and December 12, 2003, discussed the availability of Ingenix data via Ingenix's website, and WellPoint's preference of receiving at its California location Ingenix's data on CD ROMs and "cartridges," via the U.S. mails.

(vii)     an Ingenix data submission information form, dated November 20, 2008, in which M.B., an employee of of Blue Cross Blue Shield of Massachusetts (a WellPoint company), attests that this company

109

uploaded its data contribution to Ingenix's Internet website, and that the information contained in the data submission information form accompanying the data is accurate and that the form was sent electronically to Ingenix in Utah;

(viii)  an Ingenix data submission information form, dated July 14, 2006, in which J.A., of Empire Blue Cross/Blue Shield in New York (a WellPoint company), attested that this company had sent its data contribution to Ingenix in Utah, and that the information contained in the data submission information form accompanying the data was accurate and that the form was sent electronically to Ingenix in Utah (at data.contribution@ingenix.com).

There are numerous other examples of use of the telephone, email, and U.S. mail by WellPoint and Ingenix to send, receive, or discuss flawed data.

313.   WellPoint knew that the data that it contributed to Ingenix was inadequate and lacked required data fields essential for Ingenix to evaluate the data and include (or exclude) it in final UCR fee schedules, but WellPoint continued to use the Ingenix Database to make UCR determinations anyway.

314.   In furtherance of their underpayment scheme for ONS, Defendants, in violation of 18 U.S.C. §§ 1341, 1343, 1961 and 1962, repeatedly and regularly used, or caused the use of, the U.S. mail and interstate wire facilities to further all aspects of the intentional underpayment scheme to Plaintiffs and the Classes by transmitting and/or receiving, or causing the transmission and receipt of, data and information necessary to carry out the scheme to defraud Plaintiffs and the Classes.  Each Defendant intended, knew and/or should have reasonably anticipated that the U.S. mail and interstate wire facilities would be utilized in furtherance of the scheme.  Each use of the mail or wire, or causation of such use, in furtherance of the scheme was a violation of the above statutes.

315.   The foregoing acts, involving communications or transmissions, sent *via* U.S. mail and interstate wire facilities, and/or causing of such communications or transmissions, were incident to an essential part of Defendants' scheme to defraud Plaintiffs and the Classes described in this Complaint.  Each such use of the U.S. mail and interstate wire facilities, or each instance involving causation of such use, in furtherance of the scheme alleged in this Complaint constitutes a separate and distinct predicate act of "racketeering activity" and, collectively, constituted a "pattern of racketeering activity."

316.   The above-described pattern of racketeering activity is related because it involves the same fraudulent scheme, enterprise, common persons, common out-of-network claim practices, common results directly impacting upon common victims, and is continuous because it occurred over several years, and constitutes the usual practice of WellPoint and each of Enterprise, such that it amounts to and poses a threat of continued racketeering activity.  WellPoint's scheme to defraud Plaintiffs and the Classes is open-ended and on-going.

317.   The direct and intended victims and targets of the pattern of racketeering activity described previously herein were the Providers and Subscribers, whom WellPoint has underpaid for ONS.  The Associations were also direct and intended victims of the pattern of racketeering activity, as set forth herein.

318.   As a result of Defendants' fraudulent scheme, Plaintiffs and the Classes were directly injured in their business or property by reason of Defendants' RICO violations because ONS reimbursement amounts were the direct targets of the scheme to defraud, with no other, independent intervening cause responsible for their Plaintiffs' injuries; Plaintiffs were underpaid or under-reimbursed for ONS rendered to WellPoint's subscribers as a direct result of the Defendants' pattern of racketeering activity, and thereby suffered direct consequential financial loss flowing from their property (their health insurance plans) by having overpaid for their health insurance coverage (or, in the case of Providers and Associations, having suffered out-of-pocket

111

losses due to the failure of Providers and the Associations' members to be properly reimbursed for the ONS rendered by Providers).

319.    In addition, to the extent that a showing of reliance is required, Provider Plaintiffs and the Provider Class reasonably relied on the fraudulent scheme by providing ONS to WellPoint subscribers and on the validity of the assignments given to them by Subscriber Plaintiffs and Subscriber Class members.

320.    WellPoint also undertook additional predicate acts in violation of 18 U.S.C. §664 in addition to the acts of mail and wire fraud alleged above in order to achieve the same ends described above.

321.    RICO specifically identifies as a predicate act "any act which is indictable under . . . [§]664 (relating to embezzlement from pension and welfare funds)" as a predicate act. 18 U.S.C. § 1961(l)(B).  Section 664 of Title 18 provides:

**Theft   or   embezzlement   from   employee   benefit   plan**
Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined under this title, or imprisoned not more than five years, or both.

322.    For fully insured healthcare plans, in which WellPoint both administered the plans and paid the benefits from its own assets, WellPoint benefited from the conversion of assets from its ERISA plans.  Whereas these assets should have been held by WellPoint in its fiduciary capacity under ERISA plans and paid to its Members, WellPoint improperly withheld such funds and maintained them as part of its own assets for WellPoint's own benefit.  For self-funded healthcare plans, WellPoint made final appeal decisions and intentionally caused underpayment of benefits to Plaintiffs and the ERISA Subclasses in order to justify its receipt of administrative fees.

323.    Defendants acted with specific intent to deprive ERISA Plaintiffs and the ERISA Subclasses of guaranteed benefits, and were sufficiently aware of the facts to know that they were acting unlawfully and contrary to the trust placed in them by the Plaintiffs, the ERISA Subclass (as defined below) members and the plan sponsors whose plans they were administering.

324.    Each false payment on a claim constitutes a separate and distinct predicate act, in violation of 18 U.S.C. § 664, of converting or misappropriating funds specifically earmarked within the applicable plan as a guaranteed benefit for the intended member, for Defendants' direct or indirect benefit.

325.    Plaintiffs' injuries were proximately caused by Defendants' violations of 18 U.S.C. § 1962(c) because these injuries were the foreseeable, direct, intended, and natural consequence of Defendants' RICO violations (and commission of underlying predicate acts) and, but for Defendants' RICO violations (and commission of underlying predicate acts), they would not have suffered these injuries.

326.    The Provider Class and ERISA Subclass allege they have standing to pursue these claims as assignees of their patients' out-of-network benefits and as third party-beneficiaries of their patients' out-of-network benefits.

327.    The Association Plaintiffs have standing to pursue these RICO claims both individually and/or on behalf of their members.

## BREACH OF CONTRACT ALLEGATIONS

328.    During times relevant to the Complaint and continuing through the present, Plaintiff J.B.W. has been, and is, a member of an individual and family health plan issued and administered by defendant WellPoint *via* its Blue Cross of California subsidiary that is not governed by ERISA.  Plaintiff J.B.W. enrolled in the Blue Cross Individual PPO $3,500 deductible plan effective November 1, 2008.  During the relevant time, Plaintiff J.B.W. paid his plan premiums directly to Blue Cross of California.  According to Plaintiff J.B.W.'s Agreement, benefits were to be paid to the subscriber and his enrolled family members.

329.    Plaintiffs Darryl and Valerie Samsell have been members of individual and family health plans issued and administered by Defendant WellPoint, by and through Anthem Blue Cross and Blue Shield, Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield, and/or Trigon Blue Cross Blue Shield predecessor and/or subsidiary companies.  During the Relevant Time Period, the Samsells paid substantial premiums to WellPoint and/or the aforesaid predecessor or subsidiary entities.  The Samsells paid higher premiums for their health plans for the benefit of having coverage for ONS services.

330.    WellPoint issues Combined Evidence of Coverage and Disclosure Forms for individual and family plans (the "Agreements") to Plaintiffs J.B.W. and the Samsells  and its other members setting forth the benefits WellPoint agrees to provide members as well as the costs to the members of the plans.  For example, upon subscribing to the Individual PPO $3,500 Deductible Plan, Plaintiff J.B.W. received his Agreement from WellPoint.

331.    The Agreements are uniform contracts that utilize the same definitions across different health plans.  The Agreements are one-sided adhesion contracts.  Such contracts are presented on a take-it-or-leave-it basis and are not subject to negotiation or alteration by individual members.

332.    The Agreements provide members like Plaintiffs J.B.W. and the Samsells with an express right to receive treatment from out-of-network providers. WellPoint refers to these providers as "non-participating," "non-contracting," "non-network," "non-PPO" and/or "out-of-network" providers.  Services by "in-network" providers are reimbursed at discounted rates negotiated between the healthcare provider and WellPoint.  WellPoint promises in the Agreements to reimburse its members for services by out-of-network providers at a percentage of the lesser of (i) the actual, billed charge or (ii) the UCR for the services in the geographic area in which the services were performed.  For example, the Agreements state that for "Non-PPO Providers" (*i.e.*, ONS) "the maximum covered expense for services provided by

114

a non-PPO provider or other healthcare provider will always be the lesser of the billed charge or (1) for a physician, the customary and reasonable charge [.]"   The "customary and reasonable charge" is defined by the Agreements as a "charge which falls within the common range of fees billed by a majority of physicians for a procedure in a given geographic region."   WellPoint uses the terms "UCR," "usual and customary," and "customary and reasonable charge" interchangeably.  WellPoint often refers to the amount it will reimburse for ONS as the "amount allowed," "allowed expense," or "allowable charge."

333.   As an example, Plaintiff J.B.W.'s Agreement specifies that there is a set deductible, and that once this deductible is satisfied, WellPoint is required to reimburse its subscribers, including Plaintiff J.B.W., according to a chart contained within the Agreement.  Pursuant to the chart, medical procedures are classified as either being undertaken by a participating or preferred participating provider or by a non-participating provider.  "Non-Participating Provider" is defined as an entity (hospital, physician or otherwise) "which does NOT have a Prudent Buyer Plan Participating Provider agreement with [Blue Cross] in effect at the time services are rendered[.]"

334.   Moreover, the coverage matrix in Plaintiff J.B.W.'s Agreement contains various medical procedures and the corresponding reimbursement amounts and subscriber payment responsibilities.  For Medical Emergencies in California, Plaintiff J.B.W.'s Agreement states that, for a non-participating provider, the consumer, Plaintiff J.B.W., must pay "[a]ll charges in excess of Customary and Reasonable charges."   Like the other Agreements, Plaintiff J.B.W.'s Agreement defines "Customary and Reasonable Charge" as a "charge which falls within the common range of fees billed by a majority of physicians for a procedure in a given geographic region."   Other ONS services, such as "Professional Services," are reimbursed at 50% of the "Negotiated Fee Rate."   Plaintiff J.B.W.'s Agreement defines the "Negotiated Fee Rate" as "the rate of payment that Anthem has negotiated with the Participating

115

Provider under a Prudent Buyer Participating Agreement for Covered Services." Because, however, out-of-network providers by definition have not negotiated rates under a Prudent Buyer Participating Agreement or any other agreement, there can be no Negotiated Fee Rate for out-of-network providers.  Thus, the reimbursement of ONS based on a Negotiated Fee Rate is nonsensical on its face unless there is some reference to a Customary and Reasonable Charge.

335.   WellPoint makes clear in its Agreements, as well as in other written communications with its plan members that the plan member is financially responsible for the difference between the allowed expense and the provider's billed charge for ONS.  WellPoint's Agreements explicitly state that "You will be responsible for any billed charge which exceeds the customary and reasonable charge" for ONS.  Once a member receives ONS, WellPoint and/or Blue Cross of California provide an EOB that describes the division of payment for the service.  The EOBs state the amount the out-of-network provider charged for the service, the amount allowed, and after stating the percentage and portion of the amount allowed that WellPoint will pay, states the balance, which the EOBs describe as "Your Responsibility."

336.   The portions of ONS charges not paid by WellPoint are not credited toward deductibles or out-of-pocket maximums that limit the total amount a plan member has to pay for medical services over a given time period.  Thus, such costs are borne entirely by the plan members.

337.   Beginning on or about January 23, 2009, Plaintiff J.B.W. began a series of outpatient medical visits with Non-Participating Providers.  Also, on or about October 10 and 11, 2009, Plaintiff J.B.W. received inpatient medical services from a Non-Participating Provider.   He submitted a claim with WellPoint regarding these services.  WellPoint made reimbursement determinations on Plaintiff J.B.W.'s claims that reimbursed him less than the agreed-upon percentage of either the provider's actual charges or the UCR.  Although never disclosed in the Agreement, Plaintiff J.B.W. has learned through the course of this litigation that WellPoint used internal

116

fee schedules that it does not make available to its customers to determine the rate at which he would be reimbursed for his ONS services. These fee schedules were derived with reference to Ingenix fee schedules and are not the result of any negotiation between WellPoint and Plaintiff J.B.W.'s providers, let alone any other provider. These reimbursement determinations resulted in Plaintiff J.B.W. being obligated to pay not only his deductible, but also that part of the provider's billed charge that exceeded the reimbursement amount determined by WellPoint.

338. Plaintiffs Darryl and Valerie Samsell's plans covered both themselves and their three minor children pursuant to two policies: (1) The Blue Cross and Blue Shield Comprehensive Major Medical and Dental Policy and the Blue Cross and Blue Shield Comprehensive Major Medical Policy (providing coverage to Valerie Samsell from 1976-2007). These policies also included several endorsements dated July 2001, July 15, 2002, and October 2002.

339. Under the policies, the Samsells were insured for a number of "Covered Services" provided by "Providers" or specifically defined as "Physicians."

340. The Samsells were insured for Covered Services rendered by physicians, whether or not they were "Participating Physicians" or "Non-Participating Physicians." The policies further defined a "Participating Physician" as one who "agrees to accept the Allowable Charge as payment in full for "Covered Services." On the other hand, "[a] Non-Participating Physician means other Physician, including one who participates with another Blue Shield Company."

341. "Allowable Charges" was defined in the Samsells' original policies as follows:

> This phrase means the allowance for Covered Services, as determined by the Company. Outside the Company's Service Area, Your Allowable Charge will be determined by the Blue Cross and/or Blue Shield Company serving the area in which the Covered Service is rendered. If Covered Services are rendered in

an area which does not have a Blue Cross and/or Blue Shield Company, the allowance will be determined by the Company."

342.   The endorsements to these policies changed this definition of "Allowable Charges" to the following:

**C. ALLOWABLE CHARGES**

1.   With respect to a Provider's charge, the term "Allowable Charge" means the Company's allowance for a specified Covered Service or the Provider's charge for that service, whichever is less.

2.   With respect to a Covered Facility's Charge, the term "Allowable Charge" means:

\*\*\*

d.   The amount which the Company determines, in its sole discretion, to be reasonable for the Covered Service when the Company pays a claim for services rendered by a Covered Facility located outside of Virginia that does not have a claims reimbursement agreement directly with the Company or with the Blue Cross or Blue Shield plan where the services were rendered.

3.   With respect to charges for Covered Services supplied by other than   Covered Facilities or Providers, the term means the amount which the Company determines, in its sole discretion, is reasonable for the Covered Service provided.

343.   The endorsements further provided with respect to the payments by WellPoint/Anthem for Covered Services to "Non-Participating Providers and Non-Participating/Non-Contracting Covered Facilities" as follows:

When a Covered Person receives Covered Services from a Non-Participating Provider or Non-Participating/Non-Contracting Covered Facility, the Company may choose to make payment directly to the Insured, or at the company's sole option, to any

person responsible for payment to the Non-Participating Provider or Non-Participating/Non-Contracting Covered Facility. The company only pays under these circumstances after the Company has received an itemized bill and the medical information the Company decides, in its sole discretion, is necessary to process the claim.

Non-Participating Providers and Non-Participating/Non-Contracting Covered Facilities do not accept the Company's Allowable Charge as payment in full. These providers and facilities may charge You the difference between their normal charge and the Company's Allowable Charge. When these providers and facilities are used by the Covered Person, the Covered Person is responsible for any applicable Coinsurance and Deductible, as well as the difference in the amount charged and the Company's Allowable Charge.

344. These provisions of the policies and endorsements in the Samsells' health plans advised the Samsells that, while out-of-network services would be paid based upon an "Allowable Charge" in the discretion of WellPoint, that discretion was not unfettered; instead, it would be based upon the company's "reasonable" determinations based upon actual review of itemized bills submitted by the Samsells' doctors. .

345. The Agreements between WellPoint and the Samsells did not advise them that the "Allowable Charges" for "ONS" would be based upon Anthem Virginia's standard, in-network participating fee schedule. The Agreements also did not advise the Samsells that Anthem Virginia's in-network participating physician schedules were created based upon undisclosed, low Medicare rates multiplied by a "dollar conversion factor" set by WellPoint based upon the desired premium increases the companies wished to pass on to the Samsells. This self-described "top down approach," by which WellPoint/Anthem essentially determined how much money they wanted to make each year in premium increases and passed on those increases to the

119

Samsells – in violation of the explicit provisions of their Agreements – caused the Samsells to pay more in premiums and provider charges for out-of-network services than they otherwise should have paid.

346.   The Samsells' policies and endorsements both stated explicitly that while their premiums were "subject to change, . . . [p]remium changes will be based only on class.  You shall not be singled out for a Premium change.  Premiums will go up as your age increases, eligible dependants are added, coverage is increased or there is a change in the area of residence."  Premium increases passed onto the Samsells were not based upon any of these factors.

347.   The Samsells sought medical treatment for their minor dependent children from out-of-network providers who performed oral surgery and other related services.  For example, the Samsells' then-minor dependant son received oral surgical services on or about August 6, 2002 from a non-participating provider.  The Samsells' minor daughter received oral surgical services on or about July 30, 2004 and May 14, 2005 from a non-participating provider.

348.   WellPoint thereafter made a determination of the "Allowable Charge" on these claims based upon the above described out-of-network payment policy that reimbursed the Samsells less than the stated charge of the provider's actual charge.  The determination and subsequent payment of the "Allowable Charge" for the Samsells' "ONS" resulted in the Samsells being obligated to pay, and in fact paying, charges for out-of-network services that exceed the "reasonable" charges for such services in the geographic area.

349.   In processing claims for ONS charges, WellPoint is obligated by the terms of its Agreements to reimburse plan members for ONS based on either the actual billed charge or the objective criteria for UCRs and other types of ONS reimbursements as set forth in the Agreements.  WellPoint, however, fails to honor the terms of the Agreements by basing its reimbursements for ONS on the False UCRs and other ONS Benefit Reductions to diminish ONS reimbursements.

350.    In making ONS reimbursements, WellPoint uses the Ingenix Database and other ONS Benefit Reductions.  As detailed above, the Ingenix Database and other ONS Benefit Reductions used by WellPoint to calculate ONS reimbursements result in the systematic under-reimbursement of Plaintiffs J.B.W. and the Samsells and the Non-ERISA Subscriber Class.

351.    Plaintiffs J.B.W. and the Samsells and the other members of the Non-ERISA Subscriber Class complied with their obligations under their Agreements with WellPoint.

352.    WellPoint failed to comply with the terms of its Agreements with Plaintiffs J.B.W. and the Samsells and the other members of the Non-ERISA Subscriber Class by making reimbursement determinations for ONS that had the effect of covering less than the stated percentage of either the Providers' actual charges or the UCR without valid data to support such determinations.

353.    Rather than reimbursing for ONS based on either the actual charge or the customary and reasonable charge for a particular service as promised in the Agreements, WellPoint reimbursed Plaintiffs J.B.W. and the Samsells and the other members of the Non-ERISA Subscriber Class based on the flawed and artificially-deflated data provided by Ingenix, WellPoint's internal fee schedules,, negotiated fee schedules and other ONS Benefit Reductions.  WellPoint's conduct thus contravenes the express terms of the Agreements and constitutes a breach of its contracts with its members.  Such conduct also, in violation of the covenant of good faith and fair dealing, prevents its members from obtaining the benefits of the reimbursements they reasonably expect to receive pursuant to the terms of the Agreements.

354.    Although Plaintiffs J.B.W. and the Samsells and the other members of the Non-ERISA Subscriber Class are contractually entitled to choose care for ONS, WellPoint inhibited the use of ONS providers by using False UCRs and other ONS Benefit Reductions that increased the unpaid amounts for which Plaintiffs J.B.W. and

1   the Samsells and the other members of the Non-ERISA Subscriber Class were liable,

2   thereby deterring their members' use of ONS.

3       355.   As a consequence of WellPoint's and the Conspirators' actions,

4   Plaintiffs J.B.W. and the Samsells and the other members of the Non-ERISA

5   Subscriber Class were reimbursed for ONS in amounts less than what they should

6   have been paid under their Agreements and received a health insurance policy of less

7   value and for which they overpaid.  WellPoint pursued its standard and uniform

8   policies in making reimbursement determinations for ONS in a fashion that conflicted

9   with its contractual obligations under its Agreements and that violated its fiduciary

10   duties to Plaintiffs J.B.W. and the Samsells and the other members of the Non-ERISA

11   Subscriber Class.

12       356.   The Provider Plaintiffs and members of the Provider Class allege they

13   have obtained assignments and otherwise obtained the right to "stand in the shoes" of

14   the Subscriber Plaintiffs and have the right to enforce the contracts with WellPoint.

15                          ***Plaintiff Dr. Higashi***

16       357.   Plaintiff Dr. Higashi is a chiropractor with a private practice in Los

17   Angeles, California.  She is licensed to and does in fact practice in the State of

18   California, and has been certified by the California Chiropractic Board.  During the

19   relevant time, Dr. Higashi provided ONS to WellPoint's subscribers.

20       358.   Because patients find it difficult to pay out of pocket for medical

21   treatment at the time of service, they rely on their health plans to reimburse their

22   physicians for their services.  While this arrangement is generally beneficial for the

23   patient who does not have to pay for treatment at the time of service, it leaves the

24   Provider Plaintiffs and members of the Provider Class to advance the cost of such

25   medical treatment until they receive payment from their patients' insurers.  To

26   facilitate direct payment from insurers, Dr. Higashi's patients sign a form assigning

27   their health benefits to her before treatment.  This form includes an express

28   authorization by the patient for insurers, such as WellPoint, to remit payment for

1  "professional and medical expense benefits allowable under my current insurance

2  policy for services rendered to me or my dependent" directly to Mar Vista Institute of

3  Health.

4      359.   At all relevant times, Dr. Higashi utilized a HCFA 1500 form (n/k/a,

5  CMS 1500) to submit claims to WellPoint for payment.  Dr. Higashi's claims are

6  often submitted electronically.  Once an electronic claim is submitted, it passes

7  through a clearinghouse before reaching WellPoint.  All of Dr. Higashi's claims are

8  submitted to WellPoint using CPT codes, HCPCS, and modifiers, as necessary.  Dr.

9  Higashi does not find out her compensation from WellPoint for services rendered until

10  after a procedure is performed and a claim for payment is submitted.

11      360.   At all relevant times, Dr. Higashi expected to be reimbursed by

12  WellPoint at the lesser of her billed charges or the current UCR.  WellPoint defines

13  UCR as follows:

14        A "usual" charge is the amount that is most consistently charged by an

15        individual physician for a given service.  A "customary" charge is the

16        amount that falls within a specified range of usual charges for a given

17        service billed by most physicians with similar training and experience

18        within a given geographic area.  A "reasonable" charge is a charge that

19        meets the Usual and Customary criteria, or is otherwise reasonable in

20        light of the complexity of treatment of the particular case.  Under a UCR

21        Program, the payment is the lowest of the actual billed charge, the

22        physician's usual charge or the area customary charge for any given

23        covered service.

24      361.   At various times, WellPoint, through both Anthem and Blue Cross of

25  California, unlawfully diminished Dr. Higashi's compensation by improperly

26  calculating UCRs through the Ingenix Database or Non-Ingenix Methodologies

27  (including discounted Par provider fee schedules, *i.e.*, in-network fee schedules) – and

28  then misapplying these rates to her claims.  Dr. Higashi's EOBs often state that her

1    billed charges purportedly are "in excess of the allowed expense for a non-

2    participating provider," and that the "Health Plan is not responsible for any amounts in

3    excess of this allowed expense."  Nowhere on the EOBs or elsewhere in any other

4    correspondence sent to Dr. Higashi does WellPoint or its Anthem or Blue Cross of

5    California subsidiary discuss or identify how it actually calculates UCR.  The EOBs

6    do not even specify whether Ingenix data or some other methodology was used in

7    these calculations.

8      362.   WellPoint's EOBs are intentionally uninformative, false, and misleading

9    regarding the use of UCRs.

10    **FALSE ADVERTISING AND DECEPTIVE CONDUCT ALLEGATIONS**

11      363.   WellPoint represents through its advertising, promotional pamphlets and

12    plan contracts that it will permit its members to choose between in-network and out-

13    of-network providers and that its members will be reimbursed for ONS based on

14    either the actual billed cost or the UCR.  It publishes and widely disseminates on its

15    website and through other media a summary description of its plans entitled "Benefits-

16    at-a-glance" in which it represents that its members will be reimbursed for ONS for

17    certain procedures based on a specified percentage of the "customary and reasonable

18    fees" or "negotiated fee rate."

19      364.   WellPoint does not reimburse for ONS based on either the actual cost or

20    the UCR, instead utilizing reimbursement rates it knows are artificially deflated.

21    Based on WellPoint's advertising, website, SPDs, and plan contracts, Plaintiffs J.B.W.

22    and the Samsells and the other members of the Non-ERISA Subscriber Class

23    reasonably believed that they would be reimbursed for ONS based on valid, objective

24    criteria and that such criteria would result in reimbursements that reflected the actual

25    costs of ONS in their area.  For example, prior to becoming a plan member, Plaintiff

26    J.B.W. reviewed WellPoint's SPDs on the WellPoint website and reasonably believed

27    that ONS would be reimbursed based on a percentage of the actual costs of services in

28    his geographic area.  The ability to use ONS was extremely important to Plaintiff

J.B.W., who was enticed into becoming a member of WellPoint's plan based on his understanding that ONS would be available and affordable.   By affirmatively misrepresenting the extent to which it will reimburse for ONS and the extent to which consumers can choose between in-network and out-of-network providers, failing to disclose that reimbursement for ONS is calculated based on False UCRs, and failing to disclose that the False UCRs are developed pursuant to a secret conspiracy amongst health insurers as detailed above, WellPoint deceived Plaintiff J.B.W. and the Samsells and the other members of the Non-ERISA Subclass.  Had Plaintiffs J.B.W. and the Samsells and the other members of the Non-ERISA Subscriber Subclass been made aware of the true cost of ONS, they would have chosen less expensive in-network care instead.  On information and belief, Plaintiffs allege that WellPoint also reimbursed Provider Plaintiffs and members of the Non-ERISA Provider Class less than WellPoint was obligated to reimburse them.

## CLASS ACTION ALLEGATIONS

365.   Plaintiffs bring this action on behalf of themselves and all others similarly situated, pursuant to Rule 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure.  Plaintiffs seek to represent the following Classes:

**The Subscriber Class**

> All persons or entities who, between January 1, 1998 and the present, subscribed to a health plan administered by WellPoint or Blue Cross of California allowing for the reimbursement of out-of-network services based upon  the usual and customary charges for the same or similar services in the same or similar area, and who submitted one or more claims for the payment of such out-of-network services that was reimbursed using a usual and customary benchmark that was lower than the amount actually billed by the Subscriber's healthcare provider.

**The Provider Class**

All non-participating physicians who provided ONS to any member of any health plan administered or insured by WellPoint, other than through the Empire subsidiaries, at any time since September 29, 2006, and were paid less than their billed charges for such services; and all other non-

125

participating healthcare providers who provided ONS, to any member of any health plan administered or insured by WellPoint, who were paid less than their billed charges for such services on or after January 1, 1999.   The Provider Class does not include members of the settlement classes in (i) *Love v. Blue Cross Blue Shield Ass'n*, No. 03-21296-CV (S.D. Fla.) (to the extent the settlement involved Defendant Empire Blue Cross Blue Shield) and (ii) *Shane v. Humana, Inc.*, Master File No. 00-1334 (S.D. Fla.) (to the extent the settlement involved Defendants WellPoint and Anthem), who did not opt out of such settlements, for any claim that arose <u>before</u> the Effective Date of the respective Settlement Agreements of these two class actions.

**The Antitrust Injunctive Relief Class**

All persons or entities currently enrolled in a health plan that includes out-of-network health insurance coverage and which is administered or insured by WellPoint and all non-participating physicians and other non-participating healthcare providers who provide or have provided ONS to any such persons or entities.

**The ERISA Subscriber Subclass**

All persons or entities enrolled in ERISA-governed health insurance plans administered by WellPoint who paid for ONS and received reimbursement in an amount less than the billed charges on or after January 1, 1998.

**The ERISA Provider Subclass**

All Physicians who provided services to and accepted a valid assignment from any person enrolled in an ERISA-governed health insurance plan administered or insured by WellPoint, other than through the Empire subsidiaries, and were paid less than their billed charges for such

126

services on or after September 29, 2006; and Other Healthcare Providers who provided services to and accepted a valid assignment from any person enrolled in an ERISA-governed health insurance plan administered or insured by WellPoint and were paid less than their billed charges for such services on or after January 1, 1999.  The ERISA Provider Subclass does not include members of the settlement classes in (i) *Love v. Blue Cross Blue Shield Ass'n*, No. 03-21296-CV (S.D. Fla.) (to the extent the settlement involved Defendant Empire Blue Cross Blue Shield) and (ii) *Shane v. Humana, Inc.*, Master File No. 00-1334 (S.D. Fla.) (to the extent the settlement involved Defendants WellPoint and Anthem), who did not opt out of such settlements, for any claim that arose <u>before</u> the Effective Date of the respective Settlement Agreements of these two class actions.

**The Non-ERISA Subscriber Subclass**

All persons enrolled in a non-ERISA individual and/or family health plan administered or insured by WellPoint who paid for ONS from a Physician or Healthcare Provider and received in an amount less than the billed charges on or after January 1, 1998.

**The Non-ERISA Provider Subclass**

All Physicians who provided services to a member of the Non-ERISA Subscriber Subclass, other than those who were enrolled in a plan administered or insured by an Empire subsidiaries, and who accepted an assignment of benefits and were paid less than their billed charges for such services on or after September 29, 2006; and all other healthcare Providers who provided services to a member of the Non-ERISA Subscriber Subclass, accepted an assignment of benefits and were paid less than their billed charges on or after January 1, 1999.  The Non-

ERISA Provider Subclass does not include members of the settlement classes in (i) *Love v. Blue Cross Blue Shield Ass'n*, No. 03-21296-CV (S.D. Fla.) (to the extent the settlement involved Defendant Empire Blue Cross Blue Shield) and (ii) *Shane v. Humana, Inc.*, Master File No. 00-1334 (S.D. Fla.) (to the extent the settlement involved Defendants WellPoint and Anthem), who did not opt out of such settlements, for any claim that arose <u>before</u> the Effective Date of the respective Settlement Agreements of these two class actions.

**The California ER Provider Subclass**

All healthcare providers who provided emergency healthcare services in the state of California to members of a Knox-Keene governed health insurance plan administered or insured by WellPoint, and were paid less than the customary and reasonable rate for such services.  The Subclass does not include members of the settlement classes in (i) *Love v. Blue Cross Blue Shield Ass'n*, No. 03-21296-CV (S.D. Fla.) (to the extent the settlement involved Defendant Empire Blue Cross Blue Shield) and (ii) *Shane v. Humana, Inc.*, Master File No. 00-1334 (S.D. Fla.) (to the extent the settlement involved Defendants WellPoint and Anthem), who did not opt out of such settlements, for any clam that arose before the Effective Date of the respective Settlement Agreements of those two class actions.

366.    Excluded from each of the above Classes and Subclasses are the Court and its officers, employees and relatives, each Defendant and Conspirator and any entity in which any Defendant or con-conspirator has a controlling interest, and their respective directors, officers, employees, and relatives; any governmental entities; and counsel for Plaintiffs and the Classes, including their partners, employees, and agents.

128

367.    The Subscriber and Provider Classes seek compensatory damages against all Defendants, appropriate equitable, injunctive and declaratory relief and treble damages, under the Sherman Act and RICO.

368.    The ERISA Subscriber and Provider Subclasses seek equitable, injunctive and declaratory relief against WellPoint for breaches of its fiduciary duties under ERISA as well as the redetermination and restitution and payment of the benefits they were owed under ERISA for WellPoint's breach of the terms of its group health plans.

369.    The Non-ERISA Subclasses seek compensatory damages and declaratory relief against WellPoint for breaches of its individual and family health plan contracts as well as restitution and injunctive relief against all Defendants.

370.    Each of the above Classes consists of thousands of individuals and entities throughout the United States, making individual joinder impractical, in satisfaction of Federal Rule of Civil Procedure 23(a)(1). The disposition of the claims in each of the above Classes in a single class action will provide substantial benefits to all parties and to the Court.

371.    Plaintiffs' claims are typical of the claims of each of the above Classes, as required by Federal Rule of Civil Procedure 23(a)(3), in that the representative Plaintiffs, like all members of each of the above Classes, paid premiums or received an assignment for out-of-network health insurance benefits from WellPoint and/or received reimbursement for out-of-network medical services that was based on a UCR provided by Ingenix. Plaintiffs, like all members of the above Classes and Subclasses, have been injured by Defendants' and the Conspirators' misconduct because, among other things, Plaintiffs were misled as to the reimbursement rates for out-of-network health insurance coverage provided by WellPoint and have been under-reimbursed or underpaid for out-of-network medical expenses.

372.    The factual and legal bases of Defendants' and the Conspirators' misconduct are common to the members of each of the above Classes and Subclasses

129

and represent a common thread of misconduct resulting in injury to Plaintiffs and members of each of the above Classes and Subclasses.

373.   Many questions of law and fact are common to Plaintiffs and each of the above Classes and Subclasses, and those questions predominate over any questions that may affect individuals in each of the above Classes and Subclasses, within the meaning of and fulfilling the requirements of Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3). Common questions of law and fact include, but are not limited to, the following:

(a)   whether Defendants and the Conspirators engaged in a deceptive scheme by improperly manipulating UCRs and/or using improperly-manipulated UCRs as the basis for out-of-network reimbursement;

(b)   whether Defendants and the Conspirators artificially lowered reimbursements for ONS medical services;

(c)   whether it was the policy and practice of Defendants and the Conspirators to prepare marketing and sales materials that contained false and misleading information regarding the extent of out-of-network coverage provided under their plans;

(d)   whether Defendants and the Conspirators engaged in a pattern and practice that caused Subscriber Plaintiffs and members of the Classes to incur excessive or unwarranted out-of-pocket expenses under their plans;

(e)   whether Defendants and the Conspirators engaged in a pattern and practice that caused Provider Plaintiffs and members of the Classes to be underpaid for their ONS;

(f)   whether Defendants and the Conspirators engaged in a pattern of deceptive conduct as to Plaintiffs and the members of the Classes;

(g)   whether Defendants and the Conspirators engaged in a contract, combination or conspiracy to fix UCRs;

130

(h)     the duration and extent of the combination or conspiracy alleged herein;

(i)     whether the alleged combination and conspiracy violated Section 1 of the Sherman Act;

(j)     whether Defendants' and the Conspirators' scheme to use Ingenix as a means by which to depress UCRs violated RICO;

(k)     whether WellPoint's ONS adverse benefit determinations ("ABDs") violated ERISA;

(l)whether WellPoint violated its fiduciary duties under ERISA;

(m)     whether WellPoint's claims review procedures comply with ERISA;

(n)     whether WellPoint's use of the Ingenix Database and Non-Ingenix Methodologies to calculate UCRs for ONS breaches its contractual obligations to its plan members in its health plans;

(o)     whether WellPoint's use of the Ingenix Database and Non-Ingenix Methodologies to calculate UCRs for ONS contravenes the reasonable expectations of its plan members such as to violate the covenant of good faith and fair dealing;

(p)     whether Defendants' conspiracy to depress reimbursement rates for ONS violates California's Unfair Competition Laws as well as New York General Business Law § 349;

(q)     whether Defendants misrepresented the extent to which they would reimburse their plan members for ONS costs;

(r)     whether Defendants omitted material information regarding the manner in which they calculate ONS reimbursements and regarding the extent to which they will provide such reimbursements; and

(s)     whether Plaintiffs and the other members of the above Classes and Subclasses have all suffered harm and damages as a result of the unlawful and wrongful conduct alleged herein.

374.    Plaintiffs will fairly and adequately represent and protect the interests of the above Classes and Subclasses, as required by Federal Rule of Civil Procedure 23(a)(4).  Plaintiffs have retained counsel with substantial experience in prosecuting nationwide consumer class actions and having expertise in the subject mater of this litigation and the laws under which the claims herein are asserted.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes and Subclasses, and have the financial resources to do so.  Neither Plaintiffs nor their counsel have any interest adverse to those of the Classes and Subclasses.

375.    **Rule 23(b)(1) and Requirements**.  The prosecution of separate actions by individual members of the ERISA Subscriber and Provider Subclasses would create the risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants and a risk of adjudications which, as a practical matter, would be dispositive of the interests of other members of those subclasses who are not parties.

376.    **Rule 23(b)(2) Requirements**. Defendants have acted and/or refused to act and are likely to act and/or refuse to act on grounds generally applicable to the ERISA Subscriber and Provider Subclasses and the Antitrust Injunctive Relief Class, thereby making appropriate final injunctive and other relief with respect to those subclasses and that Class as a whole. Defendants and the Conspirators have acted and failed to act on grounds generally applicable to Plaintiffs and those subclasses and that Class.  Therefore, the Court's imposition of uniform declaratory and injunctive relief is required to ensure compatible standards of conduct toward the ERISA Subscriber and Provider Subclasses and Antitrust Injunctive Relief Class, thereby making appropriate declaratory and injunctive relief to the above Class and Subclasses as a whole.

377.    **Rule 23(b)(3) Requirements**. Questions common to the members of the respective above-defined Classes and Subclasses, numerous examples of which

are enumerated above, predominate over questions respecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy under Federal Rule of Civil Procedure 23(b)(3).  Absent a class action, most members of the above Classes and Subclasses likely would find the cost of litigating their claims to be prohibitive, and would have no effective remedy at law.  The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

## FRAUDULENT CONCEALMENT

378.     Each Defendant and Conspirator concealed its fraudulent conduct from Plaintiffs and the members of the Classes and Subclasses by conspiring to manipulate the process by which reimbursement rates were set.  Defendants and the Conspirators also prevented Plaintiffs and the members of the Classes and Subclasses from knowing or discovering the actual methodologies used by Defendants to determine the ONS Benefit Reductions.  The fraudulent conduct alleged herein was of such a nature as to be self-concealing.

379.     Each Defendant's and Conspirator's efforts to conceal its source and methodology of determining the False UCRs indicate that it knew its conduct was fraudulent.

380.     Each Defendant and Conspirator participated in the Ingenix scheme by concealing that it was providing flawed data to Ingenix and/or knew the methodology used by the Ingenix Database and Non-Ingenix Methodologies to arrive at False UCRs was inherently flawed.  As a result, each Defendant and Conspirator knew that the False UCRs it used to set its reimbursement rates were lower than the actual costs of medical services.

133

381.   Plaintiffs were diligent in pursuing an investigation of the claims asserted in this Complaint.  Through no fault of their own, they did not receive inquiry notice nor learn of the factual basis for their claims in this Complaint and the injuries suffered until the recent disclosures in the press and media.

## TOLLING OF APPLICABLE STATUTES OF LIMITATION

382.   Any applicable statutes of limitations have been tolled by Defendants' and their Conspirators' knowing and active concealment and denial of the facts alleged herein.  Plaintiffs and members of the Classes have been kept in ignorance of vital information essential to knowledge of and the pursuit of these claims, without any fault or lack of diligence on their part.  Plaintiffs and members of the Classes could not reasonably have discovered the fraudulent scheme to manipulate the reimbursement rates paid by Defendants and the Conspirators to insureds for out-of-network claims.

383.   Defendants and the Conspirators were, and continue to be, under a continuing duty to disclose to Plaintiffs and the Classes the fact that their reimbursement rates for out-of-network medical expenses were based on False UCRs that bore, and continue to bear, no relationship to the actual charges for those medical expenses.  Because of their knowing, affirmative, and/or active concealment of the fraudulent nature of the False UCRs, Defendants and the Conspirators are estopped from relying on any statutes of limitations.

## FIRST CLAIM FOR RELIEF

**VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT**
**15 U.S.C. § 1**
**(Against All Defendants on Behalf of All Plaintiffs, Including the Association Plaintiffs with the limitation for the AMA as well as the Subscriber and Provider Classes and the Antitrust Injunctive Relief Class)**

384.   Plaintiffs incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.  Plaintiffs bring this claim on behalf of the Subscriber, Provider, and Antitrust Injunctive Relief Classes, and the

Association Plaintiffs, except that the AMA is not bringing claims against the UnitedHealthcare Defendants, as a *per se* claim and under the Rule of Reason.

385.    From a date unknown, but beginning at least as early as January 1, 1998, and continuing through the present, Defendants and the Conspirators have combined, conspired and/or contracted to restrain interstate trade in violation of 15 U.S.C. § 1.

386.    The combination or conspiracy alleged in this Complaint consisted of a continuing agreement, understanding, or concert of action by the Defendants and their other Conspirators, the substantial terms of which were to create, maintain, and use the Ingenix Database to produce artificially-low UCRs for ONS reimbursement.

387.    This agreement among horizontal competitors to utilize the same pricing schedule to fix maximum UCR reimbursement amounts is a *per se* violation of Section 1 of the Sherman Act.

388.    The conspiracy was intended to directly affect the end payors of the medical services covered by out-of-network insurance plans.  The intent, purpose and effect of the conspiracy to cap ONS reimbursement rates, was to cause under-reimbursement for medical services, and thereby minimize reimbursement payments made on such claims among Defendants and the Conspirators.

389.    Through the conspiracy, Defendants and the Conspirators have in fact set reimbursement ceilings and caused a decrease in reimbursement or payments for out-of-network medical services that would not have occurred but for their anticompetitive conduct.

390.    As a result of the wrongful conduct alleged herein, Plaintiffs who were subscribers and the Subscriber Class paid higher out-of-pocket payments and Plaintiffs who were providers and the Provider Class received lower reimbursements for out-of-network medical services than they would have paid or received but for Defendants' and the Conspirators' anticompetitive conduct.  These Plaintiffs and Classes have been injured in their business or property, and have suffered damages in an amount to be determined at trial.

391.    The conduct of Defendants and the Conspirators constitutes a *per se* and Rule of Reason violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Plaintiffs and the Subscriber, Provider and the Antitrust Injunctive Relief Classes are entitled to recover all damages and treble damages allowed under Section 1 of the Sherman Act against Defendants, jointly and severally, together with their costs of suit, including reasonable attorneys' fees, as well as any necessary injunctions to bar or abate Defendants' anticompetitive acts.

Wherefore, Plaintiffs pray for judgment against Defendants, as set forth hereafter.

## SECOND CLAIM FOR RELIEF

**CLAIM FOR UNPAID BENEFITS UNDER GROUP PLANS GOVERNED BY ERISA**
**29 U.S.C. § 1132(a)(1)(B)**
**(Against WellPoint on Behalf of the ERISA Plaintiffs, and the ERISA Subclasses and by the Association Plaintiffs on Behalf of Their Members)**

392.    Plaintiffs repeat the allegations contained in the prior paragraphs of the Complaint as if fully set forth herein, except that they are not relying upon the conspiracy allegations.

393.    Where a benefits plan is insured by, funded by or administered by WellPoint, WellPoint must pay benefits plan subscribers, or their assignees, pursuant to the terms of their ERISA plans.

394.    WellPoint violated its legal obligations under ERISA and federal common law when it made the ONS ABDs described in this Complaint.  The violations include but are not limited to Wellpoint's reliance on the Ingenix Database and other ONS Benefit Reductions.

395.    WellPoint's lack of disclosure to its respective plan members or their providers, including Plaintiffs Roberts, Cooper, Rivera-Giusti, Henry, Schwendig, Peck, Pariser, Kavali, the NPSC and the members of the Association Plaintiffs, violated WellPoint's legal obligations.

396.   WellPoint violated its obligations each time it engaged in conduct that discouraged or penalized plan members' use of ONS providers, such as by making ONS ABDs.

397.   Plaintiffs Roberts, Cooper, Rivera-Giusti, Henry, Schwendig, Peck, Pariser, Kavali, and the NPSC, on their own behalf and on behalf of the members of the ERISA Subscriber and Provider Subclasses, and the Association Plaintiffs, on behalf of their members, seek unpaid benefits, re-calculated deductible and co-insurance amounts and interest back to the date their claims were originally submitted to WellPoint.

398.   In addition, Plaintiffs requests attorneys' fees, costs, prejudgment interest and other appropriate relief against WellPoint.

### THIRD CLAIM FOR RELIEF

**CLAIM FOR BREACH OF FIDUCIARY DUTY UNDER ERISA**
**29 U.S.C. § 1132(a)(2)**
**(Against WellPoint on Behalf of the ERISA Plaintiffs' and their Plans, and the ERISA Subclasses and by the Association Plaintiffs on Behalf of Their Members)**

399.   Plaintiffs incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint as if set forth fully herein, except that they are not relying upon the conspiracy allegations.  ERISA § 502(a)(2) authorizes a plan participants to bring a suit a suit for appropriate relief under 29 U.S.C. § 1109.  29 U.S.C. § 1132(a)(2).  Section 1109 of ERISA provides:

> Any person who is a fiduciary with respect to a plan who breaches any of
> the responsibilities, obligations, or duties imposed upon fiduciaries by
> this subchapter shall be personally liable to make good to such plan any
> losses to the plan resulting from each such breach, and to restore to such
> plan any profits of such fiduciary which have been made through use of
> assets of the plan by the fiduciary, and shall be subject to such other

equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

400.　Here, WellPoint served as a fiduciary for the ERISA plans. As such, it owed the plans and the plans' participants a duty to act with undivided loyalty when managing and administering the plans. WellPoint also owed the plans and the plans' participants a duty of prudence.

401.　WellPoint breached its duties of loyalty and prudence under ERISA by engaging in the conduct described in detail in this Complaint. Among other things, WellPoint breached its duty of loyalty and prudence by failing to disclose and taking affirmative steps to conceal that its reimbursement rates for out-of-network medical expenses were based on False UCRs or other ONS Benefit Reductions that bore, and continue to bear, no relationship to the actual charges for those medical expenses. The breaches include but are not limited to when WellPoint relied upon an Ingenix Database and other ONS Benefit Reductions in determining the reimbursement rates for out-of-network medical expenses.

402.　Through these actions, WellPoint has set reimbursement ceilings and caused a decrease in reimbursement or payments for out-of-network medical services.

403.　As a result of the wrongful conduct alleged herein, (1) Plaintiffs and the Subscriber ERISA Class paid higher out-of-pocket payments; (2) Plaintiffs who were providers and the Provider ERISA Class received lower reimbursement for their out-of-network medical services and suffered other injuries and damages; and (3) the subscribers' ERISA plans paid for health insurance plans of less value than they received for their subscribers, causing them to suffer damages, in an amount to be determined at trial.

# FOURTH CLAIM FOR RELIEF

### FAILURE TO PROVIDE FULL AND FAIR REVIEW REQUIRED BY ERISA
### 29 U.S.C. § 1132(a)(3)
### (Against WellPoint on Behalf of the ERISA Plaintiffs, and the ERISA Subclasses and by the Association Plaintiffs on Behalf of Their Members)

404.    Plaintiffs repeat the allegations contained in the prior paragraphs of the Complaint as if fully set forth herein, except that they are not relying upon the conspiracy allegations.

405.    WellPoint functioned, and continues to function, as a "Plan Administrator" within the meaning of such term under ERISA.  During the Class Period, Plaintiffs and the ERISA Subclasses were entitled to receive a "full and fair review" of all claims denied by WellPoint, and are entitled to assert a claim under 29 U.S.C. § 1132(a)(3) for failure to comply with these requirements.

406.    Although WellPoint was obligated to do so, it failed to provide a "full and fair review" of denied claims pursuant to 29 U.S.C. § 1133 (and the regulations promulgated thereunder) for Plaintiffs and the ERISA Subclasses by making ONS ABDs that are inconsistent with, or unauthorized by, the terms of members' EOCs and SPDs, as well as by failing to disclose data, their methodology and other critical information relating to ONS ABDs.  The failures include but are not limited to when WellPoint relied upon an Ingenix Database and other ONS Benefit Reductions in determining ONS ABDs.

407.    The law and implementing regulations set forth minimum standards for claim procedures, appeals, notice to members and the like.  In engaging in the conduct described herein, including use of an invalid database for calculating UCRs and other ONS Benefit Reductions, WellPoint failed to comply with ERISA, its regulations and federal common law.  As a result, WellPoint failed to provide a "full and fair review," failed to provide reasonable claims procedures, and failed to make necessary disclosures to its plan members.

408.   Plaintiffs Roberts, Henry, Schwendig, Peck, Pariser, Kavali, and the NPSC appealed or attempted to appeal their claims review and thus exhausted their administrative remedies.  Members of the Association Plaintiffs, including Plaintiffs Henry, Schwendig, Peck, Pariser, Kavali, and the NPSC have pursued extensive claims reviews during the Class Period and exhausted their administrative remedies.

409.   Furthermore, appeal of Plaintiff Roberts', Henry's, Schwendig's, Peck's, Pariser's, Kavali's, the NPSC's, the Association Plaintiffs' and the ERISA Provider and Subscriber Subclasses' claims should be deemed exhausted or excused by virtue of, among other things, WellPoint's numerous and systematic procedural and substantive violations.

410.   During the Class Period, Plaintiffs and the ERISA Provider and Subscriber Subclasses have been harmed by WellPoint's failure to provide a "full and fair review" of appeals under 29 U.S.C. § 1133, and by WellPoint's failure to disclose relevant information in violation of ERISA and the federal common law, entitles them to appropriate equitable relief.

## **FIFTH CLAIM FOR RELIEF**

### **FAILURE TO PROVIDE AN ACCURATE EOC AND SPD**
**29 U.S.C. § 1132(c)**
**(Against WellPoint on Behalf of the ERISA Plaintiffs, and the ERISA Subscriber and Provider Subclasses and by the Association Plaintiffs on Behalf of Their Members)**
**(Dismissed Claim Re-Pleaded for Purpose of Preservation for Appeal)[3]**

411.    Plaintiffs repeat the allegations contained in the prior paragraphs of the Complaint as if fully set forth herein, except that they are not relying upon the conspiracy allegations.

412.    WellPoint's disclosure obligations under ERISA include furnishing accurate materials summarizing its group health plans, known as SPD materials, under 29 U.S.C. § 1022.  WellPoint's failure to supply accurate EOCs, SPDs and other required information is actionable under 29 U.S.C. § 1132(c).

413.    WellPoint's failure to disclose material information about its ONS ABDs including but are not limited to when WellPoint relied upon an Ingenix Database and other ONS Benefit Reductions in determining ONS reimbursement, and its contribution of flawed data to Ingenix and use of such data, violated ERISA, federal regulations and federal common law.

414.    During the Class Period, Plaintiffs and the ERISA Subscriber and Provider Subclasses have been proximately harmed by WellPoint's failure to comply with 29 U.S.C. § 1022, federal regulations, and federal common law, in an amount to

---

[3] The Court dismissed this Count in its August 11, 2011 ruling on Defendants' motion to dismiss the Second Consolidated Amended Complaint.  D.E. 243, at 40-41, 49, The law of the Ninth Circuit is unclear as to whether Plaintiffs are required to re-assert it in this Third Amended Consolidated Complaint in order to preserve any arguments with respect to that dismissal on appeal because the Court's dismissal was without leave to amend, *see Parrino v. FHP, Inc.*, 146 F.3d 699, 704 (9th Cir. 1998) (no obligation to replead dismissed count in amended complaint where count was dismissed on summary judgment), in an abundance of caution, Plaintiffs re-allege it in order to ensure that they are not deemed to have waived it, recognizing that no responsive pleading from Defendants is required as to this Count.

be determined at trial, and are also entitled to injunctive and declaratory relief to remedy WellPoint's continuing violation of these provisions.

## SIXTH CLAIM FOR RELIEF

### FOR VIOLATIONS OF RICO, BASED ON PREDICATE ACTS OF MAIL AND WIRE FRAUD
### 18 U.S.C. § 1962(c)
### (Against All Defendants on Behalf of All Plaintiffs, the Association Plaintiffs with the Limitation for the AMA and the Subscriber and Provider Classes)

415.    Plaintiffs incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.  This Claim is brought by all Plaintiffs, the Subscriber and Provider Classes and the Association Plaintiffs on behalf of themselves and their members, except that the AMA does not bring claims against the UnitedHealth Defendants.

416.    At all relevant times, Defendants were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

417.    At all relevant times, and as described in this Complaint, Defendants carried out their underpayment scheme to defraud Plaintiffs and the Class in connection with the conduct of an "enterprise," within the meaning of 18 U.S.C. § 1961(4), as described above in the RICO Allegations section.

418.    At all relevant times, the enterprise was engaged in, and its activities affected, interstate commerce within the meaning of RICO, 18 U.S.C. § 1962(c).

419.    Through the wrongful conduct as alleged herein, Defendants, in violation of 18 U.S.C. § 1962(c), conducted and participated in the conduct of the Enterprise's affairs, directly and indirectly, through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5).

420.    WellPoint, acting through its officers, agents, employees and affiliates, has committed numerous predicate acts of "racketeering activity," as defined in 18 U.S.C. § 1961(5), prior to and during the Class Period, and continues to commit such predicate acts, in furtherance of its underpayment scheme for ONS, including (a) mail

1   fraud, in violation of 18 U.S.C. § 1341, and (b) wire fraud, in violation of 18 U.S.C. §

2   1343.  Such predicate acts include the following:

3          (a)    as   discussed above, mailing, causing to be mailed and/or

4   knowingly agreeing to the mailing of materially false data for use in the Ingenix

5   Database, and other information or communications that facilitated the transmission of

6   such data and/or the scheme to defraud, with each such mailing constituting a separate

7   and distinct violation of 18 U.S.C. § 1341; and

8          (b)    transmitting, causing to be transmitted and/or knowingly agreeing

9   to the transmittal of materially-false data for use in the Ingenix Database, as well as

10  other information or communications that facilitated the transmission of such data

11  and/or the scheme to defraud, by means of telephone, facsimile and the Internet, in

12  interstate commerce, for the purpose of effectuating the above-described false

13  payment schemes, and each such transmission constituting a separate and distinct

14  violation of 18 U.S.C. § 1343.

15     421.   In furtherance of its underpayment scheme for ONS, Defendants, in

16  violation of 18 U.S.C. §§ 1341, 1343, 1961 and 1962, repeatedly and regularly used

17  the U.S. mail and interstate wire facilities to further all aspects of the intentional

18  underpayment to Plaintiffs and the Subscriber and Provider Classes by delivering

19  and/or receiving materials necessary to carry out the scheme to defraud.

20     422.   The foregoing communications, sent *via* U.S. mail and interstate wire

21  facilities, were incident to an essential part of Defendants' scheme to defraud as

22  described in this Complaint.

23     423.   Each such use of the U.S. mail and interstate wire facilities alleged in

24  this Complaint constitutes a separate and distinct predicate act of "racketeering

25  activity" and, collectively, constituted a "pattern of racketeering activity."

26     424.   The above-described pattern of racketeering activity is related because it

27  involves common persons (namely, Plaintiffs and the Subscriber and Provider

28  Classes), common out-of-network claim practices, common results impacting upon

143

1   common victims, and is continuous because it occurred over several years, and
2   constitutes the usual practice of the Enterprise, such that it amounts to and poses a
3   threat of continued racketeering activity.  Defendants' scheme to defraud Plaintiffs
4   and class members is open-ended and on-going.

5   425.   The direct and intended victims of the pattern of racketeering activity
6   described previously herein are Plaintiffs and the Subscriber and Provider Classes,
7   who were underpaid for ONS.

8   426.   Plaintiffs and the Subscriber and Provider Classes were injured by
9   reason of Defendants' RICO violations because they were under-reimbursed or
10  underpaid for services rendered to WellPoint health plan subscribers and thereby
11  suffered consequential financial loss flowing from their property (health insurance
12  plans) by, in the case of Subscribers, having overpaid for their health insurance
13  coverage and, in the case of Providers, having suffered out-of-pocket losses because
14  they were not properly reimbursed for ONS).  As discussed above, their injuries were
15  proximately caused by Defendants' violations of 18 U.S.C. § 1962(c) because these
16  injuries were the foreseeable, direct, intended and natural consequence of Defendants'
17  RICO violations (and commission of underlying predicate acts) and, but for
18  Defendants' RICO violations (and commission of underlying predicate acts), they
19  would not have suffered these injuries.

20  427.   Pursuant to Section 1964(c) of RICO, 18 U.S.C. § 1964(c), Plaintiffs
21  and the Subscriber and Provider Classes are entitled to recover threefold their
22  damages, costs, and attorneys' fees from Defendants and other appropriate relief.

23
24
25
26
27
28

## SEVENTH CLAIM FOR RELIEF

### FOR VIOLATIONS OF RICO
### 18 U.S.C. § 1962(c)
### FOR PREDICATE ACTS
### 18 U.S.C. § 664
### (Against Defendants on Behalf of All ERISA Plaintiffs and the ERISA Subscriber and Provider Subclasses and by the Association Plaintiffs with the Limitation for the AMA on Behalf of Themselves and Their Members) (Partially Dismissed Claim Re-Pleaded as to Non-ERISA Plaintiffs for Purpose of Preservation for Appeal)[4]

428.   Plaintiffs hereby repeat the allegations of the prior paragraphs of the Complaint as if fully set forth herein.  This claim is asserted by the ERISA Plaintiffs on behalf of themselves and on behalf of the members of the ERISA Provider and Subscriber Subclasses and Association Plaintiffs, on behalf of themselves and their members, except that the AMA does not bring claims against the UnitedHealthcare Defendants.

429.   Section 1961(1)(B) of RICO specifically identifies as a predicate act "any act which is indictable under . . . [§]664 (relating to embezzlement from pension and welfare funds)" as a predicate act. 18 U.S.C. § 1961(l)(B).  Section 664 of Title 18 provides:

---

[4] The Court dismissed this Count as to all Non-ERISA Plaintiffs in its August 11, 2011 ruling on Defendants' motion to dismiss the Second Consolidated Amended Complaint.  D.E. 243, at 31-32, 49,  Because the  Court's partial dismissal was with leave to amend, Plaintiffs re-allege this Count as to all Plaintiffs in order to preserve any arguments of the non-ERISA Plaintiffs with respect to the Court's dismissal, *see N.Y. City Employees' Ret. Sys. v. Jobs*, 593 F.3d 1018, 1025 (9th Cir. 2010) ("'If a plaintiff fails to include dismissed claims in an amended complaint, the Plaintiffs are deemed to have waived any error in the ruling dismissing the prior complaint.'") (quoting *Forsyth v. Humana, Inc.,* 114 F.3d 1467, 1474 (9th Cir. 1997)), recognizing that no responsive pleading from Defendants as to the Non-ERISA Plaintiffs is required as to this Count.

145

**Theft or embezzlement from employee benefit plan.** Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined under this title, or imprisoned not more than five years, or both.

430.    Each of the WellPoint healthcare plans which is an "employee welfare benefit plan" within the meaning of ERISA, 29 U.S.C. § 1002(1)(A), and otherwise is subject to "any provision" of Section 3 of ERISA is included in this Count.

431.    Each of the WellPoint healthcare plans that are subject to ERISA or are a non-ERISA plan funded by insurance coverage WellPoint provides or administers, are subject to Section 664 of Title 18.  The applicable plan documents expressly state that all benefits due under the plan terms will be paid and that the underlying benefits they expressly guarantee are plan assets.

432.    The governing plan documents warrant that all benefits due under the plans will be paid.  By improperly reducing payments on out-of-network claims, WellPoint intentionally caused Plaintiffs and the members of the ERISA Subscriber and Provider Subclasses to be underpaid guaranteed benefits to which they were otherwise entitled in accordance with the terms of their group health plans.

433.    For fully insured healthcare plans, in which WellPoint both administered the plans and paid the benefits from their own assets, Defendants benefited from the conversion of assets from their ERISA plans.  Whereas these assets should have been held by WellPoint in its fiduciary capacities under ERISA and non-ERISA plans and paid to its members, WellPoint improperly withheld such funds and maintained them as part of its own assets for its own benefit. For self-funded healthcare plans, WellPoint made final appeal decisions and intentionally caused underpayment of

benefits to Plaintiffs and the ERISA Subscriber and Provider Subclasses in order to justify receipt of administrative fees.

434.    The pattern of racketeering activity described above was undertaken by and through the Enterprise described above.  The use of the Enterprise was necessary for the underpayment scheme and these predicate acts to be successfully undertaken. Defendants controlled and directed the affairs of the Enterprise as described above.

435.    Defendants acted with specific intent to deprive Plaintiffs and ERISA Subscriber and Provider Subclasses of guaranteed benefits, and were sufficiently aware of the facts to know that they were acting unlawfully and contrary to the trust placed in them and the plan sponsors whose plans they were administering.

436.    Each false payment on a claim constitutes a separate and distinct predicate act, in violation of 18 U.S.C. § 664, of converting or misappropriating funds specifically earmarked within the applicable plan as a guaranteed benefit for the intended member, for WellPoint's direct or indirect benefit.  These intentional underpayments numbered in the millions and continuous through the various class periods continuing to the present.

437.    As set forth in this Complaint, Defendants concocted multiple and multi-faceted underpayment schemes, including use of the Ingenix Database, to make improperly reduced payments for ONS.

438.    As named fiduciaries and claims administrators of the WellPoint healthcare plans, WellPoint occupied and occupies a position of trust and it had, and has, a special relationship with Plaintiffs and the ERISA Subscribers and Provider Subclasses.

439.    The above-described acts of conversion of employee benefit plan funds, and mail and wire fraud, are related because they each involved common participants, common methodologies, common results impacting upon common victims and a common purpose of executing the under payment scheme, and are continuous because they occurred over a significant period of years, and constitute the usual practice of

147

1  WellPoint such that they amount to and pose a threat of continued racketeering

2  activity.

3      440.   The purpose of WellPoint's scheme was to underpay the guaranteed

4  benefits to the Subscriber Plaintiffs and the ERISA Subscriber Subclass, as well as

5  those which were assigned to the Provider Plaintiffs and the ERISA Provider

6  Subclass, and convert those withheld funds for its own direct or indirect financial

7  gain.  WellPoint created an appearance of regularity and legitimacy by providing false

8  and incomplete information to Plaintiffs and ERISA Subclass members, in order to

9  increase revenue through its plan and claims administration business.

10     441.   The direct and intended victims of the pattern of racketeering activity

11  described previously herein are Plaintiffs and ERISA Provider and Subscriber

12  Subclasses, who Defendants deprived of the complete guaranteed benefits to which

13  they are entitled for ONS.

14     442.   Defendants' RICO violations injured Plaintiffs and the ERISA

15  Subscriber and Provider Subclasses in their business and property by depriving them

16  of hundreds of millions of dollars in guaranteed benefits on their claims for

17  reimbursement of out-of-network charges, as well as the knowledge necessary to

18  challenge false and manipulative UCR determinations, and their injuries were

19  proximately caused by the violations of 18 U.S.C. § 1962(c) because these injuries

20  were the foreseeable, direct, intended, and natural consequence of WellPoint's RICO

21  violations (and commission of underlying predicate acts), and but for their RICO

22  violations (and commission of underlying predicate acts), ERISA Plaintiffs,

23  Association Plaintiffs and ERISA Subclass members would not have suffered the

24  injuries suffered by them.

25     443.   As a result of their misconduct, Defendants are liable to the ERISA

26  Plaintiffs, the ERISA Provider and Subscriber Subclasses, and the Association

27  Plaintiffs in an amount to be determined at trial. Pursuant to Section 1964(c) of RICO,

28

18 U.S.C. § 1964(c), ERISA Plaintiffs and the ERISA Subclass members are entitled to recover threefold their damages, and costs and attorneys' fees from Defendants.

## EIGHTH CLAIM FOR RELIEF

### FOR VIOLATIONS OF RICO
### 18 U.S.C. § 1962(d)
### (Against All Defendants on Behalf of All Plaintiffs and the Subscriber and Provider Classes and the Association Plaintiffs with the Limitation for the AMA)

444.    Plaintiffs hereby repeat the allegations of the prior paragraphs of the Complaint as if fully set forth herein.    This Claim is brought by all Plaintiffs, the Subscriber and Provider Classes and the Association Plaintiffs on behalf of themselves and their members, except that the AMA does not bring claims against the UnitedHealth Defendants.

445.    WellPoint conspired with Ingenix and UnitedHealth, among others, to conduct or participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity as described in this Complaint in violation of 18 U.S.C. § 1962(d).  This conspiracy to violate 18 U.S.C. § 1962(c) constitutes a violation of 18 U.S.C. § 1962(d).

446.    In furtherance of this conspiracy, Defendants and others known and unknown to Plaintiffs committed numerous overt acts as alleged above in the pattern of racketeering described above.

447.    As a direct and proximate result of, and by reason of, the activities of Defendants and their conduct in violation of 18 U.S.C. § 1962(d), Plaintiffs and the Subscriber and Provider Classes have been injured within the meaning 18 U.S.C. § 1964(c).

448.    Plaintiffs are entitled to treble damages, together with the costs of this lawsuit, expenses, and reasonable attorneys' fees on behalf of themselves and the Subscriber and Provider Classes.

# NINTH CLAIM FOR RELIEF

### BREACH OF CONTRACT
**(Against WellPoint on Behalf of the Non-ERISA Plaintiffs and the Non-ERISA Subscriber and Provider Subclasses)**

449.    Plaintiffs incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint, except that they are not relying upon the conspiracy allegations.  Plaintiffs bring this claim on behalf of the Non-ERISA Subscriber and Provider.

450.    The Agreement constitutes a contract whereby members of the Non-ERISA Subscriber Class agree to pay dues, deductibles, and co-payments, on one hand, and WellPoint agrees to provide healthcare benefits, including ONS reimbursements based on either the actual charges, the "Negotiated Fee Rate," or the customary rates charged by healthcare professionals in the region where the ONS was obtained, on the other hand.  On information and belief, Plaintiffs J.B.W. and the Samsells entered into substantially similar Agreements.  And Plaintiffs Henry, Schwendig, Peck, Pariser, Kavali, Higashi, and the NPSC were assigned the benefits of such Agreements by some WellPoint insureds, for whom they provided ONS.

451.    Plaintiffs J.B.W.and the Samsells and other members of the Non-ERISA Subscriber Subclass performed their obligations under such Agreements.  WellPoint unjustifiably breached its Agreements by failing to reimburse ONS based on the UCR, a fair rate negotiated with the provider, or otherwise in accordance with the terms of its contracts and, instead, using the flawed and depressed rate information obtained from Ingenix or Non-Ingenix Methodologies, both to determine the UCR and the Negotiated Fee Rate.

452.    Plaintiffs J.B.W. and the Samsells and members of the Non-ERISA Subscriber Subclass were damaged by WellPoint's breach of its Agreements in that either their out-of-pocket costs for ONS were increased and/or their deductibles were not paid down as quickly as they should have been as a direct result of WellPoint's breach, or they under-reimbursed for ONS.  To the extent they did not bill and receive

full payment, Plaintiffs Henry, Schwendig, Peck, Pariser, Kavali, Higashi, the NPSC, and members of the Non-ERISA Provider Subclass received less reimbursement than they were entitled to for providing ONS for non-ERISA subscribers from when they obtained assignments.  Plaintiffs J.B.W., the Samsells, Henry, Schwendig, Peck, Pariser, Kavali, Higashi, the NPSC, and members of the Non-ERISA Subscriber and Provider Subclasses are therefore entitled to damages in accordance with proof at trial.

## **TENTH CLAIM FOR RELIEF**

**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(Against WellPoint on Behalf of the Non-ERISA Plaintiffs and the Non-ERISA Subscriber and Provider Subclasses)**

453.   Plaintiffs incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint, except that they are not relying upon the conspiracy allegations.  Plaintiffs bring this claim on behalf of the Non-ERISA Subscriber and Provider Subclasses.

454.   Plaintiffs J.B.W., the Samsells, Henry, Schwendig, Peck, Pariser, Kavali, Higashi, and the NPSC are informed and believe and thereon allege that since at least 1998 and continuing thereafter through the present, WellPoint has been calculating UCRs and other forms of ONS reimbursement based on the flawed data obtained from Ingenix and Non-Ingenix Methodologies, resulting in its failure to reimburse ONS in accordance with the terms of its Agreements.

455.   WellPoint utilized the flawed data thereby under-reimbursing its members in order to obtain additional revenues to unlawfully enrich WellPoint to the detriment of Plaintiffs J.B.W., the Samsells, Henry, Schwendig, Peck, Pariser, Kavali, Higashi, the NPSC, and the other members of the Non-ERISA Subscriber and Provider Subclasses.

456.   Plaintiffs J.B.W., the Samsells, Henry, Schwendig, Peck, Pariser, Kavali, Higashi, the NPSC, and members of the Non-ERISA Subscriber and Provider Subclasses purchased the health service plans and/or provided services to WellPoint

insureds with the reasonable expectation that they would be reimbursed for ONS based upon the actual charge, a fairly-negotiated rate, or the reasonable charge for the particular healthcare service in the region where that service is obtained.

457.    Plaintiffs J.B.W., the Samsells, Henry, Schwendig, Peck, Pariser, Kavali, Higashi, the NPSC. and members of the Non-ERISA Subscriber and Provider Subclasses purchased the health services plans and/or provided services with the reasonable expectation that WellPoint would deal with them honestly, fairly, equitably, in good faith, and in full conformity with the fundamental and implied terms of the Agreements.  WellPoint brought about and intended this expectation through the contractual language in the Agreements, through its advertising, websites, SPDs, and through the express representations of its employees, agents, and representatives.

458.    In breach of the covenant of good faith and fair dealing, WellPoint has failed to reimburse ONS based on actual UCRs or a fairly-negotiated rate, and has not provided any additional benefits to Plaintiffs J.B.W., the Samsells, Henry, Schwendig, Peck, Pariser, Kavali, Higashi, the NPSC, and the Non-ERISA Subscriber and Provider Subclasses, for the increased charges resulting from their under-reimbursement for ONS.  WellPoint has unreasonably denied Class members the benefit of their bargain and/or the benefits owed pursuant to assignment of benefits executed by WellPoint insureds.

459.    WellPoint has materially and fundamentally breached the duty of good faith and fair dealing owed to Plaintiffs J.B.W., the Samsells, Henry, Schwendig, Peck, Pariser, Kavali, Higashi, the NPSC, and the Non-ERISA Subscriber and Provider Subclasses, in at least the following respects:

(a)    unreasonably, secretly, and in bad faith conspiring to utilize flawed data to calculate depressed UCRs, Negotiated Fee Rates, and other types of ONS reimbursement in order to under-reimburse plan members for ONS to unlawfully enrich themselves;

152

(b)     unreasonably and in bad faith failing to clearly and definitely provide notice of the fact that WellPoint utilizes flawed data or inappropriate data to calculate False UCRs and Negotiated Fee Rates, which results in higher payments for ONS;

(c)     unreasonably and in bad faith continuing to misrepresent that WellPoint insureds were being reimbursed for ONS based on the UCR or a fairly-negotiated rate when, in reality, WellPoint continues to utilize flawed Ingenix data or Non-Ingenix Methodologies to calculate False UCRs and Negotiated Fee Rates;

(d)     unreasonably, secretly, and in bad faith providing intentionally flawed and manipulated data to Ingenix for use in the Ingenix Database with the knowledge that such data would produce artificially-low False UCRs from Ingenix;

(e)     unreasonably and in bad faith putting the interests of WellPoint ahead of those of the Subscriber and Provider Non-ERISA Subclasses.

460.    WellPoint's conduct represents a failure or refusal to discharge its contractual responsibilities, prompted by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of Plaintiffs J.B.W., the Samsells, Henry, Schwendig, Peck, Pariser, Kavali, Higashi, the NPSC, and the Non-ERISA Subscriber and Provider Subclasses, and thereby deprives the same of the benefits of the Agreements in accordance with their agreed-upon terms.

461.    Plaintiffs J.B.W. and the Non-ERISA Subscriber and Provider Subclasses, performed their obligations under the Agreements by paying WellPoint the dues, deductibles, and co-payments required by the Agreements.

462.    Upon information and belief, Plaintiffs J.B.W., the Samsells, Henry, Schwendig, Peck, Pariser, Kavali, Higashi, the NPSC, and the Non-ERISA Subscriber and Provider Subclasses, were damaged by WellPoint's breach of the covenant of good faith and fair dealing in that they made out-of-pocket, direct payments and/or

were under-reimbursed for ONS, ONS coverage that the Non-ERISA Subscriber Subclass would not even have purchased had they been adequately informed of its true cost, thereby resulting in increased out-of-pocket costs and/or they were unable to pay down their deductibles as quickly as they should have, and are therefore entitled to damages in accordance with proof at trial.

## ELEVENTH CLAIM FOR RELIEF

**FOR VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW**
**(Against WellPoint Defendants on Behalf of Plaintiffs J.B.W., Henry, Higashi, Schwendig, Peck, Pariser, the NPSC, the Non-ERISA Subscriber and Provider Subclasses and AMA, CMA, APMA, CCA, and CPA**

463.	Plaintiffs incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.  Plaintiffs J.B.W., Henry, Schwendig, Peck, Pariser, Higashi, the NPSC, and the AMA, CMA, APMA, CCA, and CPA bring this claim on behalf of the members of the Non-ERISA Subscriber and Provider Subclasses residing in or providing services in California (the "California Non-ERISA Subclasses").

464.	Plaintiffs J.B.W., Henry, Higashi, Schwendig, Peck, Pariser, Kavali, and the NPSC have suffered injury in fact and lost money as a result of the unfair competition alleged.  These Plaintiffs each relied on WellPoint to reimburse them the appropriate amount for their services in compliance with WellPoint's legal and contractual obligations, and not to take actions to improperly lower the reimbursement rates.

465.	The California Unfair Competition Law ("UCL"), Business and Professions Code § 17200, *et seq.*, defines unfair competition to include any unlawful, unfair, or fraudulent (within the meaning of the UCL) business act or practice and unfair, deceptive, untrue, or misleading advertising.

154

466.    From at least as early as January 1, 1999, Defendants have committed acts of unfair competition proscribed by Business and Professions Code §17200 *et seq.*, including the acts and practices alleged herein.

467.    WellPoint also has engaged in unfair business practices by failing to reimburse for ONS based on the actual price or the UCR as promised in their Agreements.  The unfair business practices include, but are not limited to, when Wellpoint has used Ingenix and other ONS Benefit Reductions to determine the amount of reimbursement for ONS.  Such conduct is unlawful as a breach of contract and a breach of the implied covenant of good faith and fair dealing found in insurance agreements.  Such conduct represents a failure or refusal to discharge their contractual responsibilities, prompted by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the policyholders and thereby deprives the policyholders of the benefits of the agreement according to the agreed-upon terms.  The policyholders have fully performed and are entitled to full performance by WellPoint.  The policyholders have suffered losses including under-reimbursement for ONS by WellPoint due to their unlawful and secret conspiracy; Providers suffered the same losses as well as injuries to their business due to Defendants' actions and unlawful conspiracy as beneficiaries of assignments of benefits from insureds.

468.    WellPoint's business acts and practices constitute unlawful and fraudulent business practices in that WellPoint advertises, promotes and sell their health plans based on false, widely disseminated representations on its website, SPDs, and other standard promotional materials that their insureds will have the right to freely choose between in-network and out-of-network providers, and that ONS will be reimbursed based on the actual billed cost or based on UCRs.  In reliance upon these materials, described in paragraph 364, Plaintiff J.B.W. and the members of the Non-ERISA Subscriber Subclass became subscribers of the WellPoint healthcare plans with the reasonable understanding and belief that they would have a free choice of

155

providers, and that they would be reimbursed for ONS based on the actual billed cost or based on UCRs.  Overall out-of-pocket costs of healthcare, including the cost of ONS, and choice of providers are extremely important to Plaintiff J.B.W. and the other members of the Non-ERISA Subscriber Subclass.  As described herein, WellPoint does not use the actual cost or UCRs to calculate ONS, but, rather, use the False UCRs obtained from Ingenix and other ONS Benefit Reductions to calculate reimbursements for ONS.  By using False UCRs and other ONS Benefit Reductions as a basis for reimbursing Plaintiff J.B.W. and the other Non-ERISA Subscriber Subclass members, WellPoint increased their own out-of-pocket costs for ONS and deterred the California Non-ERISA Subscriber Subclass members from freely choosing between in-network and out-of-network providers.

469.    A business practice is "unlawful" under the Unfair Competition Law if it is forbidden by law, including state or federal laws or regulations.

470.    California Health and Safety Code, title 28, Sect. 1300.71, subd. (a) (3) (B) provides:

> (3) "Reimbursement of a Claim" means:
>
> (B) For contracted providers without a written contract and non-contracted providers, except those providing services described in paragraph (C) below: the payment of the reasonable and customary value for the health care services rendered based upon statistically credible information that is updated at least annually and takes into consideration:(i) the provider's training, qualifications, and length of time in practice; (ii) the nature of the services provided; (iii) the fees usually charged by the provider; (iv) prevailing provider rates charged in the general geographic area in which the services were rendered; (v) other aspects of the economics of the medical provider's practice that are relevant; and (vi) any unusual circumstances in the case.

156

471.    As described throughout this Complaint, WellPoint's use of Ingenix and other faulty data to determine UCRs for reimbursements was not based on statistically credible information as required by the California regulation quoted above.  Rather, it was based on unreliable data that skewed UCRs and reimbursements to the California Non-ERISA Subscriber and Provider Subclasses to lower amounts than they should have been.   WellPoint's conduct violated the "unlawful" prong of the Unfair Competition Law.

472.    WellPoint's conduct also violated the "unlawful" prong of the Unfair Competition Law by violating its duty of disclosure under Section 332 of the California Insurance Code and its accompanying sections to the California Non-ERISA Subscriber Subclass and, as assignees of insureds under their health insurance plans, the California Non-ERISA Provider Subclass.  Section 332 entitled "Required Disclosure" provides that "[e]ach party to a contract of insurance shall communicate to the other, in good faith, all facts within his knowledge which are or which he believes to be material to the contract and as to which he makes no warranty, and which the other has not the means of ascertaining."   As described throughout this Complaint, WellPoint concealed, misrepresented, and failed to disclose to Plaintiffs and members of the California Non-ERISA Subclasses its use of faulty and unreliable data to determine UCR amounts or that it was under-reimbursing them, which was material information known only to WellPoint and the Conspirators.

473.    Moreover, as the violation of any law may serve as the predicate for a violation of the "unlawful" prong of the Unfair Competition Law, Plaintiffs further allege that WellPoint, in violating RICO, the Sherman Act, the common law of contract, and entering into a trust that impairs competition in violation of California's Cartwright Act, California Business and Professions Code § 16700 *et seq*., violated the Unfair Competition Law.  By committing the acts alleged above, WellPoint has engaged in unlawful business practices and acts of unfair competition within the meaning of California Business and Professions Code § 17200.  WellPoint's conduct,

1   which is ongoing, is immoral, unethical, oppressive, unscrupulous and substantially

2   injurious to consumers.  The gravity of harm caused by WellPoint's conduct far

3   outweighs the utility, if any, of such conduct.

4   474.   In addition, California Business & Professions Code § 17500 makes it

5   unlawful for any corporation to knowingly make, by means of any advertising device

6   or otherwise, any untrue or misleading statement with the intent to sell anything of

7   any nature, or to induce the public to purchase anything of any nature.  WellPoint's

8   advertising described herein, violated California Bus. & Prof. Code §§ 17200 and

9   17500 because it is likely to deceive, and in fact has deceived Plaintiffs J.B.W.,

10   Henry, Higashi, Schwendig, Peck, Pariser, the NPSC, and the members of the Non-

11   ERISA Subclasses, including members of the Association Plaintiffs in violation of

12   Calif. Bus. & Prof. Code § 17500.

13   475.   WellPoint has disseminated, and continues to disseminate advertising

14   and other materials to plan members, potential customers, their insureds, and

15   healthcare providers, which it knows or should reasonably know is false and

16   misleading.

17   476.   WellPoint advertises, promotes, and sells its health plans based on

18   widely disseminated and uniform representations on its website, SPDs, and other

19   standard form promotional materials that ONS will be reimbursed based on the actual

20   billed cost or based on UCRs.  WellPoint nevertheless does not use either actual costs

21   or UCRs to calculate ONS, but rather, uses the False UCRs obtained from Ingenix,

22   and other ONS Benefit Reductions to calculate reimbursements for ONS.

23   477.   By committing the acts alleged above, WellPoint has knowingly

24   disseminated untrue and/or misleading statements in an advertising or other device in

25   order to sell or induce members of the public to purchase their health benefit plans and

26   induce providers to administer healthcare services to its insureds, in violation of Calif.

27   Bus. & Prof. Code § 17500.

28

158

478.    Plaintiffs J.B.W., Henry, Higashi, Schwendig, Peck, Pariser, Higashi, the NPSC, and the California Non-ERISA Subclasses, including members of the Association Plaintiffs who reside in or who provide services in California, have suffered injury in fact to their businesses and persons and lost money or property as a result of WellPoint's false and misleading statements.  Among other things, Plaintiff J.B.W. and the other members of the California Non-ERISA Subscriber Subclass who subscribed to WellPoint's health plans have been forced to pay higher out-of-pocket costs for ONS as a result of WellPoint's conduct alleged herein, ONS that they would not even have purchased had they been adequately informed of its true cost, while providers received lower payments for their services as beneficiaries of their patients' assignments of benefits than they should or otherwise would have.

479.    WellPoint holds, retains, and has derived benefits from money properly belonging to Plaintiffs J.B.W., Henry, Higashi, Schwendig, Peck, Pariser, the NPSC, and the Non-ERISA Subclasses, including members of the Association Plaintiffs, thereby entitling those Plaintiffs and subclasses to restitution.

480.    WellPoint's unfair, unlawful, and misleading business acts and practices described herein present a continuing threat to the California Non-ERISA Subscriber and Provider Subclasses in that WellPoint is currently engaging in such acts and practices, and will persist and continue to do so unless and until this Court issues appropriate injunctive and declaratory relief.

## TWELFTH CLAIM FOR RELIEF

**FOR VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW AND CALIFORNIA HEALTH & SAFETY CODE §1371.4**
**(Against WellPoint Defendants on Behalf of Plaintiff Schwendig, and the California ER Provider Subclass, CMA, and AMA)**

481.    Plaintiffs incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.  Plaintiff Schwendig, and the

159

AMA and CMA bring this claim on their own behalf and on behalf of the members of the above-defined California ER Provider Subclass, who provided emergency medical services to WellPoint Knox-Keene governed plan members in the state of California.

482.   Plaintiff Schwendig has suffered injury in fact and lost money as a result of the unfair and unlawful competition alleged.  He relied on WellPoint to reimburse him the appropriate amount for services in compliance with WellPoint's legal obligations for its Knox-Keene plans, and not to take actions to improperly lower the reimbursement rates.

483.   Dr. Schwendig rendered emergency services to WellPoint members in Knox-Keene governed plans and was reimbursed less than the reasonable and customary value for those services.

484.   The California UCL, Business and Professions Code § 17200 *et seq.*, defines unfair competition to include any unlawful, unfair or fraudulent (within the meaning of the UCL) business act or practice and unfair, deceptive, untrue, or misleading advertising.

485.   From at least as early as January 1, 1999, WellPoint has committed acts of unfair competition proscribed by Business and Professions Code §17200 *et seq.*, including the acts and practices alleged herein.

486.   A business practice is "unlawful" under the Unfair Competition Law if it is forbidden by law, including state or federal laws or regulations.

487.   California Health and Safety Code, title 28, California Health & Safety Code § 1371.4(b) provides:

A health care service plan . . . shall reimburse providers for emergency services and care provided to its enrollees, until the care results in stabilization of the enrollee, except as provided in subdivision (c).  As long as federal or state law requires that emergency services and care be provided without first questioning the patient's ability to pay, a health care service plan shall not require a provider to obtain authorization prior

160

to the provision of emergency services and care necessary to stabilize the enrollee's emergency medical condition.

488.   As noted above, Sect. 1300.71, subd. (a) (3) (B) provides:

(3) "Reimbursement of a Claim" means:

(B) For contracted providers without a written contract and non-contracted providers, except those providing services described in paragraph (C) below: the payment of the reasonable and customary value for the health care services rendered based upon statistically credible information that is updated at least annually and takes into consideration:(i) the provider's training, qualifications, and length of time in practice; (ii) the nature of the services provided; (iii) the fees usually charged by the provider; (iv) prevailing provider rates charged in the general geographic area in which the services were rendered; (v) other aspects of the economics of the medical provider's practice that are relevant; and (vi) any unusual circumstances in the case.

489.   As described throughout this Complaint, WellPoint's use of Ingenix and Non-Ingenix Methodologies, including in-network fee schedules to determine the UCR or "reasonable and customary value" for reimbursements, was not based on statistically-credible information as required by California law.  Rather, it was based on unreliable data that skewed UCRs and reimbursements to the California ER Provider Subclass to lower amounts than they should have been.  WellPoint's conduct violated section 1371.4 of the California Health and Safety Code and the "unlawful" prong of the UCL.

490.   By committing the acts alleged above, WellPoint has engaged in unlawful business practices and acts of unfair competition within the meaning of California Business and Professions Code § 17200.  WellPoint's conduct, which is ongoing, is immoral, unethical, oppressive, unscrupulous and substantially injurious to

1   consumers.  The gravity of harm caused by WellPoint's conduct far outweighs the

2   utility, if any, of such conduct.

3       491.    Plaintiff Schwendig and the other members of the California ER

4   Provider Subclass, including members of the Association Plaintiffs who reside in or

5   who provide services in California, have been under-reimbursed and suffered injury in

6   fact to their businesses and persons and lost money or property as a result of

7   WellPoint's false and misleading statements.  WellPoint holds, retains, and has

8   derived benefits from money properly belonging to Plaintiff Schwendig, other

9   members of the California ER Provider Subclass, and the AMA, CMA, and their

10  members, thereby entitling those Plaintiffs and that Subclass to restitution.

11      492.    WellPoint's unlawful business acts and practices described herein

12  present a continuing threat to the California ER Subclass in that WellPoint is currently

13  engaging in such acts and practices, and will persist and continue to do so unless and

14  until this Court issues appropriate injunctive and declaratory relief.

15  ### THIRTEENTH CLAIM FOR RELIEF

16  **FOR VIOLATION OF THE CARTWRIGHT ACT**
    **(Against All Defendants on Behalf of Plaintiffs Roberts, J.B.W., Henry,**

17  **Higashi, Schwendig, Peck, Pariser, Kavali and the NSPC, the AMA (with the**
    **Limitation Below, CMA, APMA, CCA and CPA and the Provider and**

18  **Subscriber Classes)**
    **(Partially-Dismissed Claim as to ERISA Plaintiffs**

19  **Repleaded for Purpose of Preservation for Appeal)[5]**

20      493.    Plaintiffs incorporate herein by reference each of the allegations

21  contained in the preceding paragraphs of this Complaint.  Plaintiffs, Roberts, J.B.W.,

22

23

24  [5] The Court dismissed this Count, to the extent asserted by all ERISA Plaintiffs, in its
    August 11, 2011 ruling on Defendants' motion to dismiss the Second Consolidated

25  Amended Complaint.  D.E. 243, at 46-48.  Because the Court's dismissal was with
    leave to amend, Plaintiffs re-allege this Count in order to preserve any arguments of

26  the ERISA Plaintiffs with respect to the Court's dismissal on appeal, *see N.Y. City*

27  *Employees' Ret. Sys*, 593 F.3d at 1025, recognizing that no responsive pleading from
    Defendants with respect to the ERISA Plaintiffs is required as to this Count.

28

1   Henry, Higashi, Schwendig, Peck, Pariser, Kavali, the NSPC, the AMA (except that

2   the AMA is not bringing claims against the UnitedHealthcare Defendants),  the CMA,

3   APMA, CCA, and CPA bring this claim on behalf of members of the Subscriber and

4   Provider Classes residing in or providing services in California.

5        494.    From a date unknown, but beginning at least as early as January 1, 1999,

6   Defendants and the Conspirators engaged in unlawful contracts, combinations, and

7   conspiracies in an unreasonable restraint of interstate trade or commerce in violation

8   of the Cartwright Act (Cal. Bus. & Prof. Code § 16700 *et seq*.). These unlawful

9   contracts, combinations, and conspiracies were entered into and effectuated within the

10  State of California and within each of the states whose antitrust laws Plaintiffs have

11  alleged Defendants have violated.

12       495.    The unlawful contracts, combinations, and conspiracies consisted of

13  continuing agreements, understandings, and concerts of action between and among

14  WellPoint, UnitedHealth, Ingenix and the other Conspirators, the substantial terms of

15  which were to illegally fix UCRs.  Defendants' illegal conspiracy was intended to

16  directly affect the end payors of the medical services covered by ONS insurance plans.

17  The intent, purpose and effect of the conspiracy were to cap ONS reimbursement rates

18  for the purpose of under-reimbursing patients and providers who submitted claims for

19  ONS services.   Defendants and the Conspirators set reimbursement ceilings and

20  caused a decrease in reimbursements and/or payments for ONS medical services that

21  would not have existed but for their anticompetitive conduct.  As a result of the

22  wrongful conduct alleged herein, Plaintiffs Roberts, J.B.W., Henry, Schwendig, Peck

23  Pariser, Kavali, the NPSC, as well as members of the AMA, CMA, APMA, CCA, and

24  CPA who are residents of or who provided services within California and the

25  Subscriber and Provider Classes paid more for ONS services and/or received less for

26  providing ONS services than they would have but for Defendants' and the

27  Conspirators' anticompetitive conduct.

28

163

1    WHEREFORE, Plaintiffs pray for judgment against Defendants, as set forth

2    hereafter.

3                                    **PRAYER FOR RELIEF**

4    WHEREFORE, Plaintiffs pray as follows:

5    A.    The Court determine that this action may be maintained as a class action

6    pursuant to Rules 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil

7    Procedure and declare Plaintiffs as representatives of their respective  Classes and

8    Subclasses and, pursuant to Rule 23(g)(1) of the Federal Rules of Civil Procedure,

9    their counsel as counsel for those Classes and Subclasses;

10   B.    The Court declare the conduct alleged herein be unlawful;

11   C.    The Court enjoin Defendants from continuing the unlawful activities

12   alleged herein;

13   D.    The Court order WellPoint to recalculate and issue unpaid benefits to

14   Plaintiffs and members of the Classes that were underpaid as a result of Defendants'

15   unlawful activities alleged herein;

16   E.    The Court declare that WellPoint has breached the terms of its EOCs and

17   SPDs and award unpaid benefits to Plaintiffs and the ERISA Subscriber and Provider

18   Subclasses, as well as awarding injunctive and declaratory relief to prevent

19   WellPoint's continuing ONS ABDs that are undisclosed and unauthorized by EOCs

20   and SPDs;

21   F.    The Court declare that WellPoint has violated its fiduciary duties

22   including the duties of loyalty and care to Plaintiffs and the Classes, and award

23   appropriate relief, including unpaid benefits, restitution, interest, and declaratory and

24   injunctive relief to Plaintiffs and the Classes, and removing WellPoint and any of its

25   agents, divisions, subsidiaries, or other affiliates as fiduciaries;

26   G.    The Court declare that WellPoint has failed to provide a "full and fair

27   review" to Plaintiff Roberts, Cooper, Rivera-Giusti, Schwendig, Henry, Peck, Kavali,

28   the NPSC, and the ERISA Subscriber and Provider Subclasses under 29 U.S.C. §

1133, and award injunctive, declaratory, and other equitable relief to ensure compliance with ERISA and its regulations ;

H.     The Court declare that WellPoint has violated its disclosure and related obligations under ERISA and federal common law, including under 29 U.S.C. § 1022, for which Plaintiffs Roberts, Cooper, Rivera-Giusti, Henry, Schwendig, Peck, Kavali, and Pariser and the ERISA Subscriber and Provider Subclasses are entitled to injunctive, declaratory and other equitable relief;

I.     The Court declare that WellPoint breached the terms of its Agreements and award unpaid benefits to Plaintiffs J.B.W., the Samsells, the Non-ERISA Subscriber Subclass, Provider Plaintiffs, and the Non-ERISA Provider Subclass;

J.     The Court award injunctive and declaratory relief to prevent continuation or recurrence of Defendants' undisclosed and unauthorized scheme;

K.     The Court award Plaintiffs and the Classes and Subclasses monetary damages as provided for under law, including any trebling or special damages allowable under law;

L.     The Court award the Association Plaintiffs monetary damages, declaratory and injunctive relief as allowed under law, including trebling or special damage, and award injunctive and declaratory relief as appropriate to those Associations;

M.     The Court award Plaintiffs and the Subclasses Classes either legal or equitable restitution, as appropriate;

N.     The Court award Plaintiffs and the Classes and Subclasses their costs of suit, including reasonable attorneys' fees, experts' fees, and all other expenses as provided by law;

O.     The Court award pre- and post-judgment interest; and

P.     The Court grant such other and further relief as is just and proper.

1 || **DEMAND FOR JURY TRIAL**

2 || Plaintiffs demand a jury trial of all issues so triable.

3 || DATED: October 26, 2011

4 || **SCOTT+SCOTT LLP**                  **KIESEL BOUCHER LARSON, LLP**

5 || /s/Christopher M. Burke              Helen Zukin

6 || Christopher M. Burke, SBN 214799      Raymond P. Boucher, SBN 115364
7 || Joseph P. Guglielmo, *pro hac vice*   Helen Zukin, SBN 117933
   || Amelia F. Burroughs, SBN 221490       **KIESEL BOUCHER LARSON LLP**
8 || 6424 Santa Monica Blvd.               8648 Wilshire Boulevard
   || Los Angeles, CA 90038                 Beverly Hills, CA 90211-2910
9 || Tel: (213) 985-1274                   Tel: (310) 854-4444
   || Fax: (213) 985-1278                   Fax: (310) 854-0812
10|| cburke@scott-scott.com                boucher@kbla.com
   || jguglielmo@scott-scott.com            zukin@kbla.com
11|| amburroughs@scott-scott.com           eyerly@kbla.com

12||                                       Edith M. Kallas
   ||                                       Joe R. Whatley, Jr.
13||                                       W. Tucker Brown
   ||                                       380 Madison Avenue, 23rd Floor
14||                                       New York, NY 10017
   ||                                       Tel: (212) 447-7070
15||                                       Fax: (212) 447-7077
   ||                                       ekallas@wdklaw.com
16||                                       jwhatley@wdklaw.com
   ||                                       tbrown@wdklaw.com
17||

18|| Stephen A. Weiss                      D. Brian Hufford
   || Christopher A. Seeger                 Robert J. Axelrod
19|| Diogenes P. Kekatos, *pro hac vice*   **POMERANTZ HAUDEK GROSSMAN**
   || James A. O'Brien III, *pro hac vice*  **& GROSS LLP**
20|| **SEEGER WEISS LLP**                  100 Park Avenue
   || 77 Water Street                       New York, NY 10017
21|| New York , NY 10005                   Tel: (212) 661-1100
   || Tel: (212) 584-0700                   Fax: (212) 661-8665
22|| Fax: (212) 584-0799                   dbhufford@pomlaw.com
   || sweiss@seegerweiss.com                rjaxelrod@pomlaw.com
23|| cseeger@seegerweiss.com
   || dkekatos@seegerweiss.com
24|| iobrien@seegerweiss.com               *Interim Co-Lead Counsel for Provider
   ||                                       Class and Attorneys for American Medical
25|| *Interim Co-Lead Counsel for          Association, California Medical
   || Subscriber Class Counsel for          Association, Medical Association of
26|| Plaintiff Michael Roberts*            Georgia, Connecticut State Medical
   ||                                       Society, Stephen D. Henry, M.D., James
27||                                       G. Schwendig, M.D. Carmen Kavali, M.D.*

28||

166

| | | |
|---|---|---|
| 1 | Mark N. Todzo, SBN 168389<br>Lisa Burger, SBN 239676 | Christopher P Ridout, SBN 143931<br>Devon Marie Lyon, SBN 218293 |
| 2 | **LEXINGTON LAW GROUP** | **RIDOUT AND LYON LLP** |
| 3 | 1627 Irving Street<br>San Francisco, CA 94122 | 555 East Ocean Boulevard, Suite 500<br>Long Beach, CA 90802 |
| 4 | Tel:  (415) 759-4111<br>Fax:  (415) 759-4112 | Tel: (562) 216-7380<br>Fax: (562) 216-7385 |
| 5 | mtodzo@lexlawgroup.com<br>lburger@lexlawgroup.com | c.ridout@ridoutlyonlaw.com<br>d.lyon@ridoutlyonlaw.com |

1   Mark N. Todzo, SBN 168389
Lisa Burger, SBN 239676
2   **LEXINGTON LAW GROUP**
1627 Irving Street
3   San Francisco, CA 94122
Tel:  (415) 759-4111
4   Fax:  (415) 759-4112
mtodzo@lexlawgroup.com
5   lburger@lexlawgroup.com

6   *Interim Co-Lead Counsel for*
*Subscriber Class and Attorneys for*
7   *Plaintiff J.B.W., a minor, by and*
*through Julz W., parent and*
8   *guardian ad litem*

9   Brian S. Kabateck, SBN 152054
Richard L. Kellner, SBN 171416
10   Joshua H. Haffner, SBN 188652
Artin Gholian, SBN 258280
11   **KABETECK KELLNER LLP**
644 South Figueroa Street
12   Los Angeles, CA 90017
Tel : (213) 217-5000
13   Fax: (213) 217-5010
ag@kbklawyers.com
14   bsk@kbklawyers.com
jhh@kbklawyers.com
15   rlk@kbklawyers.com

16   Eric D. Freed, SBN 164523
George K. Lang
17   Jeffrey A. Leon
**FREED & WEISS LLC**
18   111 West Washington Street, Ste
1331
19   Chicago, IL 60602
Tel (312) 220-0000
20   Fax: (312) 220-7777

21   eric@freedweiss.com
george@freedweiss.com
22   David M. Sternfield
**DAVID M. STERNFIELD LAW**
23   **OFFICES**
33 North Dearbon Street, Suite 300
24   Chicago, IL 60602

25

26

27

28

Christopher P Ridout, SBN 143931
Devon Marie Lyon, SBN 218293
**RIDOUT AND LYON LLP**
555 East Ocean Boulevard, Suite 500
Long Beach, CA 90802
Tel: (562) 216-7380
Fax: (562) 216-7385
c.ridout@ridoutlyonlaw.com
d.lyon@ridoutlyonlaw.com

Maury A. Herman
Stephen J. Herman
**HERMAN GEREL LLP**
230 Peachtree Street NW, Suite 2260
Atlanta, GA 30303
Tel: (404) 880-9500
Fax: (404) 880-9605
mherman@hermangerel.com
sherman@hermangerel.com

*Attorneys for Plaintiff North Peninsula*
*Surgical Center, L.P., et al.*
Donald E. Haviland, Jr.
**THE HAVILAND LAW FIRM LLC**
111 South Independence Mall East
Suite 1000
Philadelphia, PA 19106
Tel: 215-609-4661
Fax: 215-392-4400
haviland@havilandlaw.com

*Designated Counsel for Issues Relating to*
*Empire Blue Cross Blue Shield, a*
*Subsidiary of WellPoint and Attorney for*
*Plaintiffs D. Samsell, V. Samsell, and M.*
*Cooper,*

Barbara G. Quackenbos
Barry M. Epstein
Kevin P. Roddy
**WILENTZ, GOLDMAN & SPIZER PA**
90 Woodbridge Center Drive, Suite 900
Box 10
Woodbridge, NJ 07095
Tel: 732-636-8000
Fax: 732-855-6117

*Attorneys for Plaintiffs D. Samsell, V.*
*Samsell,, and M. Cooper*

1   Richard J. Burke
**RICHARD J. BURKE LLC**
2   1010 Market Street, Suite 650
St Louis, MO 63101
3   Tel: (314) 880-7000
rich@richardjburke.com
4
*Attorneys for Plaintiff S. Higashi*
5
Joseph N. Kravec, Jr.
6   Ellen M. Doyle
**STEMBER FEINSTEIN DOYLE**
7   **PAYNE & CORDES LLC**
429 Forbes Avenue, 17th floor
8   Pittsburgh, PA 15219
Tel: 412-281-8400
9   Fax: 412-281-1007
jkravec@stemberfeinstein.com
10   edoyle@stemberfeinstein.com
11
12   William T. Payne SBN 90988
**STEMBER FEINSTEIN DOYLE**
13    **PAYNE & CORDES LLC**
14   1007 Mount Royal Boulevard
Pittsburgh, PA 15223
15   Tel:  412-492-8797
16   Fax:  412-492-8978
17   Janet Lindner Spielberg
**LAW OFFICES OF JANET L**
18   **SPIELBERG**
12400 Wilshire Boulevard, Suite 400
19   Los Angeles, CA 90025
Tel: 310-392-8801
20   Fax: 310-278-5938
jlspielberg@jlslp.com
21
Michael D. Braun
22   **BRAUN LAW GROUP PC**
10680 W Pico Boulevard, Suite 280
23   Los Angeles, CA 90064
Tel: 310-836-6000
24   Fax: 310-836-6010
service@braunlawgroup.com
25
*Attorneys for Plaintiff M. Pariser*
26
27
28

Andrew S. Friedman
Elaine A. Ryan
**BONNETT FAIRBOURN FREIDMAN**
**AND BALINT**
2901 North Central Avenue, Suite 1000
Phoenix, AZ 85012-3311
Tel: 602-274-1100
Fax: 602-274-1199
afriedman@bffb.com

Tonna K. Farrar
**BONNETT FAIRBOURN FREIDMAN**
**AND BALINT**
600 West Broadway, Suite 900
San Diego, CA 92101
Tel: 619-756-7095
Fax: 602-274-1199

*Designated Counsel for Issues Relating to*
*Non-Physician and Non-Dental Providers*
*and Attorneys for Plaintiffs American*
*Podiatric Medical Association, California*
*Chiropractic Association, California*
*Psychological Association, and J. Peck*

Robert J. Rohrberger
**FOX ROTHSCHILD LLP**
75 Eisenhower Parkway
Roseland, NJ 07068
Tel: 973-922-7543
Fax: 973-922-9125
rrohrberger@foxrothschild.com

1    Richard B. Brualdi
     Sue Lee
2    **THE BRUALDI LAW FIRM**
     29 Broadway, Suite 2400
3    New York, NY 100006
     Tel: 212-952-0602
4    Fax: 212-952-0608
     rbrualdi@brualdilawfirm.com
5    slee@brualdilawfirm.com

6    *Attorneys for Plaintiff H. Bernard*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28